**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: | ) | Case No. 17-12870 |
| | ) | |
| REILLY-BENTON COMPANY, INC., | ) | Chapter 7 |
| | ) | |
| DEBTOR. | ) | Judge Grabill |
| | ) | |
| _____ | ) | |

**BRIEF OF THE CHAPTER 7 TRUSTEE AND THE CENTURY PARTIES**
**IN RESPONSE TO THE COURT'S INSTRUCTIONS**
**AT THE JANUARY 26 STATUS CONFERENCE**

## I.     Introduction and summary of argument

At the January 26, 2021 status conference, the Court instructed the parties to submit briefs addressing:

> whether the Court has the authority to use Rule 9019 to approve settlements that would compromise the rights of individuals who are not parties to those settlements by enjoining them from proceeding against entities other than the Debtor for their asbestos tort claims, when 1) this case was filed under chapter 7 and 2) the applicable Louisiana law grants tort claimants the right to proceed directly against insurance companies.[1]

First, the Court has the authority to issue an injunction in this Chapter 7 case that would bar third-party asbestos claimants from asserting claims against the settling "Century Parties" (Century Indemnity Company and Pacific Employers Insurance Company), who would be settling coverage disputes and buying back their insurance policies from the debtor's estate "free and clear" of interests under § 363(f).  In a mass or multiple tort case such as this one, where the claims are sufficiently numerous to pose a threat that policy proceeds may not be sufficient to pay all claims, the Fifth Circuit treats such policy proceeds as "property of the estate."  The

---

[1]     Court's Memo to Record of Status Conference held 1/26/2021 (Dkt. No. 102).

Bankruptcy Code expressly vests the Trustee with the power to sell such property of the estate free and clear of interests. Reflecting this fact, bankruptcy courts in Chapter 7 asbestos bankruptcies and in other types of Chapter 7 cases involving mass or multiple tort claims have authorized a trustee's sale of policies back to the issuing insurer under § 363(f), and issued injunctions under § 105 to protect the insurer from claims against the policies that were bought back on a free and clear basis. In such instances, the claims of persons who assert that the insurance covers their claims are not discharged or "wiped out," but instead are channeled to the proceeds of the sale, which are then distributed to claimants by the trustee under procedures approved by the relevant court.

Second, the Louisiana Direct Action Statute (the "Act") is no impediment to the Court exercising its authority to issue an injunction barring claims against settling insurers who have bought back their coverage on a "free and clear" basis. Claims brought pursuant to the Act, like any other litigation claims against a debtor, can be channeled to the proceeds of a settlement. The Fifth Circuit has recognized that the Act "does not create an independent cause of action against the insurer," but "merely grants a procedural right of action against the insurer where the plaintiff has a substantive cause of action against the insured."[2] All the Act does is allow a claimant to sue the debtor's insurer without joining the debtor to the action.[3] Where the insurance policy proceeds are property of the estate, as they are here, nothing in the Act precludes a direct claim against the insurer from being channeled to the proceeds of a "free and clear" sale approved under § 363(f). If it did, it would be preempted by the Bankruptcy Code because the Act would then interfere with the Trustee's express right to monetize assets of estate in order to make

---

[2]     *Sosebee v. Steadfast Ins. Co.*, 701 F.3d 1012, 1022 (5th Cir. 2012), quoting *Descant v. Adm'rs of Tulane Educ. Fund*, 639 So.2d 246, 249 (La. 1994).

[3]     *See* La. Rev. Stats. § 22:1269(B)(1)(a).

distributions that treat creditors equally. Construing the Act to permit such interference with the Trustee's administration of the estate would start a race to judgment among creditors, where some would win and the vast majority would lose, in violation of the central bankruptcy policy of equal treatment of creditors.

Of the more than 18,500 persons asserting asbestos claims against the Debtor, only eight persons – fewer than 0.01% – have objected to the proposed settlement. The eight persons who did object primarily argue that they are asserting "operations claims" to which the policies' aggregate limits do not apply, and thus the proceeds of the policies are not property of the estate. However, not only do Objectors' legal arguments ignore controlling Fifth Circuit law that renders the proceeds of the Century Parties' policies property of the estate, they have not substantiated the factual assertions underpinning their arguments. The Trustee believes the Objectors' factual assertions lack any merit. As a result, even if the Court concludes that the Objectors' legal arguments might be correct, it should defer ruling in favor of the objections until after the Trustee has had a chance to make his evidentiary case, including on the issue of whether the Objectors' claims are actually subject to aggregate limits. Instead, the Court should allow the Trustee to proceed to a hearing on this Motion.

## II.     Factual background

### A.     Procedural background

The Trustee has determined that the settlement he and his counsel negotiated with the Century Parties is in the best interests of all tort claimants against the Debtor, taken as a whole. If approved, the settlement would resolve serious disputes about the availability of insurance coverage under the Century Policies by bringing $3.5 million into the estate for the benefit of all asbestos claimants – including the Objectors.

The Trustee served his motion seeking approval of the settlement (the "Motion,"

Dkt. No. 56) on counsel for more than 18,500 asbestos claimants, as authorized by this Court's order concerning service in this case.[4]   To reach additional unknown claimants, the Trustee published notice of the Motion and the settlement in one national newspaper, in newspapers in New Orleans and throughout Louisiana, and in newspapers in Texas, Mississippi, and Alabama.[5]

Despite this broad outreach, only two objections were filed, by only eight named objectors.  One objection was filed by the Roussel law firm on behalf of four objectors who are all heirs of Nelcome J. Courville, Jr.  Those four objectors are essentially asserting a single claim deriving from Mr. Courville's alleged exposure to Debtor's asbestos.[6]  A second objection was filed by the Landry law firm on behalf of four persons.  The Landry objection provides no information whatsoever about those persons or the claims they are asserting against Debtor.[7]

In other words, upwards of 18,500 claimants have not objected to the Motion, the proposed settlement, the proposed free and clear sale, or the proposed injunction.  It is black-letter law that for purposes of § 363(f)(2), a "failure to object can constitute consent, if there was adequate notice," as there indisputably was here.[8]  Thus, all of the known and unknown claimants who failed to object to the Motion should be deemed to have consented to it and all of the relief sought therein.

---

[4]     *See Order Approving Notice Procedures*, Dkt. No. 45.

[5]     *See Submission of Proofs of Publication*, Dkt. No. 67.

[6]     *See* Roussel objection (Dkt. No. 70), listing as objectors Mary Patsy Soileau Courville, Mavis Todd Courville, Michael Wade Courville, and Joseph Eric Courville, all heirs of Nelcome J. Courville, Jr.

[7]     *See* Landry objection (Dkt. No. 72), listing as objectors Donald Bridges, Tina Danos, Mary Sanderson, and Frank Tranchina.

[8]     3 COLLIER ON BANKRUPTCY § 363.06 n.39 (16th ed. rev. 2020).  Although both objections make reference to other persons apparently represented by the Roussel or Landry firms, none of those other persons asserted a timely objection to the Trustee's motion, and thus each has waived any objection to the Motion.  *See id.*

Because it became apparent that Judge Brown would be unable to conduct a hearing on this matter before his retirement, the parties agreed to continue the approval hearing that had been scheduled for August 21, 2020. As a consequence, the Trustee has not yet filed a reply brief responding to the arguments made by the Objectors in opposition to his Motion. In addition, the Objectors have not yet been required to substantiate any of their allegations, including the Courville heirs' allegation that their derivative claims should be deemed to be "operations claims" not subject to aggregate limits in the policies.

## B. Substantive background

At the hearing on his Motion, the Trustee will prove that his settlement with the Century Parties meets all of the applicable requirements under Rule 9019 and § 363(f).[9] In short, the Trustee believes this settlement is a very good one for the asbestos claimants. Absent settlement, each claimant would first have to proceed in the tort system to establish the Debtor's underlying liability for the claimant's alleged injuries.[10] Then, the Trustee or each of the 18,500+ claimants would need to litigate a bevy of insurance issues with the Century Parties. That litigation would be expensive and inefficient for the estate, the claimants, and the courts. Absent settlement, the Trustee or each claimant who succeeds in obtaining a judgment will need to overcome numerous hurdles to any insurance recovery, and a stumble by any claimant over any of these hurdles could significantly jeopardize any recovery by all claimants and by the trustee.

Those hurdles to insurance recovery that the Trustee or any claimant could face include the following, among others:

---

[9]     *See* Motion, ¶¶ 14-18, for an in-depth discussion of the standards that must be satisfied.

[10]    Like all of the other claims pending against the Debtor, the Objectors' claims are contingent and unliquidated. They have not yet proven that the Debtor is liable to them, nor have they proven any amount of damages. The allegations on which they base their claims have not been submitted to a trier of fact.

- Century's contention that the limits of certain Century policies have already been exhausted, in which event coverage would not be available under those policies;

- Whether Century is correct that it could only be obligated to pay for its pro-rata share of Debtor's virile share of liability, severely limiting or even completely defeating Century's obligation to pay any established liability;

- Whether Century is correct that it could not be obligated to "drop down" in place of an underlying insurer (Reliance) that is insolvent, which again could mean that Century has a severely limited, or even no, further payment obligation;

- Whether a 2013 settlement agreement is effective, which would mean that Reilly Benton arguably released Century for certain claims;[11] and

- Whether coverage is finite and limited due to other insurance coverage rulings, including whether aggregate limits apply to claims arising from an operation that was completed before the Century policy periods, and how the policies' per-occurrence liability limits might apply.[12]

As the Trustee stated in his Motion, "there is substantial risk that the Century Parties' arguments might prevail, leaving no recovery for non-products/premises claims under any of the Century Policies," and the Century Parties' other legal and factual defenses, "if successful,

---

[11]     The effectiveness of this settlement agreement was the subject of litigation involving the Courville heirs and another insurer, Liberty Mutual, who was a party to the same agreement.  After the trial court ruled that the agreement was enforceable and justified a grant of summary judgment in Liberty Mutual's favor, the Louisiana Fourth Circuit Court of Appeals reversed the summary judgment, finding genuine issues of material fact existed, and remanded for further trial court proceedings.  *See Courville v. Lamorak Ins. Co.*, 301 So.3d 557 (La. App. 2020).  The Louisiana Supreme Court then denied an application for writ review.  302 So.3d 1100 (La. 2020) (mem.). The Century Parties, who did not take part in the litigation before the trial court or the court of appeals, would contest the applicability of the Fourth Circuit's ruling as to Century, and would also contest the correctness of the Fourth Circuit's ruling, which the Louisiana Supreme Court did not address when it summarily denied Liberty Mutual's application for interlocutory writ review. Thus, contrary to statements made by the Courville heirs' counsel to this Court, whether the 2013 settlement agreement is enforceable and bars coverage, as the trial court had concluded, remains an open, litigable question.  Most importantly, the Louisiana Supreme Court, in any future actual appeal (rather than a mere discretionary interlocutory writ), can impose the analysis of the trial court as the correct interpretation of the law.  It is not at all unusual for an appellate court in Louisiana to deny a writ, but then later rule based upon a complete record.

[12]     *See* Motion, ¶¶ 20-31, for a complete discussion of these hurdles that must be overcome for the Trustee or any claimants to recover insurance policy proceeds from the Century Parties.

would eliminate or substantially reduce any recovery with respect to non-products claims."[13]

Even if the Trustee and/or claimants overcame every one of these, and other, defenses to coverage that Century already has asserted, the Trustee was cognizant of the costs and delays of litigation of these coverage issues, the certainty provided by a settlement as opposed to litigation, and the benefit to claimants of obtaining policy proceeds from Century now as opposed to waiting for years to obtain coverage. He concluded that the Settlement Agreement "is in the best interests of the Estate" and the asbestos claimants because it would avoid "the uncertainty, attorneys' fees, costs, and delay associated with coverage litigation," and "provide cash funding for distributions to holders of allowed Asbestos Claims against the Estate."[14]

The Objectors for the most part do not challenge the Trustee's reasons in support of approval of the settlement. Instead, they primarily argue that the Trustee cannot sell the policies back to the Century Parties because the proceeds of the policies are not property of the estate and, therefore, the sale would interfere with their rights under the Louisiana Direct Action Statute. Although we address these arguments below, we note here that Objectors' principal argument cannot be squared with the Fifth Circuit's ruling in *OGA Charters*,[15] which held that, in a mass tort case like this one, policy proceeds are property of the estate.

The Roussel objection also argues that the Courville heirs' claim is an "operations claim" that is not subject to aggregate limits. Below, we explain why that argument is very likely without merit as a factual matter and, if Century's legal arguments are correct (the Trustee disputes those arguments), also without merit as a matter of law. In any event, their bare allegation,

---

[13]     Motion, ¶ 21.

[14]     *Id.*, ¶¶ 19, 20.

[15]     *Martinez v. OGA Charters, L.L.C. (In re OGA Charters, L.L.C.)*, 901 F.3d 599, 604 (5th Cir. 2018).

- 7 -

unsupported by any substantial evidence, cannot be a basis for barring the Trustee from presenting his case in support of the settlement at an evidentiary hearing.[16]

Of course, the fact that a miniscule percentage of claimants have objected to the Motion is not, by itself, a reason to deny it.  While the applicable Rule 9019 standards do require the Court to consider "the best interests of the creditors, with proper deference to their reasonable views,"[17] the Bankruptcy Code does not grant individual claimants the right to veto settlements they do not like, if the trustee proves that the settlement is fair and equitable, in the best interest of the estate and creditors, and otherwise meets the requirements of Rule 9019 and §§ 363(f) and 105. The Trustee "realistically cannot be required to demonstrate to the satisfaction of every individual creditor and the debtor, or to any compelling degree of certitude, that the settlement benefit to the [estate] and the value of the settled claim comprise a matched set."[18]  Instead, the Trustee need only reach an informed judgment that it would be "prudent to eliminate the inherent risks, delay and expense of prolonged litigation in an uncertain cause."[19]

## III.   Bankruptcy courts presiding over Chapter 7 cases have issued § 105 injunctions to enforce "free and clear" policy buy-backs under § 363(f), including in Chapter 7 asbestos bankruptcies

Bankruptcy courts in Chapter 7 cases, including asbestos cases, have issued precisely the kind of injunction sought here by the Trustee – an ancillary injunction enforcing a § 363(f) "free and clear" sale of insurance policies back to the insurer that issued the policies.  In

---

[16]   The Landry objection makes no argument that the claims of any of the four Landry objectors are "operations claims."

[17]   *In re Age Refining, Inc.*, 801 F.3d 530, 540 (5th Cir. 2015), quoting *In re Cajun Elec. Power Co-op.*, 119 F.3d 349, 356 (5th Cir. 1997).

[18]   *Kowal v. Malkemus (In re Thompson)*, 965 F.2d 1136, 1145 (1st Cir. 1992).  The Fifth Circuit cited this language with approval in *In re Solomon*, 1997 WL 680934 at *6 (5th Cir. Sept. 25, 1997), an unpublished *per curiam* decision.

[19]   *Id.*

such cases, the injunction channels the underlying tort claims to the settlement funds paid by the insurer to the trustee, for distribution by the trustee as authorized by the bankruptcy court.

The statutory support for such sales and ancillary injunctions is clear.  Sections 363(f) and 105, and Rule 9019, apply equally in Chapter 7 cases as they do in Chapter 11 cases. Section 103(a) of the Code states that, "[e]xcept as provided in section 1161 of this title, chapters 1, 3, and 5 of this title apply in a case under chapter 7, 11, 12, or 13 of this title."[20]  Thus, "Section 363 applies in cases under chapters 7, 11, 12, and 13 of the Bankruptcy Code."[21]  As a result, "Section 363(f) authorizes a chapter 7 trustee to sell property free and clear of any 'interest' in such property."[22]  In fact, a "chapter 7 trustee is the only party in a chapter 7 case that has standing to seek authority to sell under § 363 . . . or to settle claims against or on behalf of the estate under Fed R. Bankr. P. 9019."[23]  Likewise, Rule 9019 applies fully in Chapter 7 cases; indeed, a Chapter 7 trustee's settlements must be presented to the bankruptcy court for approval.[24]  Also of note, in *In re Vitek, Inc.*, a case involving more than 400 tort claims against the debtor, the Fifth Circuit approved a bankruptcy court's issuance of an injunction barring claims against insurance carriers

---

[20]     11 U.S.C. § 103(a).

[21]     *In re Ditech Holding Corp.*, 606 B.R. 544, 580 (Bankr. S.D.N.Y. 2019), citing 11 U.S.C. § 103(a).  *See also id.* at *607-08 ("section 363 provides the only mechanism to sell property free and clear in a chapter 7 case").

[22]     *N. Am. Serv. Holdings, Inc. v. Erick M. Black, L.L.C. (In re Realia, Inc.)*, 2012 WL 833372 at *10 (B.A.P. 9th Cir. Mar. 13, 2012), *aff'd*, 569 F. Appx. 544 (9th Cir. 2014).

[23]     *In re Ellis*, 2014 WL 1725810 at *1 (Bankr. S.D. Ind. Apr. 30, 2014).

[24]     *In re Jennings*, 2011 WL 1167877 at *4 (Bankr. M.D. Fla. Mar. 24, 2011) (explaining that Chapter 7 trustees must submit their proposed settlements to the bankruptcy court for approval under Rule 9019).  In *Jennings*, a Chapter 7 case, the court approved the trustee's settlement of a malpractice action and, over creditor objections, issued a bar order enjoining creditors of the debtor from asserting claims against the settling law firm.  *See id.* at *2, *5 (the court found that it "possessed the jurisdiction and authority to enter the Bar Order" and that "entry of the Bar Order was fair and equitable").

who settled with a Chapter 7 trustee.[25]

**A.     Bankruptcy courts in Chapter 7 asbestos bankruptcies have issued ancillary § 105 injunctions in support of sales "free and clear" under § 363(f)**

**1.     *In re National Service Industries* (Bankr. D. Del.)**

*National Service Industries* was commenced as a Chapter 7 case in the U.S. Bankruptcy Court for the District of Delaware.[26]  As of the petition date, the debtor in *NSI* was subject to approximately 28,000 personal injury and wrongful death claims arising from the installation and distribution of asbestos-containing insulation.[27]  The debtor's statement of financial affairs contained "555 pages listing thousands of pre-petition asbestos-related claims" that had been filed against the debtor across the country.[28]  In addition, the claims register contained approximately 9,800 claims, "the overwhelming majority of which" appeared to be personal injury or wrongful death claims.[29]  As in this case, the Chapter 7 trustee retained counsel experienced in asbestos insurance coverage issues to assist him with ensuring that the estate received the proceeds of its various insurance policies.[30]

---

[25]     *See Homsy v. Floyd (In re Vitek, Inc.)*, 51 F.3d 530 (5th Cir. 1995).  The district court had reversed the bankruptcy court's injunction, but the Fifth Circuit reversed the district court's ruling, reinstating the injunction with modifications.  *Vitek* does not appear to have included a sale of the policies under § 363(f).

[26]     *See* Voluntary Petition, Dkt. No. 1, *In re National Service Indus., Inc.*, No. 12-12057-MFW (Bankr. D. Del. July 7, 2012).

[27]     Trustee's Motion for Approval of Proposed Settlement With Westport Insurance Corporation and Sale of Insurance Policies to Westport Insurance Corporation Under 11 U.S.C. § 363(b), (f), and (m), Dkt. No. 127 at 2-3, *In re National Service Indus., Inc.*, No. 12-12057-MFW (Bankr. D. Del. Feb. 10, 2015).

[28]     *Id.* at 2.

[29]     *Id.* at 3.

[30]     *See* Application of Charles M. Forman, Chapter 7 Trustee, Pursuant to 11 U.S.C. §§ 327(e) and 328(a) for Authority to Employ and Retain Gilbert LLP as Special Insurance Counsel, Dkt. No. 52 at 2, *In re National Service Indus., Inc.*, No. 12-12057-MFW (Bankr. D. Del. June 28, (Continued...)

With the assistance of special insurance counsel, the Chapter 7 trustee entered into two buy-back settlements with insurers – one with Westport Insurance Corporation, and one with a group of insurers whose claims were administered by Resolute Management, a third-party administrator.

Westport agreed to pay $4.25 million to the Debtor's estate in exchange for mutual releases, the sale of the policies back to Westport "free and clear" pursuant to §§ 363(b)(1) and (f) of the Bankruptcy Code, and an injunction barring all future claims against Westport under the policies.[31]   The trustee provided notice of the motion to all known asbestos claimants and by publication in a single newspaper.[32]

The bankruptcy court granted the trustee's motion and, in addition to approving the proposed settlement, entered an ancillary injunction stating:

6.     Subject to all conditions set forth in the Supplemental Agreement including but not limited to, the Trustee's receipt of the Settlement Payment, and without need for further action, all Persons who hold or assert, or may in the future hold or assert, any claim against the Debtor, arising in connection with the activities covered by the Insurance Policies, or in connection with the Debtor's activities giving rise to claims made or to be made under the Insurance Policies, or any other person who may claim to be an insured, additional insured, or otherwise entitled to any benefit under the Insurance Policies, are permanently stayed, restrained, and enjoined from asserting any such claim or right to entitlement, from commencing a proceeding, or taking any other action against Westport for the purpose of obtaining any recovery or

2013); Order Pursuant to 11 U.S.C. §§ 327(e) and 328(a) Approving and Authorizing the Trustee's Employment and Retention of Gilbert LLP as Special Insurance Counsel, Dkt. No. 62 at 2, *In re National Service Indus., Inc.*, No. 12-12057-MFW (Bankr. D. Del. July 23, 2013).

[31]     Trustee's Motion for Approval of Proposed Settlement With Westport Insurance Corporation and Sale of Insurance Policies to Westport Insurance Corporation Under 11 U.S.C. § 363(b), (f), and (m), Dkt. No. 127 at 4-6, *In re National Service Indus., Inc.*, No. 12-12057-MFW (Bankr. D. Del. Feb. 10, 2015).

[32]     *Id*. at 11.  By contrast, the Trustee in this case published notice in one national newspaper, in seven newspapers in Louisiana, and in newspapers in Mississippi, Alabama, and Texas.  *See* Submission of Proofs of Publication, Dkt. No. 67.

- 11 -

other relief from Westport or under or in connection with the Insurance Policies.[33]

Approximately four years later, the NSI Chapter 7 trustee entered into another, similar settlement, this time with the Resolute-Administered Insurers. The sale was structured just like the Westport settlement – the insurer paid to buy back its coverage "free and clear" under § 363(f), the parties agreed to exchange mutual releases, and the trustee agreed to obtain an injunction to enforce the free and clear nature of the sale of the policies back to the insurers.[34] The bankruptcy court granted the trustee's motion, approved the proposed settlement, and issued the following injunction in support of the free and clear sale of the policies:

> 6.    Subject to all conditions set forth in the Agreement including, but not limited to, the Trustee's receipt of the Settlement Payment, and without need for further action, all Persons who hold or assert, or may in the future hold or assert, any claim against the Debtor, arising in connection with the activities covered by the Insurance Policies, or in connection with the Debtor's activities giving rise to claims made or to be made under the Insurance Policies, or any other person who may claim to be an insured, additional insured, or otherwise entitled to any benefit under the Insurance Policies, are permanently stayed, restrained, and enjoined from asserting any such claim or right to entitlement, from commencing a proceeding, or taking any other action against the Resolute-Administered Insurers, Resolute Management, Inc., in its capacity as claims administrator for the Resolute-Administered Insurers, and National Indemnity Company, in its capacity as reinsurer for the Resolute-Administered Insurers, for the purpose of obtaining any recovery or other relief from the Resolute-Administered Insurers or under or in connection with the Insurance Policies.[35]

---

[33]    Order (A) Authorizing the Trustee to Enter Into a Supplemental Settlement Agreement and Release By and Between National Service Industries, Inc. and Westport Insurance Corporation; and (B) Authorizing the Sale and Termination of All Rights and Interests in Certain Insurance Policies Related Thereto Under Section 363 of the Bankruptcy Code, Dkt. No. 140 at 6, *In re National Service Indus., Inc.*, No. 12-12057-MFW (Bankr. D. Del. March 17, 2015).

[34]    Trustee's Motion for Approval of Proposed Settlement With the Resolute-Administered Insurers and Sale of the Resolute-Administered Insurer Under 11 U.S.C. § 363(b), (f), and (m), Dkt. No. 338 at 3-5, *In re National Service Indus., Inc.*, No. 12-12057-MFW (Bankr. D. Del. March 14, 2019).

[35]    Order (A) Authorizing the Trustee to Enter Into a Settlement Agreement and Release By and Between National Service Industries, Inc. and the Resolute-Administered Insurers; and (B)

(Continued...)

2.      *In re C.P. Hall Co.* (Bankr. N.D. Ill.)

*In re C.P. Hall Co.* was filed as a Chapter 11 case in the U.S. Bankruptcy Court for the Northern District of Illinois, but was converted to a case under Chapter 7 on October 22, 2012.[36] The debtor in *C.P. Hall* had distributed Johns-Manville raw asbestos to customers primarily in the Midwest and California, and had been "sued as an asbestos defendant in thousands of lawsuits."[37]

As in this case and *NSI*, the Chapter 7 trustee retained counsel experienced in asbestos insurance coverage issues to assist him with ensuring that the estate received the proceeds of its various insurance policies.[38]

With the assistance of counsel, the Chapter 7 trustee entered into two buy-back settlements with insurers – one with Arrowood Indemnity Company, and one with Columbia Casualty Company. Both settlements were structured similarly to the two settlements in *NSI* – the insurers paid to buy back their policies "free and clear" under § 363(f), the parties agreed to exchange mutual releases, and the trustee agreed to obtain an injunction to enforce the free and

---

Authorizing the Sale and Termination of All Rights and Interests in Certain Insurance Policies Related Thereto Under Section 363 of the Bankruptcy Code, Dkt. No. 353 at 6, *In re National Service Indus., Inc.*, No. 12-12057-MFW (Bankr. D. Del. Apr. 15, 2019).

[36]      *See* Order Granting Motion to Convert Case From Chapter 11 to Chapter 7, Dkt. No. 180, *In re C.P. Hall Co.*, No. 11-26443 (Bankr. N.D. Ill. Oct. 22, 2012).

[37]      Debtor's Motion for Extension of Exclusive Periods for Filing a Plan and Obtaining Confirmation Thereof, Dkt. No. 27 at 5 of 9, *In re C.P. Hall Co.*, No. 11-26443 (Bankr. N.D. Ill. Oct. 14, 2011).

[38]      *See* Chapter 7 Trustee's Motion for an Order (I) Approving the Settlement Agreement and Release Between the Trustee and Arrowood Indemnity Company; (II) Approving the Sale of Certain Insurance Policies to Arrowood Indemnity Company; and (III) Issuing An Injunction In Favor of Arrowood Indemnity Company Pursuant to the Sale of Certain Insurance Policies, Dkt. No. 378 at 6, *In re C.P. Hall Co.*, No. 11-26443 (Bankr. N.D. Ill. Sept. 19, 2018); Trustee's Application to Employ Special Counsel, Dkt. No. 338, *In re C.P. Hall Co.*, No. 11-26443 (Bankr. N.D. Ill. Nov. 25, 2015); Order Authorizing Trustee to Employ Special Counsel – Joseph D. Frank, Dkt. No. 339, *In re C.P. Hall Co..*, No. 11-26443 (Bankr. N.D. Ill. Dec. 2, 2015).

clear nature of the sale of the policies back to the insurers.[39]   The approval motions for each settlement stated that the insurers' payments pursuant to their respective settlement agreements "will enable the Trustee to arrange for an orderly distribution of those monies (other than that portion needed to fund the administration of this Chapter 7 Case) to claimants who are asserting Asbestos Claims against the Debtor, while avoiding the costs of litigating or otherwise resolving any disputes as to the applicability or accessibility of the coverage under the Alleged Insurance Policy for the Asbestos Claims that [each insurer] and the Trustee otherwise might have absent the settlement agreement."[40]

In addition, both of the trustee's motions stated that the releases and requested injunctions "are in furtherance of and are intended to effectuate the Section 363 sale in that they will enjoin any successor liability claims related to the Alleged Insurance Policies and ensure that [each insurer] takes ownership of the Alleged Insurance Policies free and clear of any interests. Courts in this district and in other jurisdictions have approved similar provisions in aid of so-called 'policy buyback' settlements."[41]

---

[39]     *See* Chapter 7 Trustee's Motion for an Order (I) Approving the Settlement Agreement and Release Between the Trustee and Arrowood Indemnity Company; (II) Approving the Sale of Certain Insurance Policies to Arrowood Indemnity Company; and (III) Issuing An Injunction In Favor of Arrowood Indemnity Company Pursuant to the Sale of Certain Insurance Policies, Dkt. No. 378 at 6 of 17, *In re C.P. Hall Co.*, No. 11-26443 (Bankr. N.D. Ill. Sept. 19, 2018); Chapter 7 Trustee's Motion for an Order (I) Approving the Settlement Agreement and Release Between the Trustee and Columbia Casualty Company; (II) Approving the Sale of Certain Insurance Policy to Columbia Casualty Company; (III) Approving Compensation Relating Thereto; and (IV) Issuing An Injunction In Favor of Columbia Casualty Company Pursuant to the Sale of Alleged Insurance Policy, Dkt. No. 379 at 3-4 of 16, *In re C.P. Hall Co.*, No. 11-26443 (Bankr. N.D. Ill. Sept. 19, 2018).

[40]     *Id*. at 7 of 16.

[41]     Chapter 7 Trustee's Motion for an Order (I) Approving the Settlement Agreement and Release Between the Trustee and Arrowood Indemnity Company; (II) Approving the Sale of Certain Insurance Policies to Arrowood Indemnity Company; and (III) Issuing An Injunction In

(Continued...)

The bankruptcy court granted both of the trustee's motions, approved the two

proposed settlements, and issued injunctions in support of the free and clear sales of the policies.

The injunction relating to the Arrowood settlement stated:

> 7.     Pursuant to 11 U.S.C. §§ 105(a) and 363(f), an Injunction is hereby issued, effective as of the Approval Date.  All Persons who have held or asserted, who hold or assert, or who may in the future hold or assert, any Claim, including without limitation any Asbestos Claim, or Interest of any kind or nature against or in the Estate, the Debtor, the Alleged Insurance Policies, or Arrowood relating to, based upon, arising under or out of, derived from or attributable to (i) activities of the Debtor or any of its predecessors, or (ii) the Alleged Insurance Policies (including without limitation any Asbestos Claim, Insurance Coverage Claim, or ***Direct Action Claim***), whenever or wherever arising or asserted (whether in the nature of or sounding in tort, contract, warranty or any other theory of law, equity or admiralty), are permanently restrained and enjoined from asserting any such Claims or Interests against Arrowood and from continuing, commencing, or otherwise proceeding or taking any action against Arrowood to enforce such Claims or Interests or for the purpose of directly or indirectly collecting, recovering or receiving payments from Arrowood with respect to any such Claim or Interest.[42]

The injunction relating to the Columbia settlement was almost identical.  It stated:

> 7.     Pursuant to 11 U.S.C. §§ 105(a) and 363(f), an Injunction is hereby issued, effective as of the Approval Date.  All Persons who have held or asserted, who hold or assert, or who may in the future hold or assert, any Claim, including without limitation any Asbestos Claim, or Interest of any kind or nature against or in the Estate, the Debtor, the Columbia Policy, or Columbia relating to, based upon, arising under or out of, derived or attributable to (i) activities of the Debtor or any of its predecessors, or (ii) the Columbia Policy (including without limitation any Asbestos Claim, Insurance Coverage Claim, or ***Direct Action Claim***), whenever or wherever arising or asserted (whether in the nature of or sounding in tort, contract, warranty or any other theory of law, equity or admiralty), are permanently restrained and enjoined from

---

Favor of Arrowood Indemnity Company Pursuant to the Sale of Certain Insurance Policies, Dkt. No. 378 at 12 of 16, *In re C.P. Hall Co.*, No. 11-26443 (Bankr. N.D. Ill. Sept. 19, 2018); Chapter 7 Trustee's Motion for an Order (I) Approving the Settlement Agreement and Release Between the Trustee and Columbia Casualty Company; (II) Approving the Sale of Certain Insurance Policies to Columbia Casualty Company; (III) Approving Compensation Relating Thereto; and (IV) Issuing An Injunction In Favor of Columbia Casualty Company Pursuant to the Sale of Certain Insurance Policies, Dkt. No. 379 at 11 of 16, *In re C.P. Hall Co.*, No. 11-26443 (Bankr. N.D. Ill. Sept. 19, 2018).

[42]     Order Granting Motion to Approve Settlement With Arrowood Indemnity Company and the Sale of Certain Insurance Policies, Dkt. No. 385 at 2, *In re C.P. Hall Co.*, No. 11-26443 (Bankr. N.D. Ill. Nov. 8, 2018) (emphasis added).

asserting any such Claims or Interests against Columbia and from continuing, commencing, or otherwise proceeding or taking any action against Columbia to enforce such Claims or Interests or for the purpose of directly or indirectly collecting, recovering or receiving payments from Columbia with respect to any such Claim or Interest.[43]

Note that among the types of claims that were expressly enjoined by both of the *C.P. Hall* approval orders were "Direct Action Claims."

\* \* \*

In sum, the bankruptcy courts in the Chapter 7 asbestos bankruptcies of *National Service Industries* and *C.P. Hall* each issued two orders approving insurance settlements, authorizing the sale by a trustee of insurance policies back to the issuing insurer "free and clear" under § 363(f), and issuing injunctions under § 105 in order to enforce the "free and clear" nature of the sales. This is the same relief the Trustee is seeking in this case in connection with his proposed settlement with the Century Parties and the sale back to the Century Parties, on a "free and clear" basis, of the insurance policies they issued to the Debtor.

**B.      Bankruptcy courts in Chapter 7 non-asbestos bankruptcies have also issued ancillary § 105 injunctions in support of sales "free and clear"**

Bankruptcy courts presiding over Chapter 7 cases involving mass or multiple tort claims other than asbestos have also issued ancillary § 105 injunctions in support of sales of insurance policies, "free and clear" of interests under § 363(f), back to the insurers who issued those policies.

**1.      *In re Sunland, Inc.* (Bankr. D. N.M.)**

In *In re Sunland, Inc*, the debtor faced personal injury and business claims arising

---

[43]      Order Granting Motion to Approve Settlement With Columbia Casualty Company and the Sale of A Certain Insurance Policy, Dkt. No. 384 at 2, *In re C.P. Hall Co.*, No. 11-26443 (Bankr. N.D. Ill. Nov. 8, 2018) (emphasis added).

from a 2012 salmonella outbreak at its peanut processing plant.[44]  After extensive negotiations, the Chapter 7 trustee and one of the debtor's insurers, Great American, reached a settlement of insurance coverage disputes under which the insurer paid the estate to buy back its obligations under the insurance policies on a "free and clear" basis under § 363(f), with the sales proceeds to be used to pay salmonella-related claims against the debtor.  The settlement was conditioned on the court issuing an injunction barring creditors from pursuing any claims against Great American, instead channeling all such claims to the estate and the settlement fund.[45]  One creditor objected to the proposed settlement and the proposed injunction.

The bankruptcy court rejected all of the objector's arguments.  It held, for example, that "[a]ttachment of a creditor's interest to the proceeds of the sale provides the adequate protection required under § 363(e)," and further that issuance of an "actual injunction barring creditors from suing a purchaser of estate assets is . . . necessary and appropriate to give the 'free and clear' aspect of § 363(f) meaning."[46]  In addition, and particularly pertinent here, the court rejected the objector's argument that the court could not issue such an injunction in a Chapter 7 case, stating:

> It makes no difference whether the channeling injunction is entered in a Chapter 11 or Chapter 7 case, so long as it furthers a § 363(f) sale.  The cases cited above involved § 363(f) sales in a variety of contexts, including trustee sales in Chapter 7 and debtor in possession sales in Chapter 11 (both with and without a contemplated plan of reorganization or liquidation).[47]

The court also rejected an argument it could not issue a channeling injunction because the case before it was not a § 524(g) case.  The court stated:

---

[44]    *In re Sunland, Inc.*, 2014 WL 7011747 (Bankr. D. N.M. Dec. 11, 2014).

[45]    *Id*. at *1.

[46]    *Id*. at *5.

[47]    *Id*. at *6.

Sjaak's argues that because § 524(g) provides a mechanism for entry of a channeling injunction in a certain limited instance, by implication no other channeling injunction may be entered. This argument lacks merit. Section 524(g) applies only when a discharge is granted (there will be no discharge in this case), only in Chapter 11 cases (this is a Chapter 7), only when a plan of reorganization is confirmed (there will be no plan in this case), and only when the debts at issue are asbestos-related (Sunland manufactured peanut butter). The notion that Congress intended to limit channeling injunctions to § 524(g) is contradicted by § 363(f) and has been rejected by the courts that have entered channeling injunctions to carry out § 363(f) sales.[48]

The injunction entered by the *Sunland* court stated:

J.       Pursuant to Sections 105(a) and 363 of the Bankruptcy Code, all Persons who have held or asserted, who hold or assert, or who may in the future hold or assert any Claim or Interest of any kind or nature against Great American, Sunland, the Estate, the Policies, Shearer, Other Sunland Officers and Directors, or any other Person who may claim to be an insured, named insured, additional insured, or otherwise entitled to any insurance coverage or benefits based upon, arising under or out of, derived from or attributable to (i) activities of Debtor that give rise to Claims under the Policies, (ii) the Bankruptcy Case or (iii) the Policies, including without limitation, any Claim arising from or related to the Salmonella Outbreak or Recall Events, and any Insurance Coverage Claim, Direct Action Claim, Additional Insured Claims, or Claims relating to or arising from the Tort Actions whenever or wherever arising or asserted (including all thereof in the nature of or sounding in tort, contract or any other theory of law or equity) shall be and hereby are permanently stayed, restrained and enjoined from asserting, continuing, commencing, or otherwise proceeding or taking any action to enforce such Claims or Interests against Great American, Sunland, the Trustee, the Estate, the Policies, Shearer, Other Sunland Officers and Directors, or any other Person who may claim to be an insured, named insured, Additional insureds, or otherwise entitled to any insurance coverage or benefits, for the purpose of directly or indirectly collecting, recovering or obtaining any recovery from Great American or the Policies with respect to any such Claim or Interest.[49]

The order approving the settlement and authorizing the sale further provided that

"the Policies shall be and hereby are transferred to Great American Alliance Insurance Company,

---

[48]       *Id.*

[49]       Amended Order Approving Settlement Agreement and Insurance Policies Buyback Between Great American Alliance Insurance Company, Jimmie Shearer, and the Trustee, Dkt. No. 581 at 10, *In re Sunland, Inc.*, No. 13-13301-t7 (Bankr. D. N.M. Oct. 9, 2014). The court's opinion indicates that it was entered after the order. *See In re Sunland, Inc.*, 2014 WL 7011747 at *1 & n.2.

free and clear of any and all Interests (of all Persons in, to and with respect to the Policies, including without limitation any and all Claims against Great American)," and that "[a]ny and all such Interests shall attach to the Settlement Amount."[50]

## 2.    *In re Peanut Corp. of America* (Bankr. W.D. Va.)

One of the cases cited in *Sunland* was *In re Peanut Corporation of America*, a Chapter 7 case in which the trustee entered into an insurance settlement with one group of the debtor's insurers.  Like the debtor in *Sunland*, the debtor in *Peanut Corp.* faced salmonella tort claims, for which the Chapter 7 trustee sought coverage from debtor's insurers.

As in the settlement here, the settlement in *Peanut Corp.* was structured as a sale "free and clear" under § 363(f) of the insurance policies back to the issuing insurer.  The settlement was conditioned on the court issuing an injunction channeling all claims against the settling insurers to the proceeds of the settlement.  The court explained that "[i]ssuing a supplemental injunction under Section 105(a) of the Bankruptcy Code is essential to give effect to the sale of the Policies to the Hartford Insurers free and clear of Interests pursuant to Section 363(f) of the Bankruptcy Code."[51]

The court issued an injunction stating:

G.    Pursuant to Sections 105(a) and 363 of the Bankruptcy Code, all Persons who have held or asserted, who hold or assert, or who may in the future hold or assert any Claim or Interest of any kind or nature against or in any of the Debtors, their bankruptcy estates, the Policies, or the Hartford Insurers based upon, arising under or out of, derived from or attributable to (i) activities of Debtors that give rise to Claims under the Policies, or (ii) the Policies, including without limitation any

---

[50]    Amended Order Approving Settlement Agreement and Insurance Policies Buyback Between Great American Alliance Insurance Company, Jimmie Shearer, and the Trustee, Dkt. No. 581 at 9, 10, *In re Sunland, Inc.*, No. 13-13301-t7 (Bankr. D. N.M. Oct. 9, 2014).  The order further stated that "[n]othing contained herein is intended to nor shall be deemed to constitute a determination of the extent, validity or priority of any such Interests that may be asserted against the Settlement Amount").  *Id.* at 10.

[51]    *In re Peanut Corp. of America*, 2009 WL 8757732 at *3 (Bankr. W.D. Va. Oct. 2, 2009).

Claim arising from or related to the Salmonella Outbreak, and any Extra–Contractual Claim, Insurance Coverage Claim or Direct Action Claim, whenever or wherever arising or asserted (including all thereof in the nature of or sounding in tort, contract, warranty or any other theory of law, equity or admiralty) shall be and hereby are permanently stayed, restrained and enjoined from asserting any such Interests against Hartford and from continuing, commencing, or otherwise proceeding or taking any action against Hartford to enforce such Interests or Claims or for the purpose of directly or indirectly collecting, recovering or receiving payments from Hartford with respect to any such Claim or Interest.[52]

The court also ordered that all interests in the policies "shall attach to the Settlement Amount (as that term is defined in the Settlement Agreement) with the same validity, priority, force, and effect as such Interest holders had in the Policies prior to the entry of this Order."[53]

### 3.   *In re The Flintkote Co. (Bankr. D. Del.)*

During the January 26, 2021 status conference, the Court asked about the settlement by Aviva Insurance Company of Canada in *In re The Flintkote Company*, which led to the entry of an injunction as noted in footnote 35 of the Trustee's Motion. Although *Flintkote* was a Chapter 11 case in which a § 524(g) plan was eventually confirmed, when the bankruptcy court approved the sale of Aviva's policies back to the insurer under § 363(b), and issued an ancillary injunction in Aviva's favor under § 105, it was highly uncertain whether the debtor would be able to confirm any § 524(g) plan. Thus, *Flintkote* is properly regarded as another example of a court, in an asbestos case, issuing an ancillary § 105 injunction outside the confines of a plan of reorganization.

Specifically, the settlement agreement between the debtor and the settling insurer, Aviva, was entered into on June 11, 2010 – several years before the debtor's plan was confirmed. The settlement agreement nevertheless required Aviva to pay the full settlement amount into an

---

[52]   *Id.* at *5.

[53]   *Id.* at *4. *See also id.* at *5 (ordering that "any and all Interests that are enjoined pursuant to Paragraph G hereto shall attach exclusively to the Settlement Amount, subject to the terms and conditions of the Settlement Agreement or as otherwise directed by the Court").

escrow account just five days after execution of the settlement agreement.[54] Aviva and the debtor were then jointly required to instruct the escrow agent to transfer the full settlement amount to the debtor within five business days after the debtor advised Aviva that the bankruptcy court had entered the "Sale-Approval Order." The bankruptcy court docketed that order on July 14, 2010; that order included an immediately-applicable § 105 injunction to enforce the free and clear sale of the Aviva policies back to Aviva.[55]

Thus, at the time the § 105 injunction was entered, Flintkote's plan had not been confirmed and there was no assurance that the debtor would ever be able to obtain confirmation of a plan under § 524(g). An earlier version of the debtor's plan had failed to secure the 75% affirmative vote required under § 524(g), and thus the plan had to be renegotiated, modified, and resolicited.[56] There were also disputed issues about whether the debtor could meet the "ongoing business" requirement under § 524(g).[57] The bankruptcy court did not actually confirm a plan until December 21, 2012 – 2-½ years after it entered the § 105 injunction barring claims against Aviva.[58] *Flintkote* thus fully supports this Court's ability to enter a § 105 injunction in support of

---

[54] Settlement Agreement and Release By and Between The Flintkote Companies and Aviva Insurance Company of Canada (Dkt. No. 5097, Exh. 1 at 13-14), *In re The Flintkote Co.*, No. 04-11300 (Bankr. D. Del. June 11, 2010).

[55] Order Approving Settlement Agreement and Release By and Between The Flintkote Companies and Aviva Insurance Company of Canada (Dkt. No. 5173, ¶ 9), *In re The Flintkote Co.*, No. 04-11300 (Bankr. D. Del. July 14, 2010).

[56] *See, e.g.*, Motion of Debtors for Continuance of Confirmation Proceedings and Related Deadlines (Dkt. No. 3957), *In re The Flintkote Co.*, No. 04-11300 (Bankr. D. Del. Jan. 7, 2009).

[57] *See, e.g.*, *Imperial Tobacco Canada Limited v. The Flintkote Co. (In re The Flintkote Co.)*, 526 B.R. 515, 524-25 (D. Del. 2014).

[58] *See id.* at 519. One party appealed, to the court of appeals, the district court's order affirming the bankruptcy court's confirmation order. That appeal was settled, and the Third Circuit remanded the matter to the bankruptcy court, which subsequently entered a new order confirming the revised plan. The district court then affirmed the second confirmation order. *See* (1) Findings
(Continued...)

a § 363(f) "free and clear" sale in the present circumstances.[59]

## IV. The Louisiana Direct Action Statute is no impediment to this Court entering a § 105 injunction in support of the proposed "free and clear" policy buy-back under § 363(f)

The Objectors have argued that this Court should not approve the Trustee's proposed settlement with the Century Parties, or issue the requested injunction, because they have rights to pursue coverage directly from the Century Parties pursuant to the Louisiana Direct Action Statute (the "Act").[60] At times, it appears that they are suggesting that the Bankruptcy Code cannot affect any rights they may have under the Act, full stop. At other times, it appears they are arguing that because they are asserting "operations claims" that are not subject to aggregate limits in the Century Policies, their rights to coverage under those policies are not "property of the estate" that can be settled by the Trustee. As shown below, Objectors' arguments lack merit.

### A. To the extent the Act conflicts with the Bankruptcy Code, the Act is preempted pursuant to the Supremacy Clause of the U.S. Constitution

The Act is preempted by the Bankruptcy Code, to the extent of any conflicts between the two. Under the Supremacy Clause of the U.S. Constitution, a congressional enactment

---

of Fact, (2) Conclusions of Law, (3) Order and Notice of Certain Bar Dates, and (4) Order Regarding Confirmation Of the Amended Joint Plan Of Reorganization In Respect Of The Flintkote Company And Flintkote Mines Limited (As Modified February 9, 2015), Dkt. No. 9059, *In re The Flintkote Co.*, No. 04-11300 (Bankr. D. Del. Aug. 10, 2015), *aff'd*, No. 15-204 (D. Del. Aug. 13, 2015).

[59]    Of particular significance, the bankruptcy judge who issued the § 105 channeling injunction to support the § 363(f) sale in *Flintkote*, even though it was uncertain whether any § 524(g) plan would ever be confirmed in that case, was the same judge who presided over the bankruptcy case of Combustion Engineering, in which the Third Circuit ruled that § 105 could not be used to evade § 524(g) requirements. *See In re Combustion Engineering*, 391 F.3d 190, 233-34 (3d Cir. 2004). One would think that Judge Fitzgerald would not have issued the injunction requested in *Flintkote* if she had any concern that doing so would have run afoul of the Third Circuit's earlier decision in *Combustion Engineering.*

[60]    La. Rev. Stats. § 22:1269.

takes precedence over conflicting state law.[61] The Act is no more sacrosanct that any other provision of state law, in Louisiana or elsewhere, that is in conflict with a provision of the Bankruptcy Code.

Thus, to the extent proceeds of an insurance policy are property of the estate under the Bankruptcy Code, the Act cannot be construed to permit claimants to exercise control over such property of the estate in derogation of provisions in the Bankruptcy Code that expressly grant the Trustee power to administer property of the estate, including the power under § 363(f) to sell such property free and clear of interests, with court approval.

As shown below, the Century Policies and the proceeds of those policies are property of the debtor's bankruptcy estate. As such, the Trustee's right under the Bankruptcy Code to sell the policies and settle the proceeds cannot be constrained by the Act, which is preempted to the extent of any conflict with the Bankruptcy Code.[62]

B.  **The proceeds of the Century Policies are property of the Debtor's bankruptcy estate, subject to administration by the Trustee**

The proceeds of the Century Policies are property of the Debtor's bankruptcy estate, subject to administration by the Trustee. This is true notwithstanding Objectors' invocation of the

---

[61]    U.S. Const. art. VI, cl. 2 (federal laws, such as those concerning bankruptcy, "shall be the supreme Law of the Land; . . . [the] Laws of any State to the Contrary notwithstanding"").

[62]    The Courville heirs also argue that the proposed settlement violates La. Rev. Stats. § 22:1262, which bars post-injury retroactive annulment of an insurance policy. (Roussel Obj. at 9.) The proposed settlement here does not annul the Century Policies; rather, the Trustee is simply resolving coverage disputes under those policies by selling them back to the Century Parties, in exchange for a payment of $3.5 million that would be distributed to persons having claims against Debtor. *See, e.g.*, Transcript of Oct. 23, 2015 Proceedings, Dkt. No. 79 at 50:9-10, *In re Eagle, Inc.*, No. 15-12437 (Bankr. E.D. La. Nov. 3, 2015) (Judge Brown rejecting argument by the Roussel firm that a settlement agreement between a debtor and an insurer is an attempt to annul insurance policies in violation of § 22:1262, because the policy proceeds paid through the settlement will "be available for all claimants"). In any event, to the extent § 22:1262 conflicts with Bankruptcy Code § 363(f), which expressly allows a trustee to sell property of the estate free and clear of interests, the state statute would be preempted.

Act.

The law in the Fifth Circuit is clear regarding when insurance policy proceeds are property of the estate. A personal injury claimant's direct action claim against an insurer does not implicate property of the estate where the claim "is the result of an isolated accident to which the mass tort precedents are inapplicable."[63] However, "where a siege of tort claimants threaten the debtor's estate over and above the policy limits, we classify the proceeds as property of the estate."[64] As shown below, the Court has already found in this case that the proceeds of the Century Policies are property of the estate. As a result, any direct action claims the Objectors might seek to assert to recover those proceeds would interfere with the Trustee's administration of Debtor's bankruptcy estate.

1.  **Fifth Circuit case law establishes that, in a case like this one involving multiple tort claims against the Debtor's insurance, policy proceeds are property of the Debtor's bankruptcy estate**

In *In re OGA Charters*, a Chapter 7 case, the Fifth Circuit made "official" that the proceeds of liability insurance policies are property of the estate when there are multiple tort claims seeking payment of the same policy limits. Such a circumstance "giv[es] rise to an equitable interest of the debtor in having the proceeds applied to satisfy as much of those claims as possible."[65] The court cited the Collier treatise as support for the court's conclusion:

> When there are multiple claimants to the policy proceeds, the court should be able to oversee the allocation of the proceeds among claimants. Although policy proceeds are not available to all creditors, and in that sense are different from other property of the

---

[63]    *Sosebee v. Steadfast Ins. Co.*, 701 F.3d 1012, 1023 (5th Cir. 2012).

[64]    *Martinez v. OGA Charters, L.L.C. (In re OGA Charters, L.L.C.)*, 901 F.3d 599, 604 (5th Cir. 2018). *See also Sosebee*, 701 F.3d at 1025 ("Where a court finds insurance proceeds to be property of the bankruptcy estate the automatic stay will apply to direct actions against insurers, *see* 11 U.S.C. § 362(a)(3), but where the proceeds of the insurance policies are not property of the bankruptcy estate, direct actions against insurers will not be affected by the stay").

[65]    *Id.*

estate, they may be available to a class of creditors whose claims are covered by insurance, and may be insufficient to satisfy that class fully.  In such a case, oversight by the court is necessary to assure an equitable distribution of the available assets.[66]

The Fifth Circuit in *OGA Charters* pointed out that a "holding to the contrary would 'prevent [the] bankruptcy court from marshalling the insurance proceeds, and, along with the other assets, arranging for their distribution so as to maximize their ability both to satisfy legitimate creditor claims and to preserve the debtor's estate.'"[67]

This Court (Judge Brown) addressed at the very outset of this bankruptcy case whether the proceeds of Debtor's insurance policies are property of the estate.  In opposing a motion filed by clients of the Roussel law firm to lift the automatic stay so that they could proceed with a tort lawsuit against the Debtor, the Trustee argued that "this case is a mass tort case . . . where the claims will exhaust the insurance proceeds."[68]  Accordingly, the Trustee contended that the automatic stay applied to the Roussel clients' claims, and that the stay should not be lifted to permit claims against the Debtor to proceed.  This Court agreed and declined to lift the stay, finding that the Debtor's estate was faced with a siege of tort claimants that threatened to exceed the policy limits of the policies of the Debtor's insurers, making the Debtor's policy proceeds property of the estate to be administered proportionally among the tort claimants in the bankruptcy case.[69]

Subsequently, Judge Brown approved the Trustee's retention of special insurance counsel for the express purpose, among other things, of "maximiz[ing] any insurance recoveries,"

---

[66]   *Id*., citing 3 COLLIER ON BANKRUPTCY ¶ 362.03 (16th ed.).

[67]   *Id.* at 604-05, quoting *Tringali v. Hathaway Mach. Co.*, 796 F.2d 553, 560 (1st Cir. 1986). *See also Sosebee*, 701 F.3d at 1023 (noting that if the proceeds of insurance policies are not treated as property of the estate in mass tort bankruptcies, "the court would not otherwise be able to prevent a free-for-all against the insurer outside the bankruptcy proceeding"), quoting *In re Edgeworth*, 993 F.2d 51, 56 n.21 (5th Cir. 1993).

[68]   Dkt. No. 6 at 2.

[69]   Dkt. No. 12.  *See also* Dkt. No. 39 at 6.

"[n]egotiating settlements, agreements-in-principle or other resolutions of coverage disputes," and "[a]ssisting the Trustee with any insurance-related matters arising in connection with the formulation of pleadings and orders relating to compromise agreements, sales, and injunctions as may be necessary for the recovery of insurance proceeds for distributions to claimants."[70]  In approving the employment of special insurance counsel, the Court specifically overruled the Roussel firm's objection, which had argued that such retention was not necessary because the proceeds of Debtor's insurance policies were not property of the estate and instead were owned by the claimants.[71]

            The Objectors urge the Court to reexamine these previous rulings, contending yet again that their claims are "operations claims" not subject to aggregate limits and, thus, payment of their claims by Debtor's insurers will not affect the amounts available to other claimants. However, as explained below, it is highly unlikely that any of the Objectors' claims are actually "operations" claims.  More to the point, they have not proven that any recovery by them from Debtor's insurance would not come at the expense of other claimants.  If all a claimant had to do in a situation like this case is allege that his claim is not subject to aggregate limits in order to recover directly from insurers, the result would be, as the Fifth Circuit warned in *Edgeworth*, a "free-for-all against the insurer outside the bankruptcy proceeding," which is, in effect, a free-for-

---

[70]    Dkt. No. 36 (Amended and Supplemental Application for Employment of Special Counsel *Nunc Pro Tunc* to May 1, 2019), at 3, granted by Dkt. No. 42.

[71]    *See* Dkt. No. 38 at 3 (Roussel clients' objections, arguing that "insurance proceeds are not property of a bankruptcy estate"); Dkt. No. 47 (transcript of June 26, 2019 hearing) at 13-14, 19 (reiterating the same argument); *id.* at 20 (Judge Brown stating, "I am going to overrule the objections and grant" the employment motion"); Dkt. No. 42 at 2 (order approving the proposed employment and stating, "[t]he Objection filed by the Roussel Plaintiffs is overruled on the merits").

all against property of the estate."[72]

> **2. The Objectors have failed to establish that the insurance policy proceeds they seek to recover are not property of the estate**

The linchpin of the Objectors' arguments is their allegation that their claims are "operations claims" or "non-products claims" that are not subject to the aggregate limits in the Century Policies. Based on this, they argue that any insurance proceeds they might be entitled to recover could not be "property of the estate," because payment of their claims would not affect the amounts available to pay other claimants.

But a mere allegation that a claim is an "operations claim" does not make it so. As shown below, it is highly unlikely that any of the Objectors' claims could, in fact, be "operations claims." And even if they were, the assertion of such claims outside of the bankruptcy would adversely impact the estate and other claimants, because the Trustee cannot effectively settle with the Century Parties only with respect to "products claims" or "completed operations claims;" instead, for the Trustee to realize value for claimants asserting such claims, he must be able to release the Century Parties from any further payment obligations under their policies. The interests of the Objectors will be adequately protected if the settlement is approved, because their claims – which are merely contingent and unliquidated – would be channeled to the sale proceeds for payment, just like the claims of other persons.

> **a. The difference between "operations" or "non-product" claims, on the one hand, and "completed operations" or "products" claims, on the other hand**

Each of the Century policies contains two types of limits of liability that cap the

---

[72]    *Sosebee*, 701 F.3d at 1023, quoting *In re Edgeworth,* 993 F.2d 51, 56 n. 21 (5th Cir. 1993) ("In the mass tort context, the decisions by several courts to include the proceeds as property of the estate appear to be motivated by a concern that the court would not otherwise be able to prevent a free-for-all against the insurer outside the bankruptcy proceeding").

amount Century might have to pay under the policies – the "aggregate" limit, and the "per occurrence" limit.

The "aggregate limit" is an overall cap on Century's liability under the Century Policies, applicable to claims arising out of the "products hazard" (products claims) or the "completed operations hazard" (completed operations claims).[73] The policies provide that an operation "shall be deemed completed at the earliest of" when all operations under the contract have been completed, all operations at the site have been completed, or the work has been put to its intended use.[74]

The "per occurrence" limit under the Century policies applies to all claims under the policies – even claims not within the products hazard or the completed operations hazard (sometimes colloquially referred to as "operations claims" or "non-products claims"). In this way, the Objectors are incorrect when they say that their claims, even if they are operations claims or non-products claims, are not subject to liability limits.

If all of the claims were determined to arise out of a single "occurrence," then all claims would be subject to a single per-occurrence limit, and the coverage would indisputably be a finite asset no matter how the underlying claims are characterized.

---

[73]     Policy XBC 75888 at 1. The Century policies define "products hazard" to include personal injury (which includes bodily injury) "arising out of the insured's products or reliance upon a representation or warranty made at any time with respect thereto, but only if the personal injury . . . occurs away from premises owned by or rented to the Insured and after physical possession of such products has been relinquished to others." *Id*. at 5.

The policies define "completed operations hazard" to include personal injury "arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the personal injury . . . occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the Insured." *Id.*

[74]     *Id.*

**b.      The Objectors' claims are very highly likely to be "completed operations" or "products" claims subject to aggregate limits, not "operations" or "non-product" claims**

As a threshold matter, it is critical to keep in mind, in assessing the Objectors' arguments, that all of the claims they are asserting are contingent and unliquidated.  No judge or jury has considered the merits of their claims or made any findings of fact related to such claims.  Thus, Objectors' allegations that their claims would be considered "operations claims" for insurance coverage purposes are unproven.

Moreover, the Landry objection does not even present any argument that the claims of the four Landry Objectors should be regarded as "operations" claims.  The Landry objection presents no information whatsoever regarding the nature or basis of the Landry Objectors' claims.

In their objection, the Courville heirs represented by the Roussel firm contend that their claims might be "operations claims" that would not be subject to the policies' aggregate limits.  But they offer virtually nothing to support their contention.  Indeed, the known facts make it highly unlikely that any claims against Debtor would be considered "operations claims" to which the Century Policies' aggregate limits are not applicable.

As the Courville heirs themselves state (and as the 2006 Warren Watters deposition excerpt attached to their objection evidences), Reilly-Benton distributed asbestos-containing products until about 1972.[75]  The Trustee and the Century Parties challenge whether Reilly-Benton ever had contracting operations that involved asbestos-containing products.  Both the Watters deposition and the Trustee's own investigation suggest that Reilly-Benton in fact may not ever have had any such asbestos-related contracting activities – which would preclude any finding that

---

[75]      Roussel Obj. (Dkt. No. 70), Exh. 1 (March 13, 2006 deposition of Warren K. Watters).  Mr. Watters was Reilly-Benton's president.  He is now 93 years old.

any of the Objectors have "operations claims."

The Courville heirs' assertion that their claims might be "operations claims" is based on testimony that was contested in the proceeding in which it was taken. The excerpt they proffer from Mr. Watters' 2006 deposition establishes that Reilly-Benton was engaged only in product sales, not in contracting activity. Consistent with this, Mr. Courville's later 2017 perpetuation deposition refers to "boxes" of insulation with the name of Reilly-Benton on them – suggesting a products exposure for Reilly Benton, not contracting activity conducted by Reilly-Benton employees.[76]

Thus, of the 18,500+ claimants, only one claim, by the Courville heirs, is based on an asserted operations claim – and that claim appears to be refuted by the evidence supplied by the Courvilles themselves.

> **c.** **Even claims that arise from exposure to Debtor's products during contracting operations would be subject to the Century Policies' aggregate limits, even if the exposure was to products sold before policy inception dates**

The Courville heirs base their argument that their claims are not subject to the aggregate limits in Century's primary policy on the assertion that Reilly-Benton "was no longer even selling asbestos products at" the time that policy was in effect and, thus, "none of the claims could have been claims which would have exhausted the 'products aggregate'" limits.[77] This statement misstates how the policies work.

As noted, the aggregate limit applies to claims that are within the "products" hazard, which is defined to include claims arising out of exposure to products, but only "after physical

---

[76] Roussel Obj. (Dkt. No. 70), Exh. 3 (excerpt from March 20, 2017 perpetuation deposition of Mr. Courville) at 26:12-28:18.

[77] Roussel Obj. at 16.

possession of such products have been relinquished to others."  Any claim arising out of exposure to a Reilly-Benton asbestos product sold ("relinquished to others") before a Century policy period would therefore be a "products hazard" claim, subject to the policy's aggregate limit.  All claims arising from exposure to Reilly-Benton products are almost certainly within the "products hazard" and, thus, subject to aggregate limits.

> **d.  There are likely no "non-products" claims in the Century policy periods if Century's legal arguments – accepted by other courts – were to be accepted as to Reilly-Benton**

Similarly, the Courville heirs argue that the aggregate limits would not apply to claims arising from Reilly-Benton's "contracting" activities.[78]  Again, though, Objectors tell only a portion of the story.

The policies' aggregate limits apply to all contracting claims that arise from "completed operations," meaning the aggregate limit applies if the exposure resulted from an operation, such as performing an installation activity, that had been "completed or abandoned and occurs away from premises owned by or rented to" Reilly-Benton.  Insurers such as Century regularly argue that aggregate limits apply in all policy periods that post-date the time when a contracting operation ceased.  Insurers rely on cases that have accepted this theory.[79]

The Trustee's investigation thus far reveals that Reilly-Benton's alleged asbestos-related operations ceased well before the policy periods of the Century policies.  Based on that,

---

[78]    *Id*. at 17.

[79]    *See, e.g.*, *In re The Wallace & Gale Co.*, 385 F.3d 820, 833 (4th Cir. 2004) ("If a claimant's initial exposure occurred while Wallace & Gale was still conducting operations, policies in effect at that time will not be subject to any aggregate limit.  If, however, initial exposure is shown to have occurred after operations were concluded or if exposure that began during operations continued after operations were complete, then the aggregate limits of any policy that came into effect after operations were complete will apply"); *General Ins. Co. of America v. U.S. Fire Ins. Co.*, 886 F.3d 346 (4th Cir. 2018).

Century contends that all of the "contracting" claims posited by the Objectors would be deemed "completed operations" claims by the time the Century policies incepted, and thus all such claims would be subject to aggregate limits. The Trustee disagrees with Century's contention, but recognizes that this issue has not been decided in Louisiana and that courts elsewhere have accepted the insurers' position. Objectors entirely ignore this potential coverage-defeating issue.

> **e.      Even if there are viable "non-products" or "operations" claims, application of per-occurrence limits could preclude or severely limit recovery under the Century excess policies**

Objectors further claim that the Century excess policies provide the potential for tens of millions of dollars of additional non-products coverage.[80] This is a puzzling statement because each of the excess policies has per-occurrence limits, and sit above primary policies that also have per-occurrence limits. An excess policy's limits are exposed only if the underlying primary policies' applicable limits are exhausted. Thus, for any particular Century excess policy to attach, there would need to be exhaustion of the underlying primary policy's per-occurrence limits.

Thus, for any one person's operations claim to reach into the Century excess policies, they would first have to exhaust the underlying primary policy's $300,000 per-occurrence limit. Few claims would ever do so, particularly since, in the typical case, claimants allege that they were exposed to asbestos across many years – each year likely would be allocated only a fractional share of the total loss, making it highly unusual for a single person's claim to exhaust the primary policies' limits, which is a prerequisite for obtaining coverage under an excess

---

[80]      Roussel Obj. at 16-17.

policy.[81]

The claims of the Courville heirs provide a telling example. They have argued that Mr. Courville was exposed to Reilly-Benton asbestos over many years, triggering coverage under policies issued by Liberty Mutual during the "1960s and 1970s" and by Wausau between 1969 and 1972, in addition to the Century policies.[82] Assuming the Courville heirs established a claim against Debtor based on Mr. Courville's exposures, Century would be responsible only for its fractional share of the damages owed by Debtor, along with the other insurers whose policies were in effect at times when Mr. Courville was exposed to Debtors' asbestos. Because the amount that could be claimed against Century would be small, it is very highly unlikely that the Century excess policies could have any exposure.[83]

If, on the other hand, it were held that all of the asbestos claims against Debtor resulted from a single occurrence, the per-occurrence limits would effectively be equivalent to the policies' aggregate limits. In this circumstance, all claims (products and non-products alike) would be subject to the same per-occurrence limit, so that there would be no additional coverage available

---

[81] *See* Motion, ¶ 22 (explaining that "Century contends that if a particular claimant's Asbestos Claim resulted from 20 years of exposure to Debtor's products, Century would be obligated to pay only for 2 years out of 20, or 10% of Debtor's virile share of any settlement or judgment").

[82] *See Courville v. Lamorak Ins. Co.*, 301 So.3d 557, 559-60 (La. App. 4th Cir. 2020), *writ application denied*, 302 So.3d 1121 (La. 2020).

[83] Further limiting any recovery under the Century policies is the fact that the Courville heirs cannot recover their own wrongful death claims based on Mr. Courville's death (as opposed to the decedent's survival claims, which they inherited). Under Louisiana law, heirs' wrongful death claims do not arise until the time of the decedent's death, which is when the heirs suffered their alleged injuries. *See Walls v. American Optical Corp.*, 740 So.2d 1262, 1269-70 (La. 1999). Because Mr. Courville died long after the Century Policies were no longer in effect, (i) the heirs' wrongful death claims against Debtor are barred by the exclusive remedy provisions of the 1975 and 1976 amendments to the Louisiana Workers' Compensation Act, La. Rev. Stat. § 23:1032(A)(1), and (ii) even if they were not barred, there could be no coverage under the Century Policies for the heirs' separate wrongful death claims, since they did not suffer their injuries during the policy periods of those policies. *Id.* at 1265-75.

- 33 -

for non-products claims beyond the amount available for products claims to which the same per-occurrence limit would apply.

*    *    *

In short, it appears very highly unlikely that the Objectors' claims could possibly be deemed "operations" claims that are not subject to the Century Policies' aggregate limits. Since their claims are almost certainly subject to aggregate limits, any recovery by the Objectors from Century would deplete policy limits that are property of the estate that should be shared on an equitable basis among all claimants. Only the settlement negotiated by the Trustee, including a sale of the policies back to Century on a free and clear basis under § 363(f), and enforced by an ancillary injunction under § 105, can deliver value on an equitable basis to all of the persons who have claims against Debtor – including the Objectors.

**C.  Claims brought pursuant to the Act can be channeled to the proceeds of a settlement**

Regardless of how the Objectors' claims are categorized for insurance purposes, claims brought pursuant to the Act can be channeled to the proceeds of a settlement, just like any other litigation claim against a debtor. The Fifth Circuit held in *OGA Charters* that when a case involves multiple claimants against the same insurance policy, the proceeds of the policy are property of the estate. As such, the Trustee can settle the estate's claims against the insurance and channel all claims against the insurer to the settlement proceeds for payment.

The fact that the Act allows direct actions against insurers does not change this analysis. As the Fifth Circuit noted in *Sosebee*, "[t]he Louisiana Supreme Court has held that 'the direct action statute does not create an independent cause of action against the insurer, it merely grants a procedural right of action against the insurer where the plaintiff has a substantive cause of

- 34 -

action against the insured.'"[84]  Properly understood, all the Act does is allow a claimant to sue the debtor's insurer without joining the debtor.[85]  The Act does not exempt the claim from the automatic stay, it does not authorize claimants to pursue claims that interfere with the Trustee's efforts to administer property of the Debtor's bankruptcy estate, and it does not grant an independent insurance claim that is beyond the reach of the Trustee in a mass tort case.

It is particularly important that the Trustee have the ability to settle the estate's claims against insurance where a recovery by any one claimant, such as any of the Objectors, would reduce the recoveries available to other similarly situated claimants.  Only through such a settlement can the Trustee save claimants from a race to judgment.

In addition, the Trustee could not realize any value from the policies for the benefit of the 18,500+ claimants who have not objected to the settlement if he could not offer Century reliable protection from having to make payments beyond the agreed settlement amount.  Neither Century nor any other insurer would settle under such circumstances, because they would not be obtaining finality in exchange for their settlement payment.  Thus, even if any of the Objectors' claims were not subject to aggregate limits, their pursuit of claims against Century would preclude the Trustee from being able to administer property of the estate for the benefit of all claimants.  In other words, in a mass or multiple tort situation like this case, all of the policy proceeds must be treated as property of the estate, even if some claimants' claims are not subject to aggregate limits, because that is the only way a trustee could recognize value from the policies for the benefit of all claimants.

---

[84]     *Sosebee*, 701 F.3d at 1022, quoting *Descant v. Adm'rs of Tulane Educ. Fund*, 639 So.2d 246, 249 (La. 1994).

[85]     *See* La. Rev. Stats. § 22:1269(B)(1)(a).  Moreover, a claimant's right of action under the Act is limited by the terms and limits of the policy at issue.  *See Gorman v. City of Opelousas*, 148 So.3d 888, 893-97 (La. 2014).

Finally, it must also be emphasized that, if the settlement is approved, Century would not be avoiding any obligations it might have to the Objectors, if the Objectors are able to establish their claims against Debtor; instead, Century would be paying $3.5 million to the Trustee in compromise of disputed insurance coverage issues, for the Trustee to distribute to all deserving claimants – including, potentially, the Objectors – on a proportionate basis.

## V.    Conclusion

Because the proceeds of the Century policies are property of the Debtor's bankruptcy estate, the Court has the power, under Rule 9019, § 363(f), and § 105, to approve the Trustee's settlement with Century, authorize the sale of the Century Policies back to Century "free and clear" of interests, and issue an injunction channeling all claims against Century to the proceeds of the Century settlement.  The Louisiana Direct Action Statute is no impediment to the Court granting the relief requested by the Trustee where, as here, the policy proceeds are property of the estate and the objecting claimants' claims will be channeled to the policy proceeds.

To the extent the Court has any lingering concern about whether the Objectors' claims might not be property of the estate, it should not deny the Trustee's Motion before he has a chance to make his evidentiary case.  Instead, the Court should allow the Trustee to proceed to a hearing on his Motion, so the Objectors' allegations that their claims are not property of the estate can be tested.

DATED:  February 23, 2021          Respectfully submitted,

By: _/s/ Albert J. Derbes, IV_
Albert J. Derbes, IV
DERBES LAW FIRM, LLC
3027 Ridgelake Drive
Metairie, Louisiana  70002
Telephone:  (504) 837-1230
E-mail:  ajdiv@derbeslaw.com

*Attorneys for David V. Adler, Trustee*

- 36 -

James M. Garner
Martha Curtis
SHER GARNER CAHILL RICHTER KLEIN & HILBERT,
L.L.C.
909 Poydras Street, Suite 2800
New Orleans, Louisiana  70112

- and –

Mark D. Plevin  (admitted *pro hac vice*)
CROWELL & MORING LLP
Three Embarcadero Center, 26th Floor
San Francisco, California  94111
Phone:  (415) 986-2800
E-mail:  mplevin@crowell.com

Tacie H. Yoon  (admitted *pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Ave., N.W.
Washington, D.C.  20004
Phone:  (202) 624-2500
Email:  tyoon@crowell.com

*Attorneys for Century Indemnity Company and*
*Pacific Employers Insurance Company*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on the parties required to receive notice through the Electronic Case Filing system for the United States Bankruptcy Court for the Eastern District of Louisiana on this 23rd day of February, 2021.

*/s/ Albert J. Derbes, IV*___
ALBERT J. DERBES, IV