# UNITED STATES BANKRUPTCY COURT

# EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| | * | |
| IN RE: | * | CASE NO.: 17-12870 |
| | * | |
| REILLY-BENTON COMPANY, INC., | * | JUDGE MEREDITH S. GRABILL |
| | * | |
| Debtor | * | CHAPTER 7 |
| | * | |

**************************************

## JOINT BREIF IN OPPOSITION TO MOTIONS TO SETTLE, RELEASE AND SELL FREE AND CLEAR INSURANCE POLICIES AND PROCEEDS AND FOR ORDER ENJOINING CLAIMS BY VICTIMS AGAINST NONDEBTOR INSURERS

The proposed Motions[1] filed by The Century Parties[2] and Louisiana Insurance Guaranty Association ("LIGA") seek an order enjoining tort claimants from proceeding against them despite the fact that Louisiana law specifically allows tort claimants to proceed against insurers pursuant to the Louisiana Direct Action Statute. This Court does not have authority to provide the relief requested. Not only would such an order exceed the authority of this Court but it would also violate Louisiana law, would strip vested rights of creditors and claimants of Reilly-Benton, would grossly undervalue the proceeds of the Century policies as well as LIGA's liability, and would promote fraud among insurers and their insureds, wherein insurers and insureds could enter into

---

[1] *Trustee's Motion for an Order Approving Settlement Agreement Between the Chapter 7 Trustee for Reilly-Benton Company, Inc. and the Louisiana Insurance Guaranty Association* [ECF No. 48] and the *Trustee's Motion for an Order (A) Approving Settlement Agreement and Policy Release between the Chapter 7 Trustee for Reilly-Benton Company, Inc. and the Century Parties, (B) Approving Sale of Insurance Policies to the Century Parties Free and Clear of All Interests, and (C) Entering Injunction to Enforce the Free and Clear Aspect of the Sale of the Century Policies* (the "Motion") [ECF No. 56] (collectively, the "Motions").

[2] Century Parties include (1) Century Indemnity Company, as successor to CCI Insurance Company, successor to Insurance Company of North America and (2) Pacific Employers Insurance Company.

post-accident agreements seeking to enjoin claims and/or capping potential liability after accidents occur where there exists no bar or cap under the actual language of the policy at the time of the accident.

**I.     Louisiana law allows tort victims to pursue insurers regardless of the bankruptcy or insolvency of the insured, and tort claimants cannot be constitutionally divested of these rights, which are protected by the due process clause.**

Reilly-Benton Company, Inc. ("Reilly-Benton") filed its Voluntary Petition for Bankruptcy on October 25, 2017.  Prior to its bankruptcy, Reilly-Benton had been named as a defendant in asbestos litigation for its sale of asbestos products as well as its performance of insulation contracting activities.  Additionally, in many cases, Reilly-Benton's insurers have been named as defendants pursuant to the Louisiana Direct Action Statute.

The Louisiana Direct Action Statute specifically allows for claimants to proceed against insurers where the insured is bankrupt or insolvent.[3]  The fact that Reilly-Benton has filed for bankruptcy does not affect a tort claimants ability to proceed against the insurers.  In fact, La. R.S. 22:1269 specifically provides that "[n]o policy or contract of liability insurance shall be issued or delivered in this state, **unless it contains provisions to the effect that the insolvency or bankruptcy of the insured shall not release the insurer from payment of damages . . . .**" The policies of insurance issued by the Century Parties make clear that "Bankruptcy or insolvency of the insured or of the insured's estate shall not relieve the Company of any of its obligations hereunder."[4]  The same is true for the Reliance policies for which LIGA has responsibility.  Also, the Louisiana Direct Action Statute provides that "all liability policies within their terms and limits

---

[3] La. R.S. 22:1269(B)(1)(a) and La. R.S. 22:1269(B)(1)(b)
[4] *See e.g.*, Exhibit 8, <u>INA CGL Policy GLP 595806</u>, at p. 4, Section 5; See *also* Exhibit 7, <u>INA Policy No. XBC 75993</u>, at p. 13, Section 5.

are executed for the benefit of all injured persons and their survivors or heirs to whom the insured is liable. . . ."  La. R.S. 22:1269(B)(1) states that tortfeasors shall have a right of direct action against the insurer when the following occurs:

(a)   The insured has been adjudged bankrupt by a court of competent jurisdiction or when proceedings to adjudge an insured bankrupt have been commenced before a court of competent jurisdiction.

(b)   The insured is insolvent.

Clearly, tortfeasors have a right to proceed against Reilly-Benton's insurers.  In fact, under Louisiana law, for exposures occurring prior to 1989, tortfeasors have an unqualified right to pursue their claims against the insurers without having to fit the claim within the enumerated reasons set forth in La. R.S. 22:1269.[5]  It is well-settled in Louisiana law that "[o]nce a party's cause of action accrues, it becomes a vested property right that may not be constitutionally divested."[6]  A state tort claim is protected by the due process clause.[7]  That Louisiana claimants may proceed against the insurer of a bankrupt insured reflects the fact that under Louisiana law injured parties have a substantive right to sue the insurance company on a tortfeasors' insurance policy as a third party beneficiary to the insurance contract.[8]  The Trustee and insurers' request for an order barring these state law tort claims would divest the claimants of vested property rights which are protected by the due process clause.  There is absolutely no support nor are claimants aware of any case where a court has enjoined claimants from pursuing constitutionally protected

---

[5] *Marchand v. Asbestos Defendants*, 10-1650 (La. App. 4 Cir. 7/21/10); 44 So.3d 355, 358; *Foltmer v. James*, 01-1510 (La. App. 4 Cir. 9/12/01); 799 So. 2d 545; *Marchel v. Delta Shipbuilding Co.*, 10-168 (La. App. 4 Cir. 84/10); 345 So.3d 634.

[6] *Austin v. Abney Mills*, 01-1598 (La. 9/4/02); 824 So.2d 1137, 1145, citing *Cole v. Celotex*, 599 So.2d 1058, 1063 (La. 1992).

[7] *Austin*, 824 So.2d at 1145

[8] *Leviere v. Williams*, 2002-1816 (La.App. 4 Cir. 1/17/03), 844 So.2d 32, 36, *writ denied*, 2003-1149 (La. 6/20/03), 847 So.2d 1236; *see also Sturcke v. Clark*, 261 So.2d 717 (La.App. 4 Cir. 1971), *writ denied*, 263 So.2d 46-47, 49 (La. 1972).

rights against an insurer pursuant to a Chapter 7 bankruptcy. Reilly-Benton is an inactive company, and the motions filed by the Trustee regarding settlements that were reached with The Century Parties and LIGA are a blatant attempt to block these claims and cap the insurers' liability where no cap exists under the language of the insurance policies at issue.

The Century Parties and LIGA are not the first insurers of Reilly-Benton that have attempted to enjoin claims and/or cap liability through a settlement agreement between the insurer and insured where no cap exists under the terms of the policy. Liberty Mutual Insurance Company, another Reilly-Benton insurer, was the first Reilly-Benton insurer to ask a court to hold a Settlement Agreement between an insurer and insured binding against injured victims and individuals who were not parties to the agreement. In a matter pending in the Civil District Court for the Parish of Orleans, Liberty Mutual filed a similar motion in the *Courville* matter requesting that an injured tort victim's claims against it be dismissed since it had entered into a post-accident settlement with Reilly-Benton, wherein it sought to bar future claims. On May 27, 2020, the Louisiana Fourth Circuit rendered a decision, wherein Liberty Mutual was seeking to do what The Century Parties and LIGA are seeking to do here.[9] The Louisiana Fourth Circuit held that it was inappropriate under Louisiana law to hold a settlement binding against injured victims who were not parties to the settlement.[10] This was in accord with other decisions by the Louisiana Fourth Circuit and the Louisiana Supreme Court.[11] It is also in accord with La. R.S. 22:1262, which states:

No insurance contract insuring against loss or damage through legal liability for the

---

[9] *Courville v. Lamorak Ins. Co.*, 2020-0073 (La.App. 4 Cir. 05/27/20), 301 So.3d 557, *writ denied*, 20-791 (La. 10/14/20), 302 So.3d 1121.

[10] *Id.*

[11] *Washington v. Savoie*, 634 So.2d 1176 (La. 1994); *Long v. Eagle, Inc.*, 14-889 (La. App. 4 Cir. 2/25/15), 158 So.3d 968;

bodily injury or death by accident of any individual, or for damage to the property of any person, shall be retroactively annulled by an agreement between the insurer and insured after the occurrence of any such injury, death, or damage for which the insured may be liable, and any such annulment attempted shall be null and void.

"The plain language of La. R.S. 22:1262 prohibits insurers and insureds from retroactively rescinding or annulling policy contracts by agreement post-occurrence."[12]   The purpose of this statute "is to prevent insurers and insureds from agreeing to annul or rescind contracts to the detriment of an injured third party."[13]  This is essentially what Liberty Mutual tried to do and what the Century Parties and LIGA are trying to do.  They are entering into post-accident agreements, wherein the insurers are seeking to enjoin future claims by injured tort victims.

Obviously aware of the Louisiana Fourth Circuit's ruling in *Courville* regarding Liberty Mutual, Reilly-Benton's other insurers, The Century Parties and LIGA, raced to this Court in hopes of circumventing the Louisiana Fourth Circuit's ruling rejecting these sort of settlement agreements from enjoining the claims of third-party victims.  In fact, it appears that although Liberty Mutual has not yet done so in this Court, Liberty Mutual is hoping that this Court provides injunctive relief to LIGA and the Century Parties so that it can thereafter come to this Court seeking the same injunction since Liberty Mutual could not get the relief it was a seeking in state court.  Although it had not done so since Reilly-Benton had filed for bankruptcy in 2017, the Trustee for Reilly-Benton has now recently started to forward correspondence to plaintiffs' counsel representing tort victims of Reilly-Benton demanding that they halt their claims against Liberty Mutual since Reilly-Benton has filed for bankruptcy.  Despite the fact that Reilly-Benton filed for

---

[12] *Long v. Eagle, Inc.*, 14-889 (La. App. 4 Cir. 2/25/15), 158 So.3d 968, 971, *writ denied*, 15-811 (La. 6/19/15), 172 So.3d 652.
[13] *Id*. at 971-972.

bankruptcy in 2017, these demands are now only recently being sent since the Louisiana courts have made clear that such agreements are not binding on injured victims and that injured victims may pursue insurers, even when the insured is bankrupt or insolvent, as has always been allowed by the Louisiana Direct Action Statute.  These sort of tactics just highlight the true motives behind the entire Reilly-Benton bankruptcy as well as the motions filed by The Century Parties and LIGA, which is to obtain injunctions on behalf of the insurance companies of Reilly-Benton.

Moreover, it is important to point out that Liberty Mutual did not stop at litigating the issue before state courts.  Prior to the state court rulings, in an attempt to direct the forum that would decide this issue, Liberty Mutual actually filed a declaratory action in the United States Eastern District of Louisiana against several tort victims that had filed claims against Liberty Mutual pursuant to the Louisiana Direct Action Statue.  One of those claimants was the *Courville* plaintiffs referenced *supra*.  The Declaratory Defendants (i.e. the injured tort claimants) in that action actually filed a Rule 12(b) motion to dismiss Liberty Mutual's declaratory action, which the Honorable Wendy Vitter granted, finding that abstention applied.[14]  Now that Liberty Mutual has two strikes, it is expected that it will approach this Court for a third strike to block valid claims by injured tort victims if the Century Parties and LIGA are successful in this Court.

Moreover, this issue of post-occurrence agreements regarding an insurance policy arose before the Louisiana Supreme Court in *Washington v. Savoie*.[15]  In *Washington*, the plaintiffs were injured in vehicular accidents.[16]  After the accident occurred, however, the insurer and the insured entered into an agreement to change the effective date of an endorsement under the policy, which

---

[14] *Liberty Mutual Ins. Co. v. Boullion*, 2020 U.S. Dist. LEXIS 37261 (E.D. La. 3/4/20)
[15] *Washington v. Savoie*, 92-2957 (La. 4/11/94), 634 So.2d 1176
[16] *Id.* at 1178.

would have effectively precluded coverage for the injured party under the policy.[17] In recognizing the public policy behind Louisiana's uninsured motorist coverage statute, which was enacted to promote full recovery by innocent victims, this Court rejected the insurer and insured's attempt to preclude the injured victims recovery by a retroactive alteration of the policy.[18] Louisiana likewise recognized this same public policy when it enacted La. R.S. 22:1269, wherein it is recognized that liability policies are executed for the benefit of all injured persons and their survivors or heirs to whom the insured is liable.   Insurance coverage under a given policy is triggered when there is exposure to harmful substances (*i.e.* asbestos) during the policy period.[19]   A plaintiff's cause of action accrues at the time of the "substantial injury producing exposures giving rise to plaintiffs' claims."[20]   Once these substantive rights are conferred against the insurer, they become vested property right that may not be constitutionally divested.[21]

Even prior to its decision in the *Courville* matter, the Louisiana Fourth Circuit had recognized this and applied the holding in *Washington* to a similar situation involving a Settlement Agreement between the insurer and insured.   In *Long v. Eagle, Inc.*, USF&G issued a primary CGL policy to Eagle[22] for asbestos liabilities.[23]   USF&G notified a co-insurer, OneBeacon, that all funds had been exhausted due to a 2003 Settlement Agreement.[24]   OneBeacon argued that such a post-accident agreement regarding the insurance policy was null and void and against public

---

[17] *Id.*

[18] *Id.*

[19] *Cole v. Celotex* 599 So. 2d 1058, 1075-6 (La. 1992).

[20] *Id.* at 1063.

[21] Id. Of note, Eagle was another insulation company and competitor of Reilly-Benton who similarly filed for bankruptcy, which bankruptcy has since been dismissed.

[22] Of note, Eagle was another insulation company and competitor of Reilly-Benton who similarly filed for bankruptcy, which bankruptcy has since been dismissed.

[23] *Long*, 158 So.3d at 969.

[24] *Id*. at 969.

policy. While the Fourth Circuit ultimately found in favor of USF&G in not declaring the Settlement Agreement null and void, it did so only because the third party seeking coverage was an insurance company as opposed to the injured tort victim.[25] The Court stated as follows:

> Like in *Fruge*, the party challenging the Settlement Agreement in this case is not the injured tort victim. The third party attempting to assert rights here is an insurance company that contracted with Eagle for coverage, including the duty to defend without consideration of other policies. For that reason, we cannot extend the public policy protections in *Washington* to this matter. **However, it is worth noting that had Pearson Long challenged the Settlement Agreement under *Washington*, our finding may be different.**[26]

Accordingly, the Louisiana Supreme Court and the Louisiana Fourth Circuit Court of Appeal all have recognized that agreements such as the one the Trustee, the Century Parties, and LIGA are relying upon in this matter have no effect on injured victims. In fact, the U.S. Fifth Circuit has recognized this basic principle that "parties who choose to resolve litigation through settlement may not dispose of the claims of a third party, and *a fortiori* may not impose duties or obligations on a third party, without the party's agreement."[27]

It is submitted that the entire Reilly-Benton bankruptcy has been filed for the sole purpose of facilitating these sort of agreements among the insurers to cap liability when no such cap exists under the insurance policies. As noted above, Reilly-Benton Company, Inc. filed its Voluntary Petition for Bankruptcy on October 25, 2017. Since that time seemingly no actual progress had been made in litigating the matter to conclusion. Instead, on July 2, 2020 (after the May 27, 2020, decision by the Louisiana Fourth Circuit in *Courville* stating such agreements were not valid as to

---

[25] *Id*. at 971.
[26] *Id*. at 971
[27] *Lindsey v. Prive Corp*., 161 F.3d 886, 891 (5th Cir. 1998).

injured victims), the Trustee filed the pending motion seeking an order approving a settlement agreement between the Chapter 7 Trustee for Reilly-Benton Company, Inc. and LIGA.  Thereafter, The Century Parties filed a similar motion.

Also of note, this is not the first time an insulating company in a similar position to Reilly-Benton has attempted such a tactic.  For example, Eagle, Inc. ("Eagle"), another local Louisiana insulation company, filed a Chapter 11 bankruptcy.  This Chapter 11 bankruptcy was ultimately dismissed in its entirety.[28]  Moreover, during the pendency of that bankruptcy proceeding, there was an attempt to have Judge Jerry Brown stay all claims against "Certain Settling Insurers" of Eagle despite the fact that the Louisiana Direct Action Statute allows tort claims to proceed against insurers.  Judge Brown denied the Insurers' request.[28]  Reilly-Benton is a Chapter 7 case where the debtor is not attempting to reorganize, nor has there been nor can there be any attempt to set up a 524(g) trust, nor has any potential tort claimant had any involvement with the settlements that the Century Parties and LIGA claim should result in the injunction of all tort claims against them. There is simply no support for the argument that such tort claims should be enjoined, especially in a Chapter 7 bankruptcy case.

Also, the Western District of Louisiana dismissed a similar bankruptcy scheme in its entirety.[29] J. Graves Insulation Company, Inc. ("Graves"), an insulating company similar to both Reilly-Benton and Eagle, sold and installed insulation.  Similar purported settlements were reached between certain insurers and Graves, wherein there was an attempt to avoid responsibility for actions by tort claimants.  Similar to the Eagle bankruptcy, the Court rejected the settlements and

---

[28]Exhibit 1, <u>Order dismissing the Chapter 11 Case of Eagle, Inc.</u>
[28]Exhibit 2, <u>Order Denying Motion for Order Extending or Applying the Automatic Stay to Certain Settling Insurers</u>
[29]*In re J. Graves Insulation Co*., No. 03-13475 (W.D. La. 2006).

dismissed the bankruptcy.[30]

## II.   The policies are not exhausted.

A review of the policies at issue helps to illustrate the real motive behind the settlement agreements and the insurers' attempts to enjoin injured tort victims' constitutionally protected due process rights.  The Trustee, the Century Parties, and LIGA rely heavily upon the case of *In re OGA Charters, LLC*.[31]  Unlike with Reilly-Benton, the Fifth Circuit in *In re OGA Charters LLC* found that over $400 million in related claims threatened the debtor's estate over and above the $5 million policy limit at issue.[32]  The limits of the policy were not disputed and the issue of whether or not the pending claims would exhaust the policies was not disputed.  Importantly, even in this limited and factually distinguishable situation in *In re OGA Charters LLC*, the U.S. Fifth Circuit **did not find** that third-party claims against the insurer were barred.  The Court made clear that "we make no determination as to the validity, enforceability, or propriety of the purported settlements."[33]  Thus, even in that case, the Fifth Circuit did not provide the injunctive relief against the insurers that the Century Parties and LIGA are requesting in this instance.  However, a discussion of the insurance policies at issue in this case illustrates that the Reilly-Benton case is unlike the situation before the Court in *In re OGA Charters, LLC*.

Contrary to the Century Parties' and LIGA's representations, the settlement amounts are no where near the maximum they would be obligated to pay under the terms of the insurance policies.  The representations that the policies are exhausted and/or near exhaustion are without merit and are highly misleading.  Neither the Trustee nor the insurers can show that the policies

---

[30]Exhibit 3, Order Dismissing Chapter 11 Case of J. Graves Insulation Company, Inc.
[31]*In re OGA Charters, L.L.C.*, 901 F.3d 599 (5th Cir. 2018).
[32]*Id*. at 604.
[33]*Id*. at 605.

can be exhausted for injuries resulting from contracting activities and seemingly admit as much in briefing and statements that have been made before the Court. Because they cannot make this showing under the language of the policies, they want to circumvent the language of the policies and have this Court order that all claims are enjoined despite the fact that there is still coverage under the policy for current and future tort victims of Reilly-Benton.

There are two main types of potential bodily injury claims for which Reilly-Benton is liable to tort victims. There is bodily injury from the sale of asbestos products (i.e. product liability claims) and bodily injury from Reilly-Benton's contracting activities wherein Reilly-Benton handled and/or removed asbestos products which exposed tort victims working with or around these Reilly-Benton contractors. For example, Nelcome Courville, whose survivors are creditors herein, testified that during his career he worked side by side with insulation contractors.[34] Reilly Benton was an insulation contractor who exposed him to asbestos in the 1960s and 1970s.[35] These sort of bodily injury claims arising from contracting activities are at issue for numerous tort victims of Reilly-Benton, and will be at issue for countless future claimants. While policies did sometimes have aggregate limits for products liability claims, the sort of policies that were issued in the 1960s and 1970s, including the policies at issue in this case, did not have aggregate limits for bodily injury claims arising from contracting activities. This is precisely why the insurers are seeking an injunction from this Court. It is the insurers' intent to cap their liability through an injunction and/or order of this Court even though the language of the policy does not provide for such a limit of their liability. This is an effort to line the pockets of the insurance companies at the expense of

---

[34]Exhibit 4, Perpetuation Deposition of Nelcome Courville, Jr., at pp. 24-26.
[35]Id. at 26; Exhibit 5, Discovery Deposition of Nelcome Courville, Jr. Vol. II, at pp. 21-22; Exhibit 6, Discovery Deposition of Nelcome Courville, Jr., Vol IV, at pp. 18-20.

current and future injured tort victims of Reilly-Benton.

A.    **The Century Parties' Policies**.

The Trustee indicates that the Century Parties issued at least nine (9) separate policies of insurance, including both primary coverage and excess liability coverage, for the time period of 1971 through 1978.[36]  The language of the Century policies confirms that there exists no policy limits for bodily injury claims arising from Reilly-Benton's contracting activities.

1.    **Excess Policies**

The Century Parties, through Insurance Company of North America ("INA"), issued several excess policies.  Similar to the primary CGL policy, these excess policies likewise did not have aggregate limits for bodily injury arising out of contracting claims.   For example, INA Policy No. XBC 75888 provided excess coverage from July 1, 1972 through July 1, 1973.[37]  A review of the limits of the policy reveals that it had a limit of $1,000,000 per occurrence.[38]  The aggregate limit of $1,000,000 applied only to "the products hazard, or the completed operations hazard, or both combined."[39]   The policy further provided that "[t]here is no limit to the number of occurrences during the policy period for which claims may be made, except that the liability of INA, because of either **the products hazard or the completed operations hazard**, or both combined, arising out of all occurrences during each policy year shall not exceed the amount specified in Item 2 (i.e. $1,000,000)."[40]  The policy further defines a "products hazard" as bodily injury arising out of the insured's products and only if the bodily injury occurs after the insured no

---

[36]Rec. Doc. 56, at p. 3.
[37]Exhibit 7, INA Policy No. XBC 75993
[38]Exhibit 7, INA Policy No. XBC 75993
[39]Exhibit 7, INA Policy No. XBC 75993
[40]Exhibit 7, INA Policy No. XBC 75993 at p. 10, Section titled "Retained Limit - INA's Limit of Liability"

longer has physical possession of the product.[41]  The policy also defines a "completed operations hazard" as bodily injury arising out of insured's operations but only when the bodily injury occurs after the operations are completed.[42]

Many claims by tort victims involve allegations that the bodily injury occurred during Reilly-Benton's installation and/or removal of asbestos products.  This would fall outside of the "products hazard" because, even if Reilly-Benton is handling its own products, the injury occurs before Reilly-Benton relinquishes physical possession of the products.  Similarly, it would fall outside of the "completed operations hazard" because the injury occurred during Reilly-Benton's activities or operations and not after they are completed.  These are typical tort claims against Reilly-Benton, and according to the terms of the policy, "[t]here is no limit to the number of occurrences during the policy period for which claims may be made" when the injury falls outside of a products hazard or completed operations hazard.

As noted above, INA issued various other excess policies in the 1970s as well.  These various excess policies issued by INA included the same language regarding INA's limits of liability as already discussed *supra*.  Thus, the language of INA's policies specifically confirm that there is no limit to the number of claims that can be pursued under these policies.  When reviewing the language of these policies, the real motive behind the settlement agreement becomes readily apparent.  There are at least nine (9) policies, including excess policies with $1,000,000, per occurrence limits, and the Century Parties want this Court to limit its liability to the amount of $3,500,000, which is a small fraction of its liability to both current tort victims as well as future tort victims.

---

[41]Exhibit 7, <u>INA Policy No. XBC 75993</u> at p. 11 - Definitions.
[42]Exhibit 7, <u>INA Policy No. XBC 75993</u>, at p. 11 - Definitions.

## 2.    Primary Policy - GLP 595806

INA also issued a comprehensive general liability policy covering the period of January 1, 1977 through January 1, 1978.[43]  In the Limits of Liability section of the Century general liability policy, it states that the aggregate limit stated in the Schedule as "aggregate" only applies to bodily injury from a completed operations hazard or a products hazard.[44]  This general liability policy contains the same language as the excess policies regarding "products hazards" and "completed operations hazards".[45]  There is no aggregate limit for bodily injury claims arising from asbestos exposure occurring during Reilly-Benton's contracting activities which are neither an "operations hazard" or "products hazard."  Neither Century nor the Trustee dispute this.  In fact, the Trustee's arguments regarding potential exhaustion focused only on the "products aggregate limits of liability" of the policies.[46]  Thus, an order from this Court barring claims against Century would preclude claims against the insurers for which there exists no language in the policy which limits recovery by current and future tort victims  When considering that juries have awarded verdicts in the range of millions of dollars for a single mesothelioma victim, it becomes readily apparent why the Century Parties would want this Court to bar the claims of current and future asbestos victims for a settlement amount of $3,500,000.  The Century Parties want this court to cap its liability under these nine (9) policies for all current and future claims at $3,500,000, when this is no where near the extent of their liability under the terms of the policies.

Moreover, there are even significant issues with the Trustee's claim that the "aggregate products" limit is exhausted or near exhaustion for both the general liability policies as well as

---

[43]Exhibit 8, <u>INA CGL Policy</u>, at p. 5
[44]Exhibit 8, <u>INA CGL Policy</u>, at p. 15, Paragraph (2)(c) - Limits of Liability
[45]Exhibit 8, <u>INA CGL Policy</u>, at pp. 1-2 - Definitions
[46]Rec. Doc. No. 56, Paragraph 6, p. 3.

several of the excess policies. It is not surprising that the neither the Trustee nor the Century Parties offer proof of such an assertion. There would not have been any products hazard claims under several of the policies that could have exhausted the aggregate products coverage limits. Warren Watters, Reilly-Benton's corporate representative, testified that Reilly-Benton stopped selling asbestos products around 1972.[47] Most of the nine (9) policies referenced by the Century Parties were in effect after 1972. How can the aggregate limits for products claims be exhausted when Mr. Watters has testified that Reilly-Benton was not selling asbestos during its policy period? Reilly-Benton, however, was performing insulation contracting work. The Century Parties know that such an exhaustion argument, even as to aggregate products claims, would fail if they attempted to raise this as a defense in litigation.

###### B. LIGA

LIGA is obligated to pay covered claims pursuant to the provisions of the policies of Reliance Insurance Company and United Pacific Insurance Company, who are insolvent insurance companies. Like the Century Parties, a review of the policies at issue illustrates the real motive behind this settlement between LIGA and the Trustee/Reilly-Benton. Contrary to LIGA's representations that it only owes $1,046,414.84, the settlement amount is no where near the maximum LIGA is obligated to pay.[48] First, similar to the policies of the Century Parties, *supra*, the Trustee admits that the aggregate limits of the policies at issue only applies to the aggregate

---

[47]Exhibit 9, Deposition of Warren Watters (3/13/06), at p. 24.

[48]The Trustee states that "LIGA has represented that this is the maximum amount available under the LIGA Act and applicable insurance law under the facts here." (Rec. Doc. No. 48, at Paragraph 21). The Trustee cites to its use of business judgment in making this settlement but then concedes that the total of $1,046,413.84 is correct "if LIGA is correct in its statutory limitations argument." (Rec. Doc. No. 48, at Paragraph 28). LIGA's representations are incorrect.

products claims,[49] yet seek to "permanently" stay, bar, restrain and enjoin any claims.[50] This number grossly undervalues LIGA's obligations and essentially would rob tort victims of millions of dollars for which LIGA is liable for covered claims.

Similar to the INA policies discussed *supra*, in the Limits of Liability section of the Reliance policy, it states that the aggregate limit stated in the Declarations as "aggregate" only applies to bodily injury from a completed operations hazard or a products hazard.[51] There is no aggregate limit for bodily injury claims arising from exposure occurring during Reilly-Benton's contracting activities. Like the INA policies, there is no limit to the number of claims that can be brought under the terms of the policy for bodily injury that are not "products hazards" or "completed operations hazards." Clearly, there is no cap or limit under the terms or conditions of the Reliance policy.

The only cap that potentially applies to LIGA is any cap set forth in the LIGA Act. A discussions of LIGA's statutory cap is pertinent here. Reliance became insolvent in 2001. Accordingly, the law as it existed at the time the insurer became insolvent applies.[52] LIGA law provided for a $150,000 cap **per claim** at issue and for $300,000 per accident or occurrence.[53] The LIGA law does not limit the number of claims that can be brought against LIGA. Of note, many claimants have both survival and wrongful death claims. The wrongful death claim that would

---

[49]Specifically, the Trustee states that "LIGA's **remaining aggregate products limits** potentially available under the Act and the Reliance Policies is One Million, Forty-Six Thousand, Four Hundred Thirteen and 84/100 United States dollars (US $1,046,413.84)." (Rec. Doc. No. 48, at Paragraph 8, p. 4).
[50]Rec. Doc. No. 48, Exhibit A, page 6 at paragraph 7.
[51]Exhibit 10, Reliance Policy, at p. 24 of exhibit, Section IV(b)(3)
[52]*Hall v. Zen-Noh Grain Corp.*, 01-0324 (La. 4/27/01); 787 So.2d 280; *Southern Silica of Louisiana, Inc. v. Louisiana Ins. Guar. Ass'n,* 07-1680 (La. 4/8/08)*;* 979 So.2d 460; *Alerion Bank v. Louisiana Ins. Guar. Ass'n*, 98-2897 (La. App. 1 Cir. 2/18/00); 753 So.2d 369.
[53]*Mariner's Village Mandeville v. FAMA*, 95-1867 (La.App. 4 Cir. 3/14/96); 671 So.2d 1015, 1021, *writ denied*, 96-0944, 673 So.2d 615 (La. 5/17/96).

arise out of the victim's death is a totally separate claim which warrants its own separate cap.[54] Thus, at a minimum, LIGA is obligated to pay at least $300,000 per accident or occurrence, and depending on the number of claimants in the wrongful death action, LIGA's obligation could easily exceed $300,000 per case.[55]

In arguing that LIGA's obligations are near exhaustion, the Trustee is under the mistaken assumption that LIGA's maximum obligation is $300,000 total per Reliance policy for a total $1,500,000 (i.e. 5 Reliance policy years) regardless of the number of claimants at issue or accidents or occurrences at issue.  However, while there may exist a $300,000 cap for LIGA per accident or occurrence (assuming only one year of asbestos exposure by the injured person during only one policy period),[56] neither the Trustee nor LIGA cites to any support for an argument that all purported 18,645 claimants were exposed and/or injured during the same accident or occurrence. Such an argument is absurd, as Reilly-Benton was an insulation supplier and contractor that supplied products and performed contracting activities at many industrial facilities throughout Louisiana for decades.  Each claimant has the potential to collect at least up to the statutory cap of $150,000 per year of exposure with a possible cap of $300,000 if there are wrongful death claimants involved.  It depends how many of the purported 18,645 current claimants and the number of unknown future tort victims were injured from contracting activities of Reilly-Benton. Even if we assume it was on the extreme low side and that only 50 current or future tort victims

---

[54] *Cooper v. Huddy*, 581 So.2d 723 (La. App. 1 Cir. 1991), *writ denied*, 585 So.2d 552 (La. 1991).  In *Cooper*, Clarence Cooper was involved in a fatal automobile accident.  LIGA argued that it was limited by one cap.  The court, however, held that because there were five survivors, each had a separate claim and thus there were five separate and distinct causes of action for damages and each cause of action constituted a separate claim as defined in the LIGA statute.  Thus, separate caps would apply to each claimant.

[55] *Id.*

[56] *Id.*

were ever exposed through Reilly-Benton's contracting activities and all of the claimants were still living (i.e. no wrongful death claims), LIGA's potential liability would be no less than $7,500,000.00 ($150,000 x 50 claimants) just for that limited number of claimants. If 1,000 claimants had contracting claims, LIGA's potential liability quickly jumps to a minimum of $150,000,000.00 (1000 x $150,000). Thus, it becomes readily apparent why LIGA would want this Court to issue an order barring claims based upon a payment of $1,046,413.84. However, it is unclear as to why the Trustee would want to do this, unless the Trustee's goal is to line the pockets of LIGA at the expense of the vested property rights of injured tort victims.

Note, however, that the above example, is LIGA's liability only if LIGA is entitled to a $300,000 cap per claim regardless of the number of policies. As discussed *infra*, it is submitted that this $300,000 cap applies **per Reliance policy period** where exposure can be established during each policy period.

It is a bit perplexing how LIGA even came up with the potential liability of $1,046,413.84 as represented to the Trustee. In fact, in prior cases involving LIGA and one of the law firms representing claimants herein, there has never been a dispute by LIGA that, at the very least, the cap of $300,000 was a per claim cap (assuming both a survival action and wrongful death action). The dispute between undersigned counsel's firm and LIGA has always been whether this total $300,000 cap is the only potential liability LIGA has per claim or whether this $300,000 cap applies per policy of insurance issued by the insolvent insurer, Reliance. Using the Reliance policies as an example, the typical dispute attorneys representing tort victims and LIGA is whether LIGA's liability for a specific claim involving both a survival and wrongful death action would be $300,000 for that claim or $1,500,000 (if the LIGA cap is $300,000 per policy of insurance issued by Reliance) for the claim.

18

However, it is the creditors' position that LIGA's real liability is not limited to $300,000 per claim. When there exists exposure during each year of the policy, each year of exposure is considered a separate event.[57] "Each policy will afford coverage to the bodily injury or property damage which occurs during the policy period."[58] Accordingly, each of the Reliance policies would be triggered if there was exposure in each year of coverage.  There is a different occurrence for each year of exposure and each policy is triggered for an "occurrence" during an exposure during the policy period.[59] Accordingly, each of the Reliance policies would be triggered, and LIGA is responsible for each of these policies.[60]

LIGA was created "to provide a mechanism for the payment of covered claims under certain insurance policies to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer."[61]  A "covered claim" is defined as "an unpaid claim . . . that arises out of and is within the coverage and not in excess of the applicable limits on an insurance policy to which this Part applies issued by an insurer . . . ."[62] The provisions of the Louisiana Insurance Guaranty Association Law must be interpreted to protect claimants and policyholders rather than the interests of LIGA.[63]

Any argument by the Trustee and/or LIGA that the $300,000 cap would apply to a single claim as opposed to each policy simply seeks to protect the interests of LIGA over claimants.  This argument, however, has been rejected in the case of *Mariner's Village Mandeville v. FAMA*.[64]  In

[57]*Cole v. Celotex*, 599 So.2d 1058, 1080 (La. 1992);  *Houston v. Avondale Shipyards, Inc.*, 506 So.2d 149, 154 (La. App. 4 Cir. 1987).
[58]*Cole,* 599 So.2d at 1080.
[59]*Houston v. Avondale Shipyards, Inc.*, 506 So.2d 149 (La. App. 4 Cir. 1987).
[60]*Cole v. Celotex*, 599 So.2d 1058, 1080 (La. 1992).
[61]La. R.S. 22:2052.
[62]LSA R.S. 22:2055(6).
[63]*Morris v. East Baton Rouge Parish School Bd.*, 01-1539 (La. App. 1 Cir. 5/1/02); 826 So.2d 46.
[64]*Mariner's Village Mandeville v. FAMA*,  95-1867 (La.App. 4 Cir. 3/14/96); 671 So.2d 1015, 1021, *writ*

*FAMA*, an action was brought to recover from LIGA as successor to obligations of an insolvent insurance company which issued performance bonds guaranteeing payment of two checks.  LIGA made the same argument in *FAMA* as it is making in this case.  In *FAMA*, LIGA argued that although two separate bonds were issued to cover separate risks, it was only liable for a single cap of $50,000[65] for the entire case despite the fact that multiple bonds were issued.  The Fourth Circuit rejected this argument and held that "[e]ach bond was issued to cover a separate risk."[66]

> Here, LIGA's predecessor issued two separate bonds to cover exposures on two separate checks. There is nothing in the legislative history or the jurisprudence to suggest that the mere fact, standing alone, that the separate bonds were given to cover two separate checks tendered in connection with a complex real estate transaction involving only a single parcel would justify treating claims on the two bonds as a single claim.[67]

Thus, the Fourth Circuit applied the $50,000 cap to <u>each</u> bond issued by the insolvent insurer as opposed to applying the $50,000 bond to the entire case.  *Id*.  A ruling that the LIGA cap applies to each policy issued by Reliance is in accord with the Louisiana Supreme Court's pronouncements in long-latency occupational disease cases, wherein the Court noted that "[e]ach policy will afford coverage to the bodily injury or property damage which occurs during the policy period."[68]

Accordingly, there is a separate $300,000 cap for each policy issued by Reliance for each claim.  LIGA may assert that the Fourth Circuit case should be disregarded because LIGA is not

---

*denied*, 96-0944, 673 So.2d 615 (La. 5/17/96).

[65]At the time of the insolvency, the law provided for a cap of $50,000.  *FAMA*, 671 So.2d at 1021.  The Act was amended in 1985 to increase the cap to $150,000.  *Id*.  Thus, with regard to the Reliance policies, there would be a cap for $150,000 for the survival action claim and $150,000 for the wrongful death claim since Reliance did not become insolvent until 2001, after the amendment increasing the cap from $50,000 to $150,000.

[66]*Id*. at 1021.

[67]*Id*. at 1022.

[68] *Cole,* 599 So.2d at 1080.

the actual insurer.  However, LIGA was not the actual insurer in *FAMA* either.  Just as it is in the instant case, LIGA was liable as the successor to the insolvent insurer, which is the entire purpose for which LIGA was created.  Also, "LIGA stands in for [the insolvent insurer] and is treated as though it were the primary liability insurer."[69] Thus, <u>for each policy</u>, there is a $150,000 cap for the survival action as well as the $150,000 cap for the wrongful death action.  Thus, the total potential liability for LIGA is $300,000 per policy year per claim.[70]

As noted by one court, "LIGA is therefore responsible for the payment of each claim covered under an insolvent insurance policy . . . ."  *Weaver v. Kitchens*, 556 So.2d 120, 122 (La. App. 5 Cir. 1990).  A ruling recognizing that LIGA is only liable to pay a single $300,000 cap regardless of the number of policies issued by Reliance is directly contrary to the purpose for which LIGA was created and contrary to the liberal construction which is to be given to the statues governing LIGA's obligations.

> The statutes are to be liberally construed to effect its stated purpose. LSA-R.S. 22: 1378.  Construction of the provisions in favor of claimants and policy holders to advance and protect their interests rather than the interests of the LIGA is mandated.  *Senac v. Sandefer*, 418 So.2d 543 (La. 1982).  A policyholder with an insolvent insurer is not protected.  Accordingly LIGA substitutes for the insolvent insurer with its associated duties and obligations.  *Hickerson v. Protective Nat. Ins. Co.*, 383 So.2d 377 (La. 1980); *H & H Sewer Systems v. Ins. Guaranty Ass'n*, 392 SO.2d 430 (La. 1980).

*Id*. at 122.  "LIGA stands in for [the insurer] and is treated as though it were the primary liability insurer."[71]  No where in the LIGA statues does it indicate that LIGA is only to stand in the shoes

---

[69]*Weaver v. Kitchens*, 556 So.2d 120, 122 (La. App. 5 Cir. 1990) (*citing Billeaudeau v. Lemoine*, 386 So.2d 1359 (La. 1980)).

[70]*Mariner's Village Mandeville v. FAMA*, 95-1867 (La.App. 4 Cir. 3/14/96);   671 So.2d 1015, 1021-1022, *writ denied*, 96-0944, 673 So.2d 615 (La. 5/17/96) (where the Fourth Circuit recognized that each bond (i.e. policy) was issued to cover a separate risk and each operated as a separate policy of insurance, which resulted in a separate cap being applicable to each separate policy.)

[71]*Weaver v. Kitchens*, 556 So.2d 120, 122 (La. App. 5 Cir. 1990) (*citing Billeaudeau v. Lemoine*, 386

of the insurer for a single cap even if there are multiple policies.  Such a finding would be contrary

to the policy of construing the provisions in favor of claimants over the interests of LIGA.

Certainly if Reliance were not insolvent, it could not argue that it only owes the limits of one

policy.  Similarly, LIGA is obligated to respond to each policy up to its statutory cap of $300,000.

However, even if this Court were to find that the LIGA cap of $300,000 is not a cap per

Reliance policy, LIGA's potential obligation still greatly exceeds the $1,046,413.84.  To adopt

this number, this Court would have to find that the $300,000 cap applies to LIGA regardless of the

number of covered claims and accidents/occurrences that exist.  As noted above, it is absurd to

argue that all purported 18,645 current claimants and unknown future claims were injured in the

same accident or occurrence, especially where Reilly-Benton sold products and performed

contracting activities throughout industrial facilities in Louisiana for decades.  There has been no

case that has held that claimants who were exposed on different jobs and different work sites were

injured during the same accident or occurrence.  In fact, creditors are unaware of any case where

LIGA has even made this argument in litigating its potential liability in asbestos cases.  This is the

first time counsel representing the creditors herein has encountered an argument that all possible

claims against Reilly-Benton could be considered a single accident or occurrence regardless of the

job and/or location of the different exposures.

III.    **The Court does not have jurisdiction to nullify the claimants' claims to the policies' proceeds.**

It is well settled in the Fifth Circuit that proceeds from insurance policies are not estate

property.[72]  Hence, regardless of whether couched in terms of a sale or settlement, the Trustee does

---

So.2d 1359 (La. 1980)).

[72]  *In re Louisiana World Exposition, Inc.*, 832 F.2d 1391, 1399 (5th Cir. 1987) (distinguishing between

not have the power to sell, compromise or otherwise nullify the Policies' proceeds because the proceeds are not estate property.[73]

The Trustee essentially acknowledges the rule that liability insurance proceeds are not property of the estate, but argues that the Court should reject this principle based on the *OGA Charters* case, discussed above, and *Sosebee v. Steadfast Ins. Co.*[74] These cases recognize that in limited instances when mass tort claims may exhaust insurance proceeds courts may deem such proceeds property of the estate.[75] This limited exception does not apply here.

*OGA Charters* involved a dispute between settling and non-settling claimants injured in a bus accident. The non-settling claimants commenced an involuntary bankruptcy case against the debtor due to concerns that the settlement with settling claimants would exhaust the policy proceeds.[76] The settling claimants argued that the insurance proceeds were not property of the estate in attempt to consummate their settlement with the insurers. There was no dispute that the

---

policies, which often belong to the estate, and proceeds, which generally do not); *Matter of Edgeworth*, 993 F.2d 51, 53, 56 (5th Cir. 1993) (The court noted: "When a payment by the insurer cannot inure to the debtor's pecuniary benefit, then that payment should neither enhance nor decrease the bankruptcy estate. In other words, when the debtor has no legally cognizable claim to the insurance proceeds, those proceeds are not property of the estate."); *Sosebee v. Steadfast Ins. Co.*, 701 F.3d 1012, 1023 (5th Cir. 2012); *see also Landry v. Exxon Pipeline Co.*, 260 B.R. 769, 786 (Bankr. M.D. La. 2001); *St. Paul v. Home Depot*, 2004 WL 2075129, at *2 (N.D. Ill. 2004) (explaining that an additional insureds rights under an insurance policy are not property of the estate and "[s]ection 105 does not provide authority to order a third party's contract right with another third party to be transferred to the estate for the benefit of the debtor's creditors").

[73] *See Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 135–36 (1962) ("Property interests in a fund not owned by a bankrupt at the time of adjudication, whether complete or partial, legal or equitable, mortgages, liens, or simple priority of rights, are of course not a part of the bankrupt's property and do not vest in the trustee. . . . The Bankruptcy Act simply does not authorize a trustee to distribute other people's property among a bankrupt's creditors."); *In re DVI, Inc.*, 306 B.R. 496, 504 (Bankr. D. Del. 2004) ("Debtors cannot sell any property that they do not own."); *In re Mariner Post-Acute Network, Inc.*, 267 B.R. 46, 59 (Bankr. D. Del. 2001) ("[A] bankruptcy court's jurisdiction does not extend to property that is not part of a debtor's estate.").

[74] ECF No. 56, page 12-13.

[75] *Sosebee*, 701 F.3d at 1023; *In re OGA Charters, LLC*, 901 F.3d 599, 604 (5th Cir. 2018).

[76] *OGA Charters*, 901 F.3d at 601.

payment to the settling claimants by the insurers would exhaust the applicable policy.[77]  The court

concluded that the "case present[ed] the limited circumstances in which the proceeds of a debtor's

liability policy are property of the estate."[78]  There was a need for bankruptcy oversight based on

the inability of the non-settling claimants to stop allocation of all of the proceeds to the settling

claimants.[79]  In contrast, in this case, there exists no aggregate limit for certain types of injuries

and to the extent limits exist, the limits are significantly higher than the amount the Trustee is

taking in exchange for nullifying the policies.  Moreover, the claimants here can protect themselves

without bankruptcy court oversight because under Louisiana law (*OGA* was governed by Texas

law) the Creditors have direct claims against the insurers.[80]  Further, the claimants here are aligned

in opposing the settlement.  In *OGA Charter*, the bankruptcy court's finding that the insurance

proceeds were property of the estate hinged on the fact that the claimants had divergent interests.

In *Sosebee*, the Fifth Circuit actually concluded that the liability policy proceeds were not

property of the estate.[81]  The plaintiff had a direct claim against the proceeds under Louisiana law

and they did not need the bankruptcy court's protection.[82]  Likewise, the creditors here have direct

claims against the insurance proceeds and claimants are not concerned regarding depletion of the

policy proceeds, nor are they requesting court oversight like in *OGA Charter*.  Also, in OGA

Charter, there was a single occurrence with a single policy and single limit at issue.  For Reilly-

---

[77] *Id.*
[78] *Id.* at 605.
[79] *Compare id.* at 604, *with*, *In re Forty-Eight Insulations, Inc.*, 133 B.R. 973, 980 (Bankr. N.D. Ill. 1991), *aff'd*, 149 B.R. 860 (N.D. Ill. 1992) (recognizing that the inherent chance that the policies might be exhausted through the course of litigation did render the proceeds estate property, as "that would be a consequence of the contractual limitations . . . It would not be the consequence of this Court's abrogation of those rights pursuant to a settlement between other parties.").
[80] La.-R.S. § 22:1269.
[81] *Sosebee*, 701 F.3d at 1023.
[82] *Id.*, at 1023-1024.

Benton, there are multiple policies, both primary and excess, each policy is triggered if there is an exposure during the policy period, and an exposure during the policy period is a separate occurrence.[83]

For the foregoing reasons, the insurance proceeds are not property of the estate. For the reasons discussed above, the policy proceeds are not estate property and, therefore, the Trustee has nothing to sell under to § 363(b).  This is really not a "sale."  The insurers are attempting to nullify their insurance policies in exchange for payment of a fraction of their liability, and its being couched in terms of § 363(f) and (m) to try to strip off the rights of the Landry & Swarr Creditors and the Roussel and Clement Creditors.  Simply stated, the Trustee cannot sell other people's property.[84]

## IV.    The Court cannot enter a channeling injunction under these circumstances.

The non-debtor releases and injunctions cannot be approved.  The Trustee cannot rely on § 524(g) channeling injunction because this is not a chapter 11 reorganization case or § 524 in general because corporate chapter 7 debtors are not entitled to a discharge injunction.  Accordingly, as a last resort, the Trustee invokes the equitable power of the Court under 11 U.S.C. § 105(a).  By its terms, however, § 105(a) is limited and can only be exercised within the confines of the Bankruptcy Code.[85]  The Code does not allow the extraordinary relief requested by the insurers

---

[83] *Houston v. Avondale Shipyards, Inc.,* 506 So.2d 149 (La.App. 4th Cir.), *writ denied*, 512 So.2d 459, 460 (La.), *reconsideration denied*, 513 So.2d 813 (La. 1987).

[84]  *See* La. C.C. Art. 2452 ("The sale of a thing belonging to another does not covey ownership."); *Courville v. Lamorak Ins. Co.*, No. 2020-CA-0073, 2020 WL 2754876 (La. App. 4 Cir. 05/27/20); *see also, In re Forty-Eight Insulations, Inc.*, 149 B.R. 860, 864 (N.D. Ill. 1992) (court held that an injunction was improper where it would abrogate the contractual rights of a non-debtor insured); *St. Paul v. Home Depot*, 2004 WL 2075129 at *2 (N.D. Ill. 2004) (explaining that an additional insureds rights under an insurance policy are not property of the estate and "[s]ection 105 does not provide authority to order a third party's contract right with another third party to be transferred to the estate for the benefit of the debtor's creditors").

[85] *Law v. Siegel*, 134 S.Ct. 1188, 1194 (2014).

25

and the Trustee.

This Court does not have subject matter jurisdiction to enter the proposed release and injunction. If this Court were to attempt to adjudicate the dispute between the non-debtor injured plaintiffs and non-debtor insurers, it would clearly exceed its jurisdiction.[86] Accordingly, if the Court cannot resolve the underlying dispute, it certainly lacks jurisdiction to eliminate those claims by means of non-consensual release and injunction.

Further, the Bankruptcy Code does not authorize the proposed relief. The release and injunction between the nondebtors parties is nonsensical in a chapter 7 case where the debtor does not even receive a discharge under § 707(a)(1). The justifications typically offered for these types of releases and injunctions is not present here, including a viable, ongoing business. More concerning is that granting the Trustee's motions will provide for an end run around the protections afforded under § 524(g), including the appointment of a legal representative to protect the rights of claimants (§ 524(g)((4)(B)(i)) and acceptance of the plan by at least 75% of the class of claimants (§ 524(g)(2)((B)(ii)(IV)(bb)).[87] There exists no statutory basis for the Trustee's request.

The cases relied upon by the Trustee[88] are inapposite either because the injunctions were not objected to by a valid claimant, they involved chapter 11 reorganization cases or the injunction was needed in connection with a sale involving preservation of a going-concern business. The National Services Industries, Inc.[89] case referenced by Trustee's counsel involved a $12.3 million payment by one insurer after extensive negotiations, including a three day mediation with a

---

[86] *Stern v. Marshall*, 564 U.S. 462, 487 (2011).
[87] *See, e.g.,* § 524(g)(2)(B)((ii) (requiring establishment of a trust pursuant to a chapter 11 plan  findings that the impact on the debtor should the injunction not be entered, that 75% of class of claimants, the court appoints a legal representative to protect the rights of claimants
[88] See footnotes 34 and 35, [ECF No. 56, page 18]
[89] *In re Nat'l Servs. Industries, Inc.*, No. 12-12057-MFW, United States Bankruptcy Court for the District of Delaware.

mediator experienced in complex insurance claim, and, most importantly, it did not involve direct action claims under Louisiana law and there were no objections to the settlement.

In sum, liquidating trustees are not empowered to use this 11 U.S.C. § 105 to strip non-debtor victims of their state law rights even if the insurance companies offer the estate a cash payout in exchange.

## V.  Conclusion

For the foregoing reasons, the Trustee's settlement motions should be denied.

Respectfully submitted,

**ROUSSEL & CLEMENT**

S/ Jonathan B. Clement
GEROLYN P. ROUSSEL, T.A. - 01134
PERRY J. ROUSSEL, JR. - 20351
JONATHAN B. CLEMENT - 30444
1550 West Causeway Approach
Mandeville, LA 70471
Telephone: (985) 778-2733
Facsimile: (985) 778-2734
**ATTORNEYS FOR ROUSSEL & CLEMENT CREDITORS**

and

**CONGENI LAW FIRM, LLC**

BY:    */s/Leo D. Congeni*
LEO D. CONGENI (#25626)
650 Poydras Street, Suite 2750
New Orleans, LA  70130
Telephone: 504-522-4848
Facsimile:  504-910-3055
Email:  leo@congenilawfirm.com

**Attorneys for the Landry & Swarr Creditors**

27