# EXHIBIT "B"

1

**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF LOUISIANA**

**NEW ORLEANS**

```
*  *  *  *  *  *  *  *  *  *  *
                            *      CASE NO.
IN RE:                      *      17-12870
                            *
REILLY-BENTON COMPANY, INC., *     CHAPTER 7
                            *
         DEBTOR.            *
                            *
*  *  *  *  *  *  *  *  *  *  *
```

             Transcript of the telephonic proceedings taken in

the above captioned matter on **Wednesday, August 17, 2022,** the

Honorable Meredith S. Grabill, United States Bankruptcy Judge,

presiding.


AUDIO OPERATOR:    Sean McGinn

TRANSCRIPTIONIST:  Sherryl Robinson
                   3704 Chadwood Drive
                   Harvey, Louisiana 70058
                   (504) 348-3704


Proceedings recorded by electronic sound recording, transcript

produced by transcription service.

**APPEARANCES:**


    The Derbes Law Firm L.L.C.
    By:  Albert J. Derbes, IV, Esquire
    3027 Ridgelake Drive
    Metairie, Louisiana 70002

        Representing the Debtor and Special Counsel
        to the Chapter 7 Trustee


    Roussel & Clement
    By:  Gerolyn Roussel, Esquire
    By:  Benjamin P. Dinehart, Esquire
    1550 West Causeway Approach
    Mandevile, Louisiana 70471

        Representing Roussel & Clement Creditors


    Congeni Law Firm, LLC
    By: Leo D. Congeni, Esquire
    650 Poydras Street
    Suite 2750
    New Orleans, Louisiana 70130

        Representing Landry & Swarr Creditors


    Sher Garner Cahill Richter Klein
     & Hilbert, LLC
    By:  Martha Y. Curtis, Esquire
        (BY TELEPHONE)
    909 Poydras Street
    Suite 2800
    New Orleans, Louisiana 70112

    Crowell & Moring LLP
    By:  Mark D. Plevin, Esquire
        (BY TELEPHONE)
    Three Embarcadero Center
    26th Floor
    San Francisco, California 94111

        Representing Century Indemnity Company and
        Pacific Employers Insurance Company

**APPEARANCES (Cont'd.):**


    Stewart Robbins Brown & Altazan, LLC
    By:  William S. Robbins, Esquire
        (BY TELEPHONE)
    301 Main Street
    Suite 1640
    Baton Rouge, Louisiana 70801

    Lafleur & Laborde, LLC
    By:  Stephanie B. Laborde, Esquire
        (BY TELEPHONE)
    6160 Perkins Road
    Suite 225
    Baton Rouge, Louisiana 70808

        Representing Louisiana Insurance Guaranty
        Association

4

## I N D E X

| REILLY-BENTON DEBTOR'S EXHIBITS: | | Marked | Received |
|---|---|---|---|
| Debtor No. 1 | Letter from Dr. Robert Miles Re: Warren Watters | 16 | 16 |

| ROUSSEL AND CLEMENT CREDITORS EXHIBITS: | | Marked | Received |
|---|---|---|---|
| No. 1 | Reilly-Benton 0836 Warren Watters Document | 14 | 14 |

**P R O C E E D I N G S**

(Wednesday, August 17, 2022)

(Court is in Session)

(BY TELEPHONE)

\*   \*   \*   \*   \*

**HEARING ON MOTIONS**

\*   \*   \*   \*   \*

1   THE COURT:  Good afternoon.  This is Judge Grabill.

2   We're here in Case Number 17-12870, *In Re:  Reilly-Benton*

3   *Company, Incorporated.*

4   Let's take appearances in the courtroom first.

5   MR. DERBES:  Good afternoon Your Honor, Al Derbes on

6   behalf of the Debtor Reilly-Benton.  For the record I also am

7   Special Counsel to the Trustee, but I don't believe -- well,

8   for the Motion to Compel I'll be here on behalf of the Trustee.

9   I am Special Counsel in connection with the Motion to Seal.

10   THE COURT:  Okay.

11   MS. ROUSSEL:  And Gerolyn Roussel and Benjamin

12   Dinehart for the Roussel and Clement Creditors.

13   MR. CONGENI:  Leo Congeni for the Landry and Swarr

14   Creditors.

15   THE COURT:  Okay.  And on the phone?

16   MR. ROBBINS:  Good afternoon Your Honor, it's Will

17   Robbins for Louisiana Insurance Guaranty Association.

18   I believe that my co-counsel Stephanie Laborde is on

6

1  the line.

2          THE COURT:  Okay.  Anyone else?

3          MR. PLEVIN:  Good afternoon Your Honor, this is Mark

4  Plevin on behalf of Century Indemnity Company and Pacific

5  Employers Insurance Company.

6          MS. CURTIS:  Good afternoon Your Honor, Martha Curtis

7  also for Century and PEIC.

8          THE COURT:  Okay.  Anyone else?

9      (No response)

10         THE COURT:  All right.  So what I've got in front of

11  me today is we've got a Motion to Seal and a Motion to Compel.

12  Let's deal with the Motion to Seal first.  That seems to be a

13  bit easier.

14         MS. ROUSSEL:  Yes, Judge.  The Roussel and Clement

15  Creditors filed a Motion to Summary Judgment.  In connection

16  with that Motion for Summary Judgment they filed a Motion to

17  Seal certain documents that had been filed by Liberty Mutual

18  and Warsaw in connection with the Courville case.

19         And because they had filed those in state court

20  pursuant to seal, which the Judge ordered under seal at that

21  time; when we filed them in connection with our Motion for

22  Summary Judgment we filed a Motion to Seal as well.

23         THE COURT:  Okay.  And you know, when this first came

24  across the docket, Chambers received -- I guess it was Century

25  perhaps that wanted to file a limited response or just wanted

1   to look at it first.

2           So Mr. Plevin, what can you tell me?  You filed a

3   limited response, it looks like, but --

4           MR. PLEVIN:  Yes, Your Honor.

5           So Mr. Clement, Ms. Roussel's colleague, e-mailed me

6   and said -- told me what the two documents were, told me that

7   they were confidential Liberty Mutual and Warsaw documents that

8   counsel for Liberty Mutual and Warsaw were willing to have

9   Mr. Clement send me the documents once the documents were filed

10  with the Court under seal.  And that I had to represent that I

11  would treat the documents as confidential, which I am willing

12  to do.

13          THE COURT:  Okay.

14          MR. PLEVIN:  So I think that unless Ms. Roussel or

15  counsel for Warsaw or Liberty has anything else, I think this

16  is resolved by granting the Motion to Seal and Mr. Clement's

17  agreement to then send me copies and my agreement to treat the

18  copies I receive from them as confidential.

19          THE COURT:  Okay.  All right, so what happens with

20  everyone else that's in --

21          MR. DERBES:  Your Honor, Al Derbes, and wearing my

22  Special Counsel for Trustee hat, I am Special Counsel for the

23  Trustee in connection with the Liberty matter, as well as the

24  Century Insurance Company situation.  Mr. Messina is General

25  Counsel for all of the other insurers.

8

1      And so I would just ask that the Trustee be afforded

2  the same courtesy as Mr. Plevin for Century, that with the

3  agreement to keep things under seal and the same condition,

4  that the Trustee be allowed to examine this, to examine -- to

5  understand the assets this estate may or may not have in

6  connection with Liberty Insurance proceeds.

7      THE COURT:  Uh-huh.  Yes, so is there a protective

8  order in this case that governs the parties?  Because we're not

9  going to be able -- that's the problem.  We're not going to be

10  able to deal with the summary judgment.  There's multiple

11  parties that are going to want to respond, to see what's going

12  on.

13      So how are we going to handle that?

14      MS. ROUSSEL:  And Judge, let me just indicate, I

15  don't have -- I personally and the Roussel and Clement

16  Creditors don't have any problem with anybody seeing those

17  documents.

18      THE COURT:  Uh-huh.

19      MS. ROUSSEL:  Liberty Mutual and Warsaw were the ones

20  who filed them under seal.

21      THE COURT:  Right.

22      MS. ROUSSEL:  And let me indicate that we filed that

23  Motion for Summary Judgment if you might recall last time we

24  were here in connection with the Courville, Steib (phonetic)

25  and Bouyon (phonetic) matters.

9

1          THE COURT:  Uh-huh.

2          MS. ROUSSEL:  We had reached a settlement with

3    Liberty and Warsaw with regard to those claims which involved

4    contracting action claims.  And so when we walked out of here

5    Mr. Derbes said he in reality didn't have a problem and was

6    going to file something, ultimately didn't.  And so we filed a

7    Motion for Summary Judgment so we could have it deemed that

8    contracting activities were not included.

9          It is holding up my distribution of those settlement

10   funds to those clients.  And so we need to get that Motion for

11   Summary Judgment heard as quickly as possible unless the

12   Trustee files something into the record saying he doesn't

13   object to us disbursing those settlement funds to our clients.

14         MR. DERBES:  Your Honor, I believe -- and Mr. Plevin

15   I think is -- and I think several people are working on their

16   responses and myself on behalf of the Trustee to this Motion

17   for Summary Judgment.  There's a Motion for Summary Judgment

18   filed apparently being heard on the 14th but it doesn't move to

19   summary judgment with respect to anything.  There's no motion

20   to have summary judgment on, and no adversary to have summary

21   judgment on, so it's going to fail procedurally.

22         There should have been a Motion for Leave to open to

23   lift the stay, which would have been I guess an admission that

24   there's been violations of the stay by all kinds of people.

25   Because when you have something that may or may not be an asset

1  of the estate, according to the Fifth Circuit that may or may

2  not be an asset of the estate; you're supposed to be careful

3  and come to Court and ask that the stay be lifted.

4          We've never consented.  As you remember, Your Honor,

5  at the very end of that big, long Motion to Dismiss we said we

6  have not consented.  What she was referring to was we went in

7  the hallway, I tried to work something out with Plaintiffs'

8  counsel as well as counsel -- I can't remember what, Liberty or

9  Warsaw, one of them.

10          And I'm like:  Let me look at this, I'm going to look

11  at this.  You may recall Your Honor that shortly thereafter on

12  July 4th my father passed away.  I did not see fit to jump

13  through too many hoops there.  We will be filing a Motion for

14  Violations of the stay for contempt against some parties and

15  set that for hearing on September 14th also, concurrent on that

16  summary judgment on something.

17          THE COURT:  Uh-huh.

18          MR. DERBES:  So you'll have it in front of you as to

19  where the people have violated the stay in connection with

20  anything.  But I don't think they're going to get any relief,

21  procedurally, from that summary judgment when there's no

22  principle motion.

23          THE COURT:  Well, my main concern right here with

24  this Motion to Seal is, you know, I'm in agreement that the

25  documents should be sealed.  But my concern is that there's no

1  protective order in this case, and so with all of the -- this

2  is not just a two-party dispute.  How are we going to provide

3  transparency and let, you know, parties-in-interest respond to

4  the documents -- see and respond to the documents that are

5  filed under seal?  How are we going to do that?

6         MS. ROUSSEL:  What I would suggest is we incorporate

7  the order by the state court and make it applicable to all of

8  the parties in connection with this bankruptcy.  And so they

9  would have access to the document, but be bound by that

10 protective order and/or order of confidentiality.

11        THE COURT:  Uh-huh.

12        MR. DERBES:  Not having reviewed it Your Honor that

13 may be a good way to handle it.  I would suggest that --

14        THE COURT:  Okay.

15        MR. DERBES:  Or perhaps counsel for Plaintiffs

16 circulate that to counsel for Century, both counsel for the

17 Trustee, myself and Mr. Messina, for Mr. Robbins the regular

18 counsel for LIGA, Ms. Laborde, and I would think each of the

19 counsel for Liberty and Warsaw, I believe, or Mr. Basano

20 (phonetic) and Mr. -- I'm not sure of the other one, but --

21        And then we may just have a crafted consent order.

22        THE COURT:  Okay.

23        MS. ROUSSEL:  Judge, what I suggest too is maybe you

24 just indicate right now that all parties will be bound to keep

25 the documents confidential.  Let me indicate I think as we've

12

1    indicated in the motion; all this deals with is Liberty

2    Mutual and Warsaw and their agreement with Reilly-Benton with

3    regard to insurance policies.

4            It has nothing to do with any other party, with

5    Century or any other party.

6            THE COURT:  Uh-huh.

7            MR. DERBES:  It has to do with this estate, Your

8    Honor.

9            THE COURT:  Right.

10           MR. DERBES:  Mr. Adler -- if there's value in the

11   remainder of the policies for Warsaw and Liberty, we may want

12   that value.  And we've negotiated to be put on hold when we

13   finish with that stuff until we see the two matters that are

14   pending.  You've got two very guiding motions for settlement

15   for trial, over six days, at the end of this year and that will

16   guide how the Trustee acts with respect to Warsaw and Liberty.

17           THE COURT:  Okay.  Again, you know, I'm willing to

18   grant the Motion to Seal.  But I need anybody that's going to

19   be able to see the summary judgment and see these documents to

20   sign a protective order, okay?

21           So if you can you know, meet and confer we've got

22   several templates that Magistrate Judge North has a great one.

23   I think Magistrate Judge van Meerveld also has one.  If you've

24   got one from state court that you can just import, great.

25           So the motion is granted pending the tracking,

13

1  signing and agreement and then file it into the record of a

2  protective order --

3          MS. ROUSSEL:  Yes, Your Honor.

4          THE COURT:  -- with this Court's approval, okay?

5          MS. ROUSSEL:  Thank you.

6          THE COURT:  All right.  Okay, so let's turn to the

7  Motion to Compel.

8          MS. ROUSSEL:  Yes, Judge.

9          As you know in connection with this case we do have a

10 trial starting on November 3rd.  In connection with that we

11 have a discovery cutoff of September 6th.  Since April 6th, we

12 have been requesting a date for a deposition of Reilly-Benton

13 as well as documents from Reilly-Benton.

14         We've sent several requests.  We never got a date.

15 So we issued a subpoena on June 22nd, it was served on June 23rd

16 for records and testimony from Reilly-Benton, which was to

17 happen on July 11th.

18         They called us, we conferred on July 5th.  They

19 agreed that they would produce documents by July 11th and give

20 us a date for the deposition.  They did produce documents,

21 however it was non-documents.  It was some depositions, none of

22 which had to do with any of the areas that we requested

23 information on.  They produced a few documents, none of which

24 had anything to do with the information that we requested

25 evidence on.

14

1      Interestingly though, one of the documents that

2   they did produce and that I'm going to attach as Exhibit 1 to

3   this argument was Reilly-Benton 0836, which showed that Warren

4   Watters clearly has capability to give a deposition.

5      We're going to attach -- I'm going to offer, file and

6   introduce into evidence as Exhibit 1 to this hearing, this

7   document.

8      MR. DERBES:  May I have a copy?

9      MS. ROUSSEL:  Yes.  It was produced by Reilly-Benton.

10     And what that shows is that -- and along with the

11  other documents -- that they did produce although not

12  addressing the issues that we requested information on, clearly

13  shows that Warren Watters does have competency to give a

14  deposition in this note which interestingly was a -- was from

15  the Louisiana Department of Revenue to Reilly-Benton Holding,

16  Inc.  It sent them a tax bill and he responded and that was

17  June of this year.

18     Note:  Reilly-Benton Holding had one asset, Reilly-

19  Benton Company, Inc., which ceased to operate in 2018.  It has

20  -- and then he scratched out and put a little arrow -- had --

21  and then he put a comma, Reilly-Benton Company.  No cash or

22  other assets; therefore cannot pay this bill.  Please eliminate

23  from your records.  Warren Watters, former manager.

24     THE COURT:  Okay.

25     MS. ROUSSEL:  So that shows clearly he has

15

1  competency --

2          THE COURT:  So if you are reading from something and

3  you plan on entering it into evidence can the Court get a copy

4  of it?

5          MS. ROUSSEL:  Absolutely, Judge.  May I approach?

6          THE COURT:  Yes.

7          MR. DERBES:  May we have a copy, Your Honor, too?

8          THE COURT:  Yes.  Everyone gets a copy.

9          MS. ROUSSEL:  And my understanding is this was

10  produced to everybody in response to our discovery responses.

11  So everybody should, except for the Court of course, have a

12  copy of that.

13          THE COURT:  Okay.

14          MS. ROUSSEL:  So after -- the bottom line is no

15  objections, no formal objection or informal objection was filed

16  to the notice of deposition.  And so pursuant to Rule 30(b)(6),

17  they waived any -- and Federal Rule of Civil Procedure 45, they

18  waived any objection to any responses.

19          So Judge, we would submit, because they turned over

20  nothing with regard to the proposed 18,645 claimants they claim

21  they have no other documents other than what was produced which

22  as I indicated were some depositions dealing with personal

23  injury claims which didn't address any of the issues we raised

24  in our notice of deposition.  And these few documents here

25  which doesn't address any of those -- which included that one

16

1    memo to the Department of Revenue.

2         So we would submit that the Motion to Compel should

3    be granted in its entirety since the discovery cutoff is

4    September 6th.  We ask that Warren Watters and/or a corporate

5    representative -- and we don't care who the corporate

6    representative is, but that they give a deposition prior to

7    that time and produce the documents requested in a subpoena

8    prior to that time.

9         Thank you Your Honor.

10        THE COURT:  All right.

11        Mr. Derbes, why can't Mr. Watters sit for a

12   deposition?

13        MR. DERBES:  Well Your Honor, we'll deal with I guess

14   the oral part first then we'll get to the documents.

15        THE COURT:  Yes.

16        MR. DERBES:  May I approach Your Honor?  I do have

17   copies of a document from the attorney -- I mean from the

18   doctor, Dr. Robert Miles who is the treating internist for

19   Mr. Watters.

20        I'm giving a copy to opposing counsel.  May I

21   approach Your Honor, I'll put this as Debtor 1 --

22        THE COURT:  Okay.

23        MR. DERBES:  -- and mark it.

24        THE COURT:  All right.  I would just note for the

25   parties that typically motion days in this Court are not

17

1  treated as evidentiary hearings.  Since we only have a few

2  I'm willing to accept them.  But just know that this is not a

3  full bore evidentiary hearing.

4          MR. DERBES:  Thank you Your Honor.

5          THE COURT:  Okay.

6          MR. DERBES:  I think that's my only document.

7          THE COURT:  All right.

8          MR. DERBES:  May I approach, Your Honor?

9          THE COURT:  Yes.

10          MR. DERBES:  And let the record reflect I'm also

11  giving a copy to your law clerk.

12          And Your Honor before I go address this exhibit, I do

13  want to give the Court a little history on this part.

14          THE COURT:  Okay.

15          MR. DERBES:  I guess I'll give you a moment, a chance

16  to read it and I'll give you a little history.

17      (Pause.)

18          THE COURT:  Okay, go ahead.

19          MR. DERBES:  Your Honor, if you look at the motion by

20  the Plaintiffs, they've attached the e-mail correspondence, the

21  history.  Now did you have a chance to read that

22  correspondence?

23          THE COURT:  Uh-huh.

24          MR. DERBES:  And you'll note that we tried to work

25  things out and see if we could do written documents.  I

18

1    understood there were some issues with Mr. Watters since the

2    filing of the bankruptcy several years ago.  But we weren't

3    certain, so I personally went and visited the man.  You may

4    recall, Your Honor that I was not Debtor's counsel back then,

5    my firm was.  And so I frankly had never met Mr. Watters.  I

6    had spoken to him on the phone once in the past five years but

7    never met him.

8            So I went down and to his condo.  He couldn't come to

9    the office, he said, and so I went down to his condo to make

10   sure I was gathering the documents.  And that would follow

11   these e-mails of July 6th and 7th.  We tried to work out and

12   you see in these e-mails for example they had confirmed in the

13   e-mails, they confirmed that the oral deposition was off.

14           So in terms of a timing on any Motion to Quash I

15   believe that is not the case because they had -- there is no

16   date pending right now for the Subpoena Duces Tecum.  So

17   because there is nothing pending that those deadlines -- those

18   waivers issued are not there --

19           THE COURT:  Uh-huh.

20           MR. DERBES:  -- but it's --

21           THE COURT:  But that's essentially in your

22   opposition, that's essentially what you're arguing.

23           MR. DERBES:  Yes.

24           THE COURT:  I mean that's what I interpreted the

25   opposition is.

1          MR. DERBES:  Right.

2          THE COURT:  It's basically a request to quash.

3          MR. DERBES:  And we have also separately just in case

4  filed a Motion to Quash to be also set now for pending on

5  September 14th, the same day as a bunch of stuff with this

6  case.

7          THE COURT:  Okay.

8          MR. DERBES:  But when they take issue with the oral

9  deposition, Your Honor, we had some concerns about his dementia

10  and we suggested written deposition request is a possibility,

11  and they rejected that possibility.

12          So I went down to Mr. Watters to go find him, what he

13  had anyway.  When I found him I'm leading into the paper issue.

14  What I found was the entirety of what he owned, that he has,

15  was a pile of paper this (indicating), I'm indicating about an

16  inch and a half thick.  We took that, scanned that.  My office

17  went through it and took out the few privilege items which

18  would be from counsel and turned over everything this man has,

19  that the company has, regarding the Debtor over.

20          There are no other responsive documents.  He says he

21  may have the corporate book, but he couldn't find it.  And one

22  interesting thing, what I think I found in there was I found a

23  copy of an article in the newspaper about Reilly-Benton having

24  moved from its Tchoupitoulas location to the Elmwood area.

25          What was interesting there was he had advised me,

20

1   informed me that all of the documents of the Debtor were left

2   at its office on Tchoupitoulas.  So he actually had forgotten

3   that the company had moved from Tchoupitoulas to Elmwood.  That

4   was gone.

5            THE COURT:  Uh-huh.

6            MR. DERBES:  When I first came into there his wife

7   talked to me, and she's 90 something also.  She said he's got

8   some dementia, it's not real bad but it's there.  She said, so

9   she just wanted to let me know that.

10           He told me frankly that he has some dementia, some

11  memory issues I think he mostly described it as memory issues.

12  I did not notice any dementia in a sense of hallucinations.  I

13  just noticed significant memory gaps in the conversation.

14           The doctor's note -- well, subsequently I did talk

15  again to Mrs. Watters and to Mr. Watters and I got this

16  document known in connection with his hearing that he is 95

17  with a history of heart disease, hypertension, memory loss, and

18  poor balance.

19           Now the memory loss, what may have happened since the

20  filing of this bankruptcy several years ago was the man advised

21  me he fell twice and he was bedridden twice.  And the fallings

22  had involved general anesthesia.  And I know from personal

23  experience with a fall that an elderly person only 82 years old

24  recently that when you put an 82 year old with some dementia

25  under anesthesia; in that case it can go -- it can be horrible.

1 That's my recent experience with my father.  In this case the

2 man is not demented in the sense of hallucinations but he has

3 significant memory loss.

4   One of his falls resulted in a break so bad or a

5 problem so bad with an injury so bad to his arm they were

6 considering amputating it, they didn't.  Then he had another

7 one right after that bedridden event, he fell again --

8   THE COURT:  I mean, look --

9   MR. DERBES:  He's bad off.

10   THE COURT:  This is, you know, we're not at a medical

11 exam.  We don't have a bunch of doctors and we certainly don't

12 have, you know, any sort of -- other than this, at this point,

13 the letter from his internist, that's it as far as evidence.  I

14 mean suffice to say the man is 95 years old, okay?  And I think

15 as a general matter I don't know a whole lot of 95 year olds

16 that are you know, running marathons.  Not that there aren't

17 any, but you know, I think we can make some general

18 observations about Mr. Watters without, you know, painting a

19 picture or giving impressions.  We're not mental health

20 professionals, we're not physicians, we're just a bunch of

21 lawyers.

22   So let's just cut to the chase.  Like what exactly

23 would you like to get from Mr. Watters --

24   MR. DERBES:  Your Honor?

25   THE COURT:  Yes.

1          MR. DERBES:  Can I finish?

2          THE COURT:  Yes.

3          MR. DERBES:  I really think it will be helpful.

4          THE COURT:  Okay.

5          MR. DERBES:  He hasn't done anything with these

6    claims in years.  He has no knowledge of the current claims.

7    I'll give you background:

8          I checked on my file in the docket and where do we

9    get that exhibit -- if you look at the docket, Number 14 on the

10   docket back, way back when.

11         THE COURT:  Yes.

12         MR. DERBES:  We had listed -- we had provided the

13   names of every case that was out there.  That's where the

14   18,000 cases come from.  We had actually made a mistake, my

15   firm, and included the Social Security Numbers of the 18,000

16   people.  The Clerk of Court caught it real quick and so it was

17   either redacted -- a redacted version was there.

18         THE COURT:  Uh-huh.

19         MR. DERBES:  So the redacted spreadsheet is there

20   with all 18,000 claimants, now we're at Docket 14.  And here it

21   is, Your Honor, on the first page of it in micro-type.  And in

22   there is the name of each claimant and in there is the name of

23   each case number, and so all the information is there.

24         And my understanding is that there is -- if you sort

25   this, you get 2800 cases.  18,000 claimants in 2800 cases, you

23

1    have family members.  Somebody washed the clothes, that kind

2    of thing.

3              THE COURT:  Right.

4              MR. DERBES:  You get from the 2800 to 18,000.  That's

5    how you get to the 18,000 number.

6              But the Debtor has -- I mean the Plaintiffs have

7    every single case that's the base of this.  They could go

8    subpoena the information from the relevant insurers defending

9    this company.  Those relevant insurers have the information

10   with respect to the status of each of these cases.

11             Also, unless they've been sealed, every single one of

12   those cases is a public record.  This man does not know the

13   answer to those -- I think it's 95 topics the poor man was

14   supposed to opine on.

15             THE COURT:  Uh-huh.

16             MR. DERBES:  He doesn't know any of the answers to

17   these questions.  He hasn't dealt with this stuff since 2017

18   for certain.  He has no piece of paper other than everything I

19   gave -- I did also find six transcripts from depositions which

20   I turned over, which I gathered on my own, including one where

21   Ms. Roussel was actually the Plaintiffs' counsel cross-

22   examining the man.  He has been deposed before and he gave the

23   authority for that.

24             This man does not know anything else.  There is no

25   other officer of the company.  To his knowledge, he isn't

24

1   certain of which of the remaining -- other previous officers

2   of the company are even dead.  But if you look at the Rule, we

3   cannot be made under Rule 30(b)(6), we cannot be made to

4   identify another person, because you can't -- you've got to

5   have a corporate representative.  The Rule is an officer -- the

6   Rule is an officer 30(b)(6) -- an officer, director or managing

7   agent; or designate other person who consents to testify on its

8   behalf.  No sane person would consent to testify on those 72

9   topics on behalf of this bankruptcy.  That's the Rule.

10          So it's Mr. Watters and there's nobody else, you

11  can't substitute, and Mr. Watters does not have the knowledge

12  and they have not attempted to get the knowledge from the more

13  easily ascertainable public records of all 2800 cases, or from

14  the insurers that are defending the Debtor in those cases.

15          THE COURT:  Okay.  Well, that was the reason for my

16  question.  What do you want from Mr. Watters and where can we

17  get it if we can't get it from Mr. Watters?

18          Now, I'm also going to ask you to consider, you know,

19  if Mr. Watters is going to be deposed, which I'm not saying one

20  way or another, but if he is are there less burdensome -- can

21  you go to his home, can we limit the amount of time, can you

22  accept written responses to deposition questions?  Can you

23  limit the number of topics, like what -- how are we going to

24  solve this problem?

25          And I'll back up.  The problem is you know, when we

1  get to trial you know, what has to be proven and whose burden

2  is it to prove?  So is it your burden to go out and -- like

3  let's start with the first question:  What do you want from

4  Mr. Watters?

5          MS. ROUSSEL:  Okay.  The first, and let me indicate

6  that I separated the topics.

7          THE COURT:  Uh-huh.

8          MS. ROUSSEL:  Because when I try to -- I probably

9  could have asked three questions here.  But when I've done

10  that, I've gotten responses, "Oh it's too overly broad and

11  vague."  So I split it.  Okay, so let me tell you:

12          What are the currently pending asbestos-related

13  claims?  Because here we have 18,645 you keep hearing about.

14  What I just heard is we have a defunct company with a man who

15  has no records.  Under Federal Rule of Bankruptcy Procedure

16  9011(b)(3), you would think that he would have had records to

17  come in and say:  I had 18,645 claimants.

18          THE COURT:  Uh-huh.

19          MS. ROUSSEL:  What I'm hearing is they don't have

20  records to show that.  But that's one of my questions.  What

21  are the currently pending asbestos-related claims?  And tell me

22  the status of those currently pending claims.  And tell me the

23  date they were filed.  Now that's important for a lot of

24  reasons.  After three years that no action is taken, those

25  claims are deemed abandoned and nobody can collect a penny on

26

1  them.

2        And so -- and I understand Mr. Derbes is appearing

3  here today on behalf of Reilly-Benton.  And so my question is,

4  you know, the Trustee should be every bit as interested in

5  getting this information as I am, and getting the information

6  is this a valid bankruptcy?  And from I'm hearing:  No records,

7  no claims.  This bankruptcy should be dismissed is pretty much

8  the bottom line.

9        But I need to get -- if it's going to continue to

10  proceed I need to get the information so that I can properly

11  represent the Roussel and Clement Creditors at this trial that

12  this Court has set.

13        And so that's what all these questions deal with.

14  Tell me the relationship between your insurance companies?

15  Tell me whose decision it was to file this bankruptcy?  Tell me

16  your backup for representing to this Bankruptcy Court that

17  there are 18,645 claimants?  And this Motion to Compel is

18  against Reilly-Benton.  It's not against anybody else.  And

19  under 30(b)(6) Reilly-Benton the company -- the company, not

20  Mr. Watters.  We hear about Mr. Watters.  I'm not interested in

21  Mr. Watters.  I'm interested in what does Reilly-Benton have?

22        THE COURT:  But you understand that this is not an

23  operating company and it hasn't been operating for a good long

24  while.  So can you -- my question is, just out of curiosity:

25  Can you have a 30(b)(6) representative of a non-operating

27

1   company?

2          MS. ROUSSEL:  Well, under the Cabrera case, which is

3   a federal court case dealing with 30(b)(6), it says that they

4   have to designate somebody and otherwise they could

5   indefinitely fail to comply with plaintiff's discovery request.

6          THE COURT:  Uh-huh.

7          MS. ROUSSEL:  So my submission to this Court is this

8   bankruptcy should be dismissed, or Reilly-Benton the Debtor

9   should be compelled to give me the information that I'm

10  seeking.  You know, this is a defunct company with no records,

11  it had no basis to represent to this Court that it has over

12  18,645 claimants to begin with.

13         And so either this bankruptcy should be dismissed or

14  the Debtor, Reilly-Benton, should be compelled to provide the

15  information to back up its representations to this Court.

16         And yes, I'm willing to go to Mr. Watters' home and

17  do anything to accommodate him that's necessary.

18         THE COURT:  Okay.

19         MR. DERBES:  And Your Honor --

20         THE COURT:  And you could limit your questions to you

21  know, because as a 95 year old, I don't believe any 95 year old

22  has a lot of stamina.  He's not going to sit -- if he has to

23  sit he's not going to sit for more than half an hour to an

24  hour, at most.

25         MS. ROUSSEL:  Judge, and all I'm looking for is what

28

1  was behind the decision to file the bankruptcy, who propelled

2  that decision, what kind of agreements were made for that

3  decision to be done, and give me the backup for the

4  representation to this Court that there were 18,645 claimants.

5          MR. DERBES:  Your Honor --

6          MS. ROUSSEL:  And that's my question --

7          THE COURT:  That's like four questions.

8          MS. ROUSSEL:  That's the bulk of it.

9          MR. DERBES:  So Your Honor, I'll answer the easiest

10  one first:  What was the basis?

11          That spreadsheet was provided by Mr. Tom Cougill

12  (phonetic) who I believe, as I understand, I'm still trying to

13  get in front of this was then counsel for the Debtor.  He

14  prepared the 18,000 -- the list of 18,000 claimants.  It is

15  Document 14 in the record of this Court, so the Court has the

16  list, the backup, and so does as I said the Court and all the

17  Plaintiffs have the backup.

18          The case numbers are there, that's the backup.

19  Objective reality, the case numbers can be checked against

20  those public records.  I can tell you that my firm is, in 30

21  years, well 24 years, almost never filed a Chapter 7 for an

22  entity.  You don't get a discharge.  The only reason you would

23  ever do that is you've got so many claims you can't deal with

24  it anymore, and so this is why you do it.

25          So you say:  I'm 95, there ain't nobody -- well back

1    then, 91, there ain't nobody around, boom, we're done.  And

2    so let them deal with whatever proceeds are left to go fight

3    over in these insurance policies.

4            So, but the answer to the question:  What was the

5    basis?  This is the basis.  I can go to Mr. Cougill and say:

6    You got any more records?  Like I see preparing for this

7    hearing, check that.  He was apparently Debtor's counsel, see

8    if they have any more documents responsive.  I can do that for

9    documents responsive.

10           THE COURT:  Uh-huh.

11           MR. DERBES:  But everything the client knows, the

12   clients answer the question:  What is the status of these

13   cases?  I don't know.

14           They want a stipulation?  The answer of the Debtor to

15   what the status of these cases right now is:  We can provide a

16   stipulation.  He doesn't know.  He does not know the status of

17   these cases, and he certainly does not know the status of all

18   the cases filed since the filing of the bankruptcy, violating

19   the automatic stay.  I know there's a bunch.  I'm learning

20   about some more every day.  I haven't decided to spend the

21   energy and to do that and deal with that.  We haven't done

22   that.  But I know there's some and I know there's some filed by

23   the lawyers in this room right now, violating the automatic

24   stay.

25           So they're aware of additional ones that are pending.

30

1   They know the status, but my client, the Debtor

2   representative does not.  And 30(b)(6), that case -- I don't

3   believe -- I don't have it in front of me right now, but I

4   don't believe that Cabrera case said anything about having

5   anybody other than an officer, director, managing manager or --

6   there's only one person here.  It doesn't say provide a

7   solution to their query.

8           If they want to do written questions.  I think one of

9   the questions was, I mean, and if I could ask cross-talk, Your

10  Honor?

11          THE COURT:  Uh-huh.

12          MR. DERBES:  What is the status?  What was the

13  source?  Status, don't know except through counsel I can tell

14  them what stay violation I've been notified of by some of the

15  counsel, again, you know, some of the Plaintiffs' counsels.

16  What was the source?  This spreadsheet was literally the

17  source.  And there's another spreadsheet I know that excerpts

18  the 2800 names and makes a shorter version of this, but all of

19  the information is in here.  There's another spreadsheet from

20  counsel.

21          THE COURT:  Uh-huh.

22          MR. DERBES:  What was the third question, if I could?

23          MS. ROUSSEL:  Currently pending asbestos-related

24  claims, status of those claims.  This spreadsheet has numerous

25  of my clients on that, when I went back and looked, that had

31

1    been dismissed, settled and out on a Motion for Summary

2    Judgment years ago.

3              MR. DERBES:  And as you --

4              MS. ROUSSEL:  So this obviously, this 18,646 (sic)

5    claims is obviously wrong, I just know from the claims that I'm

6    handling.  I only know what my firm has handled, what I'm able

7    to track back.  What I need to get from him is with regard to

8    the 18,646 (sic) cases, the fact that that's true as to every

9    other case on here except maybe a handful.

10             What are the currently pending claims and what is the

11   status of those claims?

12             MR. DERBES:  Okay --

13             MS. ROUSSEL:  Because I know the ones that I'm on

14   here for, most of them are dismissed.

15             MR. DERBES:  As Your Honor knows, Debtor's counsel

16   has a duty from a due process standpoint, it's to give

17   everybody notice, all of bankruptcy who might have a claim.

18   That was done.

19             What I'm hearing is that this list may be overly

20   inclusive.  Probably so.  I know I do that with zero balance of

21   credit card claims when we do debtor cases.  You may be owed as

22   -- we're not presenting these as all of the cases that may

23   exist or still are active.  This was a depicture in time five

24   years ago of the case that was then existing that we were --

25   that our counsel was aware of.

1    Maybe some of them had settled in five years ago,

2  but I don't know that all of them settled five years ago.  I

3  know that some have been filed since then.  We don't have the

4  -- my Debtor does not have the resource or the information, and

5  frankly, this is exactly the reason why a settlement by the

6  Trustee makes sense when you have 18,000 plus claimants or

7  minus, plus or minus, 2800 cases plus or minus.  I know that

8  some have been added since then, I know that some have been

9  filed since five years ago.  This is why Trustees settle these

10  cases.  That's the burden of proof at trial is does it make

11  sense to settle?

12    If they want to fight and find out the accuracy of

13  this stuff, they can go do that.  But actually, the easy way

14  probably will be for them to depose the four insurance

15  companies who are doing the defending.  The same four questions

16  to the four insurance companies what their represent is, they

17  can actually get accurate information.

18    And perhaps Your Honor should continue this hearing

19  on the oral testimony and that part.  I think you could address

20  the written, the documentary part right now.  But it's the oral

21  part, perhaps you could continue it until after they take those

22  (inaudible) depositions of the four insurance companies.

23  Months, they've not noticed -- those four questions, those four

24  insurance companies.  That will be really easy.  That will be

25  four days, they'd be done, they'd have the information, boom,

33

1   boom.

2           MS. ROUSSEL:  I think you've just answered the

3   question.  This bankruptcy is propelled by insurance companies

4   which are non-Debtor.  I'm interested in the information from

5   the Debtor, the Debtor Reilly-Benton.

6           And with regard to claims being settled, I can tell

7   you all of the ones that are on this list that are dismissed as

8   to me were settled and/or dismissed.  One of them, I believe,

9   was 2004, so decades ago.

10          I have not settled any claims that are on this list

11  since that time with the exception of I believe the Courville

12  case, which the Fourth Circuit has said there are no limits on

13  those policies at issue.  And so clearly, it could not impair

14  this bankruptcy.  It could not have impaired the estate in any

15  way, shape or form, and that is what -- part of what my Motion

16  for Summary Judgment is about.

17          THE COURT:  Okay.

18          MS. ROUSSEL:  And Judge, since it's my motion I do

19  want to have the last word.

20          MR. DERBES:  Well, if we --

21          THE COURT:  Well, let's talk about --

22          MS. ROUSSEL:  I know Mr. Derbes keeps getting up.

23          THE COURT:  Let's talk about it.

24          MR. DERBES:  Before that --

25          THE COURT:  Let's talk about documents because I

34

1  understand that there aren't a lot of them in the Debtor's

2  hands.

3        MR. DERBES:  Every single slip of paper in the

4  possession of the Debtor has been produced.  I did figure out

5  today that I probably should contact Mr. Courville and make

6  sure -- I mean, not Mr. Courville, Mr. Cougill -- that lawyer,

7  Mr. Tom Cougill, and make sure he has no other documents.  I

8  will --

9        THE COURT:  Okay.

10        MR. DERBES:  I do need to do that.  But I figured

11  that out in preparation for the hearing yesterday and today.

12  But other than that, everything has been produced.  I have a --

13  I do have some printouts of the same spreadsheet with like less

14  information.

15        THE COURT:  Uh-huh.

16        MR. DERBES:  But on Exhibit 14 -- of Document 14, but

17  every other document that we have that is not on the privilege

18  log has been produced and there's been no Motion to Compel

19  fighting with the privilege log.

20        THE COURT:  Uh-huh.

21        MR. DERBES:  Every other slip of paper I have has

22  been produced.

23        THE COURT:  All right.  So that may be your answer

24  regarding documents.

25        MS. ROUSSEL:  Well Judge, actually that's why I need

35

1  a corporate representative to state that.  It's all

2  interesting what Mr. Derbes states.

3            THE COURT:  Uh-huh.

4            MS. ROUSSEL:  But I need a corporate

5  representative --

6            MR. DERBES:  We'll do a --

7            MS. ROUSSEL:  -- to sit down, get sworn and tell me

8  they have no records.  And which goes to my point, then they

9  had no basis to file this bankruptcy in the first place.

10            MR. DERBES:  Your Honor --

11            MS. ROUSSEL:  I need them to tell me we do not have

12  any records --

13            THE COURT:  Well, the conclusion --

14            MS. ROUSSEL:  Oh --

15            THE COURT:  -- that you're reaching is just your

16  conclusion.  What you want is the information and I

17  understand --

18            MS. ROUSSEL:  What I want is the information in my

19  notice, correct.

20            THE COURT:  Right.

21            MR. DERBES:  Well, we'll enter a stipulation, Your

22  Honor, as to the -- I think we did that but I can put an

23  affidavit -- I might not put an affidavit on top of my

24  stipulation.  I mean I hate to do that to --

25            THE COURT:  Well I know, but where does the

1   stipulation come from?  It has to come from your corporate --

2          MR. DERBES:  Mr. Watters will stipulate that that was

3   all he gave me, and so --

4          THE COURT:  Well now, if Mr. Watters is competent

5   enough to enter into a stipulation then he's competent enough

6   to sit for questioning.

7          However, he will only sit for half an hour, and

8   that's it.  And you can ask four questions, and that's it.

9          MS. ROUSSEL:  Judge, by when does he have to do that?

10  Can we have him do it before September 6th which is the

11  discovery cutoff?

12          THE COURT:  Well, it has to be before the discovery

13  cutoff.

14          MS. ROUSSEL:  Okay.

15          THE COURT:  But you're asking -- I understood you

16  wanted -- two of the questions are, you know, how many

17  currently pending asbestos claims do you know of?  Not the

18  status of those claims, not the date filed, just how many

19  currently pending asbestos claims are you aware of?

20          MS. ROUSSEL:  And in the status it's important

21  because many of those claims he's going to say 18,645 --

22          THE COURT:  Well, we don't know what he's going to

23  say, but --

24          MS. ROUSSEL:  Well --

25          THE COURT:  -- but what are you looking for?

37

1    MS. ROUSSEL:  I want to know what the status is.  I

2  want to know what the status -- have they been dismissed?  Are

3  they pending?  Are they being active?

4    THE COURT:  Well, that's my --

5    MS. ROUSSEL:  What's the status?

6    THE COURT:  -- currently pending asbestos claims.

7    MS. ROUSSEL:  And the status, Your Honor?

8    THE COURT:  I think that --

9    MR. DERBES:  And if the answer is he don't know, Your

10  Honor --

11    THE COURT:  I think that's redundant.

12    MR. DERBES:  -- I'm going to bet you --

13    THE COURT:  Well, if he doesn't know, he doesn't

14  know.

15    MR. DERBES:  He doesn't.

16    THE COURT:  But she gets the opportunity.

17    MS. ROUSSEL:  And then Judge, whose decision to file

18  for bankruptcy and what was the motive behind it?

19    THE COURT:  Okay.  So that's number two, motive for

20  filing bankruptcy.

21    MS. ROUSSEL:  And then the agreement with the

22  insurance company, his insurance companies.

23    MR. DERBES:  What agreement, Your Honor?

24    THE COURT:  Any agreement --

25    MS. ROUSSEL:  With the insurance companies.

38

1          THE COURT:  -- to file for bankruptcy?

2          MS. ROUSSEL:  Well, they could do it in different

3    ways.

4          THE COURT:  As motivation for --

5          MS. ROUSSEL:  Yeah.  Well no, any agreements with his

6    insurance companies which may have had any bearing with regard

7    to either the claims and the way they handled those claims.

8    Because what they were doing was when claims were being

9    settled, whether it was a contracting claim or a products

10   claim --

11         MR. DERBES:  Your Honor, he can't --

12         THE COURT:  Uh-huh.

13         MS. ROUSSEL:  -- they would take the money and put it

14   into the -- as a products claim so that they could exhaust the

15   aggregate, so that they could then come to bankruptcy court and

16   say we don't have any money left.

17         THE COURT:  All right.

18         MR. DERBES:  He can't answer these questions, Your

19   Honor.

20         MS. ROUSSEL:  Well, we don't know that, do we?

21         THE COURT:  Well then he can't --

22         MR. DERBES:  May I suggest --

23         THE COURT:  Then he has to sit.  If he can't answer

24   them, he can't answer them.

25         MR. DERBES:  The third one he can't -- or the fourth

39

1   one he can't.  I just know he'll get there.

2          THE COURT:  Well, we don't know, but he is going to

3   be given the opportunity.  Your four questions are:

4          One, how many currently pending asbestos claims do

5   you know of and the status?

6          Number two, do you have any more corporate records?

7          Number three, what was your motivation for

8   instructing your attorney to file for bankruptcy?

9          And number four, did you have any prior agreements or

10  arrangements with the insurance companies regarding the

11  treatment of claims or for filing for bankruptcy?

12         MS. ROUSSEL:  Yes.

13         MR. DERBES:  Your Honor --

14         THE COURT:  Those are your four questions.

15         MR. DERBES:  -- we --

16         THE COURT:  What I would suggest is that you take

17  Mr. Derbes advice and look for alternative sources and methods

18  for collecting insurance.

19         But again, it all comes -- you know, every time we

20  have one of these hearings my two questions that I end up with

21  on my little sheet of paper are:  How many live claims do we

22  have?  And what are the limits of the insurance?

23         And so I'm hoping that somebody will reveal that to

24  me eventually.

25         MR. DERBES:  But they've never --

40

1    MS. ROUSSEL:  And that's what we're trying to get,

2  Judge.

3    MR. DERBES:  They've never propounded the discovery

4  for the people who know the answers to those questions.

5    THE COURT:  I know, but it goes back to what we're

6  going to try.

7    MR. DERBES:  Right.

8    THE COURT:  You know, what are the topics, you know,

9  what's up for summary judgment, what are we going to try that,

10 you know, at the heart of this is the 9019 sale motion.  Whose

11 burden is that and what do you need to show?

12    MR. DERBES:  And Your Honor, for the four questions

13 and the one half hour; will the Court be preparing that order?

14 Or if you -- I will do so if you want.

15    THE COURT:  Okay.

16    MR. DERBES:  But I'm a bad transcriptionist.

17    THE COURT:  All right.

18    MS. ROUSSEL:  I would take the -- I would be

19 agreeable to saying what you said on the record is the order.

20    THE COURT:  Okay.  I'll do the order then.

21    MR. DERBES:  Thank you Your Honor.

22    THE COURT:  Okay.

23    MR. DERBES:  I would appreciate that.

24    THE COURT:  Yes, I'll do the order.  It has to happen

25 by September 6th; a half hour, that's it, okay?  That's it.

41

1 | And you have to go to his house.

2 |        MS. ROUSSEL: And Judge, I do want to state that we

3 | have been trying to get that information both from LIGA and

4 | from Century, and in fact Century filed -- we had a similar

5 | issue where we had to actually issue a subpoena to them and

6 | they filed a Motion for Protective Order which is on Your

7 | Honor's --

8 |        THE COURT: Okay.

9 |        MS. ROUSSEL: -- next docket.

10 |        THE COURT: All right, that's fine. And that's fine,

11 | you know, and that's what happens in litigation. I understand,

12 | all right.

13 |        All right, so the Motion to Compel is granted with

14 | limit. So I'll do the order and we'll try to -- it might not

15 | happen today, but it will happen tomorrow, tomorrow morning,

16 | okay?

17 |        Is there anything else I can help you with?

18 |        MR. DERBES: Your Honor, they're picking the date. I

19 | will need to coordinate with Mr. Watters.

20 |        THE COURT: Absolutely.

21 |        MR. DERBES: He has no individual counsel. He has

22 | bunches of medical doctors, so I assume there's time between

23 | now and then for a half hour. But as to the date I can't pick

24 | that yet.

25 |        THE COURT: Uh-huh. And I would suggest doing it in

42

1　the morning when the man is fresh.  We don't want to impose

2　on him any more than we have to, okay?

3　　　　　MS. ROUSSEL:  Judge, whenever it's convenient for

4　him, early in the morning, late at night, I'll make myself

5　available.

6　　　　　THE COURT:  Okay, I appreciate it.

7　　　　　All right.  Thank you very much.

8　　　　　THE COURTROOM DEPUTY:  All rise.

9　　　　　　　　　　　　*　*　*　*　*

10　　　　　　　　　　(Hearing is Concluded)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# **C E R T I F I C A T E**

      I certify that the foregoing is a correct transcript from the electronic sound recording of the proceeding in the above-entitled matter.

S/Sherryl P. Robinson            _8/29/2022_
Sherryl P. Robinson              Date