## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| JOANNE REULET, ET AL. | * | CIVIL ACTION NO. 3:20-cv-00404-BAJ-EWD |
| VS. | * | JUDGE BRIAN A. JACKSON |
| LAMORAK INS. CO., ET AL | * | MAG. ERIN WILDER-DOOMES |

### SECOND SUPPLEMENTAL AND AMENDING COMPLAINT

**NOW INTO COURT**, through undersigned counsel, come Plaintiffs, Joanne Reulet, Leslie Reulet Carrere, and Evan J. Reulet, who suggest to the Court that they desire to supplement and amend the Original Petition for Damages and the First Supplemental and Amending Petition for Damages filed herein as follows:

1.

Defendant, The McCarty Corporation, is a domestic corporation with its registered offices in the Parish of East Baton Rouge, State of Louisiana. Also, General Electric Company, Huntington Ingalls Incorporated, and International Paper Company have their registered offices in East Baton Rouge Parish, State of Louisiana. Also, venue is proper as to Lamorak Insurance Company, The American Insurance Company, and Fireman's Fund Insurance Company in East Baton Rouge Parish. Accordingly, venue is proper in East Baton Rouge Parish against all defendants pursuant to Louisiana Code of Civil Procedure Articles 42, 73, and 74.

2.

Defendants, HUNTINGTON INGALLS INCORPORATED (formerly NORTHROP GRUMMAN SHIPBUILDING, INC., formerly, NORTHROP GRUMMAN SHIP SYSTEMS, INC., formerly, AVONDALE INDUSTRIES, INC. and formerly AVONDALE SHIPYARDS, INC., formerly AVONDALE MARINE WAYS, INC.); ALBERT BOSSIER, JR.; EAGLE, INC. (F/k/a EAGLE ASBESTOS & PACKING COMPANY, INC.); BAYER CROPSCIENCE, INC. (successor TO RHONE POULENC AG COMPANY, formerly AMCHEM PRODUCTS, INC., formerly

**EXHIBIT 3**

BENJAMIN FOSTER COMPANY); FOSTER-WHEELER LLC (formerly FOSTER-WHEELER CORPORATION); GENERAL ELECTRIC COMPANY; HOPEMAN BROTHERS, INC.; THE MCCARTY CORPORATION (SUCCESSOR TO MCCARTY BRANTON, INC., AND PREDECESSOR AND SUCCESSOR TO MCCARTY INSULATION SALES, INC.); TAYLOR-SEIDENBACH, INC.; CBS CORPORATION (f/k/a WESTINGHOUSE ELECTRIC CORP.); UNIROYAL, INC.; INTERNATIONAL PAPER COMPANY (as successor to U.S. PLYWOOD); THE AMERICAN INSURANCE COMPANY; CF INDUSTRIES, INC.; FIREMAN'S FUND INSURANCE COMPANY; AEROJET ROCKETDYNE, INC. (f/k/a AEROJET-GENERAL CORPORATION (as successor to the liability of Barnard and Burk, Inc.); LOUISIANA INSURANCE GUARANTY ASSOCIATION (who has a statutory obligation to the plaintiffs arising out of policies of insurance issued by insolvent insurers, Lamorak Insurance Company and Houston General Insurance Company); CERTAIN UNDERWRITERS AT LLOYD'S, LONDON; BERKSHIRE HATHAWAY SPECIALTY INSURANCE COMPANY (f/k/a STONEWALL INSURANCE COMPANY), UNITED STATES FIDELITY AND GUARANTY COMPANY; FIRST STATE INSURANCE COMPANY; LIBERTY MUTUAL INSURANCE COMPANY; and EMPLOYERS MUTUAL LIABILITY INSURANCE COMPANY OF WISCONSIN (hereinafter collectively referred to as "defendants"), are all corporations incorporated under the laws of the various states of the United States. Defendants all have their principal place of business in various states of the United States, as well as some foreign countries. All of them may be served under and by virtue of the Long Arm Statute of the State of Louisiana, either through their authorized agents, servants, and/or employees, or through the Secretary of State, State of Louisiana.

3.

From approximately 1967 through 1972, Kirk P. Reulet was a direct employee of Huntington Ingalls Incorporated (formerly, Northrop Grumman Shipbuilding, Inc., formerly Northrop Grumman Ship Systems, Inc., formerly Avondale Industries, Inc. and formerly Avondale Shipyards, Inc., formerly Avondale Marine Ways, Inc.) (hereinafter sometimes "Avondale" or "Avondale Industries,

Inc."). From approximately 1964 through 1977, Pierre H. Reulet was a direct employee of Avondale. During these time periods, Henry "Zac" Carter, James O'Donnell, C. Edwin Hartzman, John McCue, Burnette "Frenchy" Bordelon, Ewing Moore, Hettie Dawes Eaves, John Chantrey, Steven Kennedy, Peter Territo, George Kelmell, Ollie Gatlin, Earl Spooner, Edward Blanchard, James T. Cole, J. Melton Garrett, William Whittle, William Alexander, and Albert Bossier, Jr. were executive officers of Avondale with the specific responsibility for the health and safety of Kirk Reulet and Pierre Reulet and their fellow employees during the time the Kirk Reulet was exposed to substances which resulted in his mesothelioma and other ill effects related thereto. Henry "Zac" Carter, James O'Donnell, C. Edwin Hartzman, John McCue, Burnette "Frenchy" Bordelon, Ewing Moore, Hettie Dawes Eaves, John Chantrey, Steven Kennedy, Peter Territo, George Kelmell, Ollie Gatlin, Earl Spooner, Edward Blanchard, James T. Cole, J. Melton Garrett, William Whittle, and William Alexander have since died. Lamorak Insurance Company (as successor in interest to the liability for policies of insurance issued by Commercial Union Insurance Company, Employers Commercial Union Insurance Company, and American Employers Insurance Company) provided insurance coverage for the liability of the following executive officers: Henry "Zac" Carter, James O'Donnell, C. Edwin Hartzman, John McCue, Burnette "Frenchy" Bordelon, Ewing Moore, Hettie Dawes Eaves, John Chantrey, Steven Kennedy, Peter Territo, George Kelmell, Ollie Gatlin, Earl Spooner, Edward Blanchard, James T. Cole, J. Melton Garrett, William Whittle, William Alexander, and Albert Bossier, Jr. Plaintiffs originally sued Lamorak Insurance Company; however, Lamorak Insurance Company was declared insolvent on March 11, 2021. Plaintiffs now make claims against Louisiana Insurance Guaranty Association (hereinafter referred to as "LIGA"), who has a statutory obligation to plaintiffs based upon policies of insurance issued by insolvent insurer, Lamorak Insurance Company, including but not limited to, employers' liability, commercial general liability insurance policies and/or excess liability insurance policies covering the following executive officers of Avondale for the liability asserted herein: Henry "Zac" Carter, James O'Donnell, C. Edwin Hartzman, John McCue, Burnette "Frenchy" Bordelon, Ewing Moore, Hettie Dawes Eaves, John

Chantrey, Steven Kennedy, Peter Territo, George Kelmell, Ollie Gatlin, Earl Spooner, Edward Blanchard, James T. Cole, J. Melton Garrett, William Whittle, William Alexander, and Albert Bossier, Jr.

Additionally, Henry "Zac" Carter, James O'Donnell, C. Edwin Hartzman, John McCue, Burnette "Frenchy" Bordelon, Ewing Moore, Hettie Dawes Eaves, John Chantrey, Steven Kennedy, Peter Territo, George Kelmell, Ollie Gatlin, Earl Spooner, Edward Blanchard, James T. Cole, J. Melton Garrett, William Whittle, William Alexander, and Albert Bossier, Jr. were insured by American Motorists Insurance Company and Highlands Insurance Company for the liability asserted herein, and plaintiffs assert a claim against Avondale for this liability pursuant to a buy-back contract and agreement.

4.

Under a buy-back contract and agreement between Avondale and American Motorists Insurance Company, Avondale is an additional insurer under the American Motorists Insurance Company policies providing coverage to Avondale and its executive officers and employees for the liability asserted in plaintiffs' petition. The plaintiffs assert an action against Avondale pursuant to this contract and agreement pursuant to La. Civil Code articles 1821-1823.

5.

Under a buy-back contract and agreement between Avondale and Highlands Insurance Company, Avondale is an additional insurer under the Highlands Insurance Company policies providing coverage to Avondale and its executive officers and employees for the liability asserted in plaintiffs' petition. The plaintiffs assert an action against Avondale pursuant to this contract and agreement pursuant to La. Civil Code articles 1821-1823.

6.

Lamorak Insurance Company (as successor in interest to the liability for policies of insurance issued by Commercial Union Insurance Company, Columbia Casualty Company, Employers Commercial Union Insurance Company, and American Employers Insurance Company) and The

- 4 -

American Insurance Company provided coverage to Eagle, Inc. for the liability asserted herein. Plaintiffs assert a direct action pursuant to Louisiana Revised Statute 22:1269 against American Insurance Company for the liability of Eagle, Inc. Additionally, Plaintiffs originally asserted a direct action against Lamorak Insurance Company under the Louisiana Direct Action Statute for the liability of Eagle, Inc. However, Lamorak Insurance Company was declared insolvent on March 11, 2021. Accordingly, Plaintiffs now make claims against LIGA who has a statutory obligation to plaintiffs based upon policies of insurance issued by insolvent insurer, Lamorak Insurance Company (as successor in interest to the liability for policies of insurance issued by Commercial Union Insurance Company, Employers Commercial Union Insurance Company, and American Employers Insurance Company), including but not limited to, employers' liability, commercial general liability insurance policies and/or excess liability insurance policies sold by Lamorak Insurance Company to Eagle, Inc. providing coverage for the liability asserted herein.

7.

Lamorak Insurance Company (as successor in interest to the liability for policies of insurance issued by Commercial Union Insurance Company) provided coverage to The McCarty Corporation for the liability asserted herein, and plaintiffs originally asserted a direct action pursuant to Louisiana Revised Statute 22:1269 against Lamorak Insurance Company for the liability of The McCarty Corporation. However, Lamorak Insurance Company was declared insolvent on March 11, 2021. Accordingly, Plaintiffs make claims against LIGA who has a statutory obligation to plaintiffs based upon policies of insurance issued by insolvent insurer, Lamorak Insurance Company (as successor in interest to the liability for policies of insurance issued by Commercial Union Insurance Company, Employers Commercial Union Insurance Company, and American Employers Insurance Company), including but not limited to, employers' liability, commercial general liability insurance policies and/or excess liability insurance policies sold by Lamorak Insurance Company to The McCarty Corporation providing coverage for the liability asserted herein.

8.

Pursuant to Louisiana Revised Statute 22:1269, plaintiffs herein assert a direct action against Fireman's Fund Insurance Company, who, at all times material herein, was the insurance carrier covering Barnard and Burk, Inc. for the liability asserted herein.

9.

At all material times herein, John Burk, John Daniel, and Julian Dyason were executive officers of Barnard and Burk, Inc. with the specific responsibility for the health and safety of Kirk Reulet and his fellow employees during the time Mr. Reulet was exposed to asbestos which resulted in his mesothelioma and death. Pursuant to Louisiana Revised Statute 22:1269, plaintiffs herein assert a direct action against Fireman's Fund Insurance Company, who, at all times material herein, was the insurance carrier covering all of the foregoing individuals as well as Barnard and Burk, Inc. for the liability asserted herein.

10.

Kirk Reulet was employed in various positions by or on the premises of the following companies, among others: Avondale from 1967 through 1972 and Barnard Burk, Inc. ("Barnard and Burk") in 1974. Throughout this time period, Mr. Reulet was exposed to asbestos. Also, Mr. Reulet was exposed to asbestos carried home on his person, clothing, and other items. Additionally, while employed at Avondale, Mr. Reulet was exposed to asbestos while riding to and from work with other Avondale employees whose person, clothing, and other items were contaminated with asbestos. Prior to September of 1975, Mr. Reulet was exposed to asbestos on a daily basis and he contracted mesothelioma as a result thereof, although it did not manifest itself until 2019. The exposures to Mr. Reulet prior to September of 1975 caused and/or contributed to his development of mesothelioma and other related ill health effects, although the disease did not manifest itself at that time. Mr. Reulet's diagnosis of asbestos-related mesothelioma is directly attributable to his exposure to asbestos fibers prior to September of 1975. The medical evidence shows that Mr. Reulet began to

sustain tissue damage shortly after the inhalation of asbestos fibers and that he sustained distinct bodily injury in each year of his occupational exposure to asbestos. On a daily basis during Mr. Reulet's employment by or on the premises of Avondale and Barnard and Burk, he was exposed to dangerously high levels of toxic substances, including asbestos, in the normal routine course of his work. At all times during Mr. Reulet's foregoing employment, he was exposed to asbestos and asbestos-containing products manufactured, distributed, sold, and/or handled by the defendants. Additionally, Mr. Reulet was exposed to asbestos while riding to and from work with other employees whose person, clothing, and other items were contaminated with asbestos.

11.

From approximately 1964 through 1977, Pierre Reulet was employed in various positions by or on the premises of Avondale. On a daily basis during this employment, Pierre Reulet was exposed to dangerously high levels of toxic substances, including asbestos, and asbestos-containing products sold, manufactured, and/or distributed by the "defendants" in the normal routine course of his work.

12.

Pierre Reulet was the father of Kirk Reulet. On a daily basis throughout the employment of Pierre Reulet, Kirk Reulet was exposed to dangerously high levels of asbestos through contact with him, through the handling and washing of his clothes and other objects belonging to him, as well as being in the area where his clothes and other objects were being handled and washed.

13.

Defendant, Avondale, had the responsibility for the health and safety of Kirk Reulet and Pierre Reulet and their fellow employees during the time Kirk Reulet was exposed to the substances which resulted in his mesothelioma and death. Also, Barnard and Burk had the responsibility for the health and safety of Kirk Reulet and his fellow employees during the time Mr. Reulet was exposed to the substances which resulted in his mesothelioma and other ill health effects related thereto. Avondale and Barnard and Burk had the responsibility of providing a safe place to work;

however, they failed to protect Mr. Reulet from the dangers of asbestos dust exposure, for which Avondale and Barnard and Burk are liable to plaintiff. Additionally, Avondale and its executive officers and Barnard and Burk were aware or should have been aware of the dangerous condition presented by exposure to asbestos, and that Mr. Reulet would suffer from asbestos-related diseases and other ill health effects associated therewith as a result of this exposure, but they failed and/or willfully withheld from Mr. Reulet knowledge of the dangers to his health from exposure to asbestos fiber.

14.

In addition to the foregoing acts of negligence and intentional concealment, Avondale and its executive officers and Barnard and Burk and its executive officers are guilty of the following:

a) Failing to reveal and knowingly concealing critical medical information to the Reulets;

b) Failing to reveal and knowingly concealing the inherent dangers in the use of asbestos, and other harmful substances in their manufacturing process and/or in connection with the work which exposed the Reulets;

c) Failing to provide necessary protection to the Reulets;

d) Failing to provide clean, respirable air and proper ventilation;

e) Failing to provide necessary showers and special clothing;

f) Failing to segregate work areas so that workers would not be exposed to deadly asbestos fiber;

g) Failing to provide necessary and adequate respiratory protection;

h) Failing to warn employees of the dangers associated with exposure to asbestos;

i) Failing to use non-asbestos containing products on jobs where non-asbestos containing products were specified;

j) Requiring employees to dispose of asbestos in dumpsters, into the river, and onto the land instead of properly disposing of asbestos and asbestos fiber, thereby further exposing employees (and subsequently their family members) to asbestos;

k) Requiring employees to dispose of asbestos under buildings instead of properly disposing of asbestos and asbestos fiber, thereby further exposing employees (and subsequently their family members) to asbestos;

l)      Failing to warn of the dangers of exposure to asbestos;

m)    Requiring employees to dispose of asbestos without precautions to prevent exposure;

n)     Failing to post warnings regarding asbestos and the hazards of same;

o)     Failing to warn employees that exposure to asbestos could cause deadly diseases including mesothelioma, cancer, asbestosis, pleural thickening, and pleural plaques; and

p)     Failing to warn employees of the invisible nature of harmful asbestos, that it could be carried home on clothing and other objects by a worker, and that it could cause diseases such as asbestosis, pleural plaques, pleural thickening, cancer, and mesothelioma.

These defendants and individuals committed these intentional acts knowing full well that Kirk Reulet's injuries would follow or were substantially certain to follow.

15.

As a result of these exposures to asbestos, Kirk Reulet contracted mesothelioma and other related ill health effects associated therewith, which was first diagnosed on approximately December 26, 2018.

16.

Kirk Reulet died on January 2, 2019, as a result of mesothelioma, complications therefrom and/or complications from treatment therefrom, and other ill health effects which resulted from exposure to asbestos. At the time of his death, Mr. Reulet was survived by his wife, Joanne Clement Reulet, and his children, Leslie Reulet Carrere and Evan John Reulet. Joanne Reulet, Leslie Reulet Carrere, and Evan Reulet assert all survival and wrongful death claims and rights to which they are entitled as a result of the injury and death of Kirk Reulet.

17.

Avondale and its executive officers and Barnard and Burk and its executive officers were aware or should have been aware of the dangerous condition presented by exposure to asbestos and that Mr. Reulet would suffer from asbestos-related disease, including mesothelioma, lung cancer, cancer, and other related ill health effects, as a result of this exposure, but they failed and/or willfully

withheld from Mr. Reulet knowledge of the dangers to his health from exposure to asbestos fiber and other toxic substances.

18.

Avondale and its executive officers had the responsibility of providing Kirk Reulet and Pierre Reulet with a safe place to work and safety equipment with which to conduct his work; however, they negligently and/or intentionally failed to carry out these duties and failed to protect the Reulets from the dangers of toxic fiber and dust exposure knowing full well or being substantially certain that certain workers, including Mr. Reulet, would develop disease as a result thereof. Likewise, Barnard and Burk and its executive officers had the responsibility of providing Kirk Reulet with a safe place to work and safety equipment with which to conduct his work; however, they negligently and/or intentionally failed to carry out these duties and failed to protect Mr. Reulet from the dangers of toxic fiber and dust exposure knowing full well or being substantially certain that certain workers, including Mr. Reulet, would develop disease as a result thereof.

19.

All defendants had care, custody, and control of the asbestos, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in the injury of Mr. Reulet and for which these defendants are liable under Louisiana law. However, with regard to Avondale and its executive officers, they are liable because they failed to properly handle and control the asbestos which was in their care, custody, and control. Petitioners are not alleging that Avondale and its executive officers are liable for the mere use of asbestos; rather, Avondale and its executive officers are liable for the misuse of asbestos, including but not limited to the failure to warn of the hazardous nature and dangers of asbestos and for the failure to take and implement reasonably safe and industrial hygiene measures, failure to train, and failure to adopt safety procedures for the safe installation and removal of asbestos.

- 10 -

20.

Defendants, Avondale and its executive officers and Barnard and Burk and its executive officers are answerable for the conduct of those handling asbestos products on their premises, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in the injury to Mr. Reulet, and for which defendants are liable under Louisiana law.

21.

Avondale and Barnard and Burk failed to exercise reasonable care for the safety of persons on or around their property and failed to protect Kirk Reulet and Pierre Reulet from the unreasonably dangerous conditions created by asbestos which existed at their job sites due to their failure to properly handle and control the asbestos which was in their care, custody, and control. At all times material herein, standards were in existence which required Avondale and Barnard and Burk to provide to the Reulets and their co-workers who handled or were exposed to harmful material with protection from the harms of asbestos. Avondale and Barnard and Burk failed and/or willfully refused to comply with these standards thereby resulting in exposure to asbestos to Kirk Reulet, thereby resulting in his injuries and death.

22.

Lamorak Insurance Company (as successor in interest to the liability for policies of insurance issued by Commercial Union Insurance Company, Employers Commercial Union Insurance Company, and American Employers Insurance Company), The American Insurance Company, and Fireman's Fund Insurance Company knew or should have known of the hazardous health effects of asbestos, but failed to inform or intentionally concealed that information from Mr. Reulet and his fellow co-workers.

23.

As a result of the aforementioned acts of the hereinabove named defendants, Kirk Reulet contracted asbestos-related mesothelioma and died, for which all defendants are jointly, severally, and in solido liable.

- 11 -

24.

At all times material herein, Kirk Reulet and Pierre Reulet were exposed to asbestos manufactured, distributed, and sold by Hopeman Brothers, Inc.  The asbestos-containing products manufactured, distributed and/or sold by Hopeman Brothers, Inc. was unreasonably dangerous per se, were defective in design, and constituted a breach of warranty from said manufacturers.  Further, these defendants failed and refused to warn the Reulets of the danger of exposure to such products. They also failed to warn them of the invisible nature of the asbestos and that is could cause deadly diseases such as mesothelioma and cancer.  As a result of the defective and unreasonably dangerous condition and composition of the  asbestos-containing products manufactured, distributed, sold, and/or used by these companies, Kirk Reulet was exposed to asbestos fibers proximately causing his mesothelioma, cancer, and other related ill health effects.  Plaintiffs further contend that said defendants are liable as a result of manufacturing, distributing, or selling an unreasonably dangerous per se product, a product defective in design, for breach of warranty, and for failing to provide adequate warnings and instructions.  Further, defendants are liable for failing to substitute available alternative products and for fraudulently concealing the dangers of their products and the health hazards associated with the use and exposure to said products.

25.

During Kirk Reulet and Pierre Reulet's employments with Avondale, Hopeman Brothers, Inc. also performed contracting work wherein asbestos-containing products were used.  During this contracting work, Hopeman Brothers, Inc. exposed the Reulets to asbestos-containing products, which caused and/or contributed to Kirk Reulet's asbestos-related diseases and other related ill health effects.  Defendant, Hopeman Brothers, Inc., had care, custody, and control of the asbestos, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in injury to Kirk Reulet and for which Hopeman Brothers, Inc. is strictly liable under Louisiana law.  Moreover, defendant, Hopeman Brothers, Inc., is answerable for the conduct of those handling asbestos products over which it had control, which asbestos was defective and which

presented an unreasonable risk of harm, which asbestos resulted in injury to Kirk Reulet and for which defendant is strictly liable under Louisiana law.

26.

In addition to the aforementioned acts of negligence, intentional tort, fraud, and strict liability of Hopeman Brothers, Inc., Hopeman Brothers, Inc. is also liable because Wayne Manufacturing Corporation was the alter ego of Hopeman Brothers, Inc. at all time material herein.

27.

Plaintiffs also makes additional allegations against Hopeman Brothers, Inc. who was aware of the risk of harm presented by its asbestos products. Hopeman Brothers, Inc. either through exchange of information and/or industry sponsored studies was notified, either directly by its parent companies or by its manufacturing associations, that their products presented an unreasonable risk of harm. However, Hopeman Brothers, Inc. disregarded these notices, elected to conceal these hazards from the workers and Mr. Reulet and continued to use and hold out these products as save and non-toxic.

28.

Hopeman Brothers, Inc. was informed that asbestos dust presented health risks by the U.S. Government or agencies acting on behalf of the U.S. Government no later than 1945. The U.S. Government issued advisories, through the U.S. Maritime Commission, to all government contractors regarding their findings of enumerated health risks in the work place. During the 1950s, the Department of Defense adopted and distributed to all government contractors, safety standards that pertained to the use of these defendants' products in various work places. In 1952, Louisiana adopted a workers compensation remedy for asbestosis. In the 1960s, the U.S. Government promulgated and published the Walsh-Healy Act which adopted safety standards and regulations regarding asbestos dust. Based on information and belief, each of these companies, their predecessor, and corporation officers were made aware of these findings at the time they were issued. Despite this knowledge, these companies continued to manufacture, distribute, relabel, fabricate, sell

- 13 -

and install these products at plaintiffs' worksites. This was done without warning to workers or Mr. Reulet and without the knowledge on the part of the Mr. Reulet that he was in danger. Additionally, these defendants continued to market their products without disclosing the dangers and simultaneously affirming that their products were safe and non-toxic.

29.

International Paper Company is the successor to U.S. Plywood. Throughout the time the Reulets were employed at Avondale, they were exposed to asbestos fiber from asbestos-containing materials manufactured, distributed, and/or sold by U.S. Plywood. At the time of this exposure to these products, they were being used in the manner and for the purpose for which they were intended; and these products were in the same condition as when they left the control and possession of U.S. Plywood.

30.

The asbestos-containing products manufactured, distributed and/or sold by U.S. Plywood were unreasonably dangerous *per se*, were defective in design, and constituted a breach of warranty from said manufacturers. Further, U.S. Plywood failed and refused to warn of the danger of exposure to such products. They also failed to warn of the invisible nature of the asbestos and that it could cause deadly diseases such as lung cancer, asbestosis, and mesothelioma.

31.

During Kirk Reulet's exposure through his own work and through the work of his father, Pierre Reulet, defendant, Westinghouse Electric Corporation (now CBS Corporation, hereinafter "Westinghouse"), was in the business of manufacturing, selling and/or distributing asbestos-containing materials to the employers of Kirk Reulet and Pierre Reulet and/or to the owners of the premises where they worked, throughout their employment history. Such products were installed, removed, and repaired by or in close proximity to Kirk Reulet and Pierre Reulet during their employment, thus exposing them to asbestos dust released by the installation, removal, and repair of said products. Throughout the time Kirk Reulet and Pierre Reulet were employed, they were

exposed to asbestos fiber from these asbestos-containing materials manufactured, distributed, and/or sold by Westinghouse.  At the time they were exposed to these products, they were being used in the manner and for the purpose for which they were intended; and these products were in the same condition as when they left the control and possession of Westinghouse.  With regard to Westinghouse marine turbines at Avondale, plaintiffs allege that the Reulets were exposed to asbestos from Westinghouse turbines on commercial vessels only.

32.

The asbestos-containing products manufactured, distributed and/or sold by Westinghouse were unreasonably dangerous *per se*, were defective in design, and constituted a breach of warranty from said manufacturers.  Further, Westinghouse failed and refused to warn the Reulets of the danger of exposure to such products.  They also failed to warn of the invisible nature of the asbestos and that it could cause deadly diseases such as lung cancer, asbestosis, and mesothelioma.

33.

Plaintiffs further allege that Westinghouse has through its actions sought to fraudulently conceal and suppress the truth about the dangerous nature of its asbestos containing products that it manufactured, sold and distributed.

34.

By the early 1940s, Westinghouse knew that exposure to asbestos could cause lung disease, asbestosis, lung cancer, and mesothelioma.  Throughout the 1930s, 1940s, and 1950s, Westinghouse was a member of the IHF, American Ceramic Society and National Safety Council.  Beginning in the 1930's, Westinghouse received asbestos scientific and medical information through these organizations.

35.

The "Air Hygiene Foundation", was established in 1935 as a fellowship within the Mellon Institute (then a part of the University of Pittsburgh).  The organizations' name was changed to "Industrial Hygiene Foundation" and, in 1968, it was again changed to the "Industrial Health

Foundation."  J-M joined in 1936.  IHF members included, among others, General Electric Company, Westinghouse Electric Corporation, or their predecessors in interest.  All of these companies are defendants in this case.  The IHF was founded to conduct occupational health research, particularly with respect to the health effects of dust in the work place.  One of the functions of the IHF was to gather and disseminate information regarding occupational health to its members.  Since its inception, it has published special bulletins on items of general interest under the headings of legal bulletins, medical bulletins, management bulletins and engineering bulletins. Since 1937, member companies have been kept informed on occupational health issues by the Industrial Hygiene Digest, a monthly publication which is sent to all members in return for their annual membership fee.  The Digest is a compilation of abstracts, grouped by topic, of the published domestic and foreign scientific and medical literature pertaining to industrial health and hygiene. In addition to scientific abstracts, the Digest included a section on legal developments, and also provide notice of any proposed changes in threshold limit values for various substances. Correspondence between members and the IHF established that members either participated in or knew of a number of studies and surveys dating as far back as the 1930's which had linked asbestos with various lung diseases.  As part of its consultative services for its members, the IHF undertook a number of studies involving evaluations of asbestos dust conditions and asbestos-related disease. In 1947, the fruits of an industry survey conducted by the IHF for the ATI and its members were published in a "Report of Preliminary Dust Survey for Asbestos Textile Institute."  The report is dated June 1947.  The object of the investigation was stated as:  "defining the specific nature and the magnitude of the (asbestosis) problem in all its phases....An original objective of most immediate importance was to facilitate the exchange of information between member companies on successful methods of dust control and otherwise to promote a general improvement in that field."  The preliminary survey to be divided into three parts designated as "Engineering, Medical and Physical Testing" was based on visits made to member companies' plants over a three month period."  While the actual report does not reveal the identity of the plants which were visited, deposition testimony

of Dr. Braum indicates that other companies evaluated in the report included defendants in this case. Minutes of the Air Hygiene Committee meetings throughout the 1940's and 1950's reflect frequent discussions and presentations pertaining to appropriate medical practices and industrial hygiene approaches to the problem of asbestos dust in the work place. It was continually stressed that both pre-employment and periodic follow-up medical examinations were essential to monitor the health of employees, the necessity of x-rays and lung function studies, and the proper requisites for a diagnosis of asbestos-related disease. Some annual meetings apparently were held by the IHF. The minutes for the Fifth Annual Meeting of the Air Hygiene Foundation of America, Inc., which was held on November 12 and 13 in 1940, revealed asbestos to be one of its two main topics of interest. An Interim Report of the Preventive Engineering Committee, written by Philip Drinker, discussed inter alia dust particle size and dust control. A second report by Foundation Research at the Saranac Laboratory entitled "Individual Susceptibility to Toxic Dusts", authored by Dr. Leroy Gardner, dealt primarily with the problems of silica dust. Also discussed were court decisions on Workers' Compensation cases. A case involving the death of a North Carolina man was discussed, the minutes indicating that the claimant sought compensation on grounds that the defendant's pneumonia was due to asbestosis. The Supreme Court of North Carolina upheld the award finding that asbestosis was a contributing cause of death. The Air Hygiene committee also recommended that pre-employment and periodic chest x-rays be conducted by a reputable radiologist, that the use of the Greenberg-Smith Midget Impinger be adopted for testing the levels of dust in the air, and that various procedures be implemented to reduce the dust in manufacturing facilities. In December of 1946, Mr. Hemeon of the Industrial Hygiene Foundation was invited to attend a meeting of the American Textile Institute (discussed infra) to respond to inquiries regarding IHF's proposed Industrial Hygiene Survey of the member companies. It was agreed at the February 5, 1947, meeting of the American Textile Institute (ATI) that the IHF be permitted to conduct its proposed survey. A June 18, 1947 report by W. C. L. Hemeon, Head Engineer for IHF, stated that the medical review reflected an incidence of asbestosis ranging between 3% and 20%. In one presentation at a regular

- 17 -

meeting (prior to 1950) of the IHF, the suggested threshold limit value was criticized as being unsafe for persons exposed to asbestos fiber. Defendants thus had direct and actual knowledge that the suggested threshold limit value for asbestos was not safe. In addition, this criticism was published in the scientific literature and all defendants were put on notice of the hazards of the suggested threshold limit value.

36.

In addition, Westinghouse and/or its medical director and industrial hygienist became members of the Konicide Club from 1932 through 1940. The Konicide Club was created to understand and control the dust related diseases in the industry, and the members would meet to discuss the methods of accomplishing these goals. On January 22, 1939, The Konicide Club even conducted a meeting which focused on the health problems of the asbestos industry in particular.

37.

Also, Westinghouse's industrial hygienist, E.C. Barnes, wrote to Westinghouse's medical department in the 1940s regarding the high dust levels associated with asbestos cloth and the mixing of asbestos cement. Barnes further explained that the inhalation of asbestos dust could cause asbestosis, and he recommended that this hazard be minimized. Westinghouse was also aware of the dust problems associated with the use of the asbestos cloth on turbines. However, from 1946 through the late 1970s, Westinghouse failed to control or reduce the dust created from the asbestos cloth, cement, and other asbestos-components of its products at the various jobsites, and failed to warn with regard to these hazards.

38.

In 1953, Westinghouse produced its Asbestos Safe Practice Data Sheet, thus further evidencing Westinghouse's knowledge of the hazards associated with asbestos exposure. Also in 1953, Westinghouse acknowledged that it had a duty to warn contractors, who lacked the knowledge

of potential hazards. However, Westinghouse still never warned the contractors nor the various jobsites of the hazards associated with exposure to asbestos.

39.

Westinghouse was also aware of the excessive dust produced from its Micarta product during the 1950s, as indicated in a letter from H.W. Speicher to James McClimans, a safety supervisor. In 1973, Westinghouse conducted dust studies at the Micarta facility and recorded high levels of airborne and settle asbestos-containing dust from the circular saw trimming of Micarta. Nevertheless, Westinghouse failed and refused to warn of health hazards of its asbestos-containing Micarta, and suppressed this information.

40.

Additionally, Westinghouse knew that asbestos was dangerous in the 1940s and began a program to clean up the manufacturing process in their plants in the 1950s while continuing to manufacture asbestos-containing products. Westinghouse began manufacturing asbestos-containing wallboard systems in 1956 until the mid 1970s. Prior to 1972, Westinghouse failed to provide any warning regarding the asbestos hazard with its products. In 1972, in response to Occupational Safety and Health Administration ("OSHA") regulations, Westinghouse applied warning labels that would necessarily be obscured by the substrate of the wallboard system, thereby appearing to comply with OSHA regulations without actually warning the end users of the inherent dangers of Westinghouse's asbestos-containing products. Subsequent to this activity, Westinghouse learned through in-house counsel that there existed numerous documents that would implicate Westinghouse for its actions. These documents reflected early knowledge on the part of Westinghouse and contained product manufacturing information, air samples studies, architectural reports, work papers, old work files, and other similar materials. It was determined that all such documents be destroyed, despite Federal Regulations requiring their retention. This document destruction was done with the specific intention of defrauding asbestos victims and the courts before which Westinghouse would undoubtedly appear. In the past, Westinghouse has refused to respond to plaintiffs' request for the

production of these documents principally on the basis that said documents did not exist due to their destruction. Accordingly, plaintiffs allege that Westinghouse's conduct constitutes fraud under Louisiana law.

41.

Additionally, even when OSHA cited Westinghouse with willful, asbestos-related violations during 1970s at its Hampton Micarta plant and in the 1980s at the Lester turbine and blanket plant. Regarding these incidents, Westinghouse's attorneys maintained that Westinghouse would not comply with either the EPA or OSHA and would take an attitude of "respectful noncompliance".

42.

Westinghouse has engaged in a pattern of suppressing information with regard to its asbestos-containing products and the health hazards associated with same. Jeffrey J. Bair of Westinghouse states in what is known as "The Smoking Gun" documents that the Industrial Hygiene Department files, dating back to 1930, have been reviewed. After a general description of the categories of documents reviewed, Mr. Bair provides a discussion of the nature of these documents. The following are quotes from that discussion:

> The majority of the documents in Industrial Hygiene's files are potential "smoking gun" documents. This is so because of the nature, duties, obligations and responsibilities of the Industrial Hygiene Department. The approximately 57 years of Industrial Hygiene files which are in existence today are filled with technical information, procedural information, safe-handling information, hazard information, recommendations and tests results. The files are filled with documentation which critiques and criticizes, from an industrial hygiene perspective, Westinghouse manufacturing and non-manufacturing operations. This documentation often times points out deficiencies in Westinghouse operations and suggests recommendations to correct these deficiencies. Industrial Hygiene's files contain information which details the various chemical substances used at Westinghouse sites over the years, and often times the inadequacies in Westinghouse's use and handling of the substances. The files contain many years of employee test results, some of them unfavorable. Industrial Hygiene, by performing its job, creates, daily, potential smoking gun documents (emphasis added).

> Plant Correspondence and Files

> Please see, for example, Wilber Speicher's letter...correspondence of this type was and continues to be, frequently generated by Industrial Hygiene. Dr. Speicher's correspondence might show early knowledge of the Corporation to certain health hazards associated with epoxy resin dissolving agents. What use did the Corporation

- 20 -

make of this knowledge to protect employees and the public?  If none or very little, then this document might become a "<u>smoking gun</u>" (emphasis added).

Industrial Hygiene audit and trip reports certainly qualify as <u>potential smoking guns</u> (emphasis added).  Industrial Hygiene, in each plant audit, critiques and criticizes the facility from an industrial hygiene perspective.  Industrial Hygiene also makes recommendations to improve the hygiene of the plant.  The <u>smoking gun possibilities</u> of such documentation are readily apparent (emphasis added).  <u>Material Cards, Materials Safety Data Sheets, Purchasing [sic] Department Specification Cards, Safe Practice Data Sheets and Historical Safe Practice Data Sheet Files</u>

Again, the <u>smoking gun</u> possibilities of these documents are clear.  If, for example, the safe practices detailed in safe practice data sheets are not made a part of a site's industrial hygiene program and communicated to employees, the potential future problems are readily apparent.  In addition, <u>if the information is not or was not conveyed to customers, the public, etc., again the potential future problems are readily apparent</u> (emphasis added).

<u>Recommendations</u>

<u>Plant Correspondence Files</u> (excluding air sampling data and employee test results such as bio-assay, radiation, etc.)

These records are not required pursuant to any federal, state or local laws and/or regulations.  The Westinghouse domestic records retention guidelines do not specifically address these records. We recommend that all such files generated prior to 1974 should be discarded.  As stated before, these records are filled with documentation dating back to the 1930's which critiques and criticizes Westinghouse operations, and points out deficiencies in such operations.  The files are filled with technical product and chemical information, hazard information and safe-handling information, <u>most of it generated by the industrial Hygiene Department in a "editorializing" and opinionated manner</u>.  The files are not used in the daily operation of the Department.  In our opinion, the risks of keeping these files on the whole substantially exceed the advantages of maintaining the records for the following reasons:

The substantial bulk of the correspondence was written by the Department in an editorializing, opinionated and verbose manner, instead of strictly factual.  In addition, the Industrial Hygiene Department, prior to 1974, was involved in testing and evaluating the safety of everything from water coolers to gloves. From a review of the files, it appears that the Department commented and editorialized on just about everything which might have been found in the workplace.  This "self-analysis" and "editorializing" type of information can be dangerous.  This is just the type of documentation which should be discarded from the files.  Correspondence generated subsequent to 1974, generally speaking, does not suffer from these drawbacks.

"<u>Historical Files or Industrial Hygiene Department</u>"

These records are not required pursuant to any federal, state or local laws and/or regulations.  The Westinghouse domestic Records Retention Guidelines do not specifically address these records.  We recommend that, with the exception of the

1974 noise survey and the testing date which is contained in these files, these files
be discarded.

Bair's Conclusions

Toxic tort litigation, including toxic tort-related workmen's compensation litigation,
show no signs of abating in the near future. In fact, legislation such as the risk
notification legislation currently being considered by Congress, will, according to
many "experts", result in an increase in such litigation. Consequently, well reasoned
and conceived document retention and destruction programs for departments such as
Industrial Hygiene, and in fact the entire Corporation, are imperative.

Bair's conclusion clearly shows that Westinghouse fraudulently destroyed relevant

documents all in furtherance of its fraudulent activities whereby it misrepresented the dangers of its

asbestos-containing products in order to gain a commercial advantage, *i.e.* sell more of its dangerous

products. More importantly, his conclusion shows that Westinghouse had motive for

destroying the documents, which was ***avoiding litigation*** and having to answer fraud allegations

therein.

43.

It is well-settled that parties have a duty to preserve discoverable evidence, both during and

prior to litigation, if it is reasonably foreseen that litigation will occur. Westinghouse knew litigation

was likely to occur and destroyed their documents in anticipation therof. This activity amounts to

fraud and spoliation. In fact, at least one court has already found that the activities set out in the

Jeffrey Bair memo demonstrate a "plan to commit a fraud on the Courts of the United States."

44.

The document destruction program set out in Bair's memo was actually implemented by

Westinghouse, as is evidenced by a memorandum entitled "Document Retention" that was written

by Wayne C. Bickerstaff on January 29, 1988, directed to J.W. Fisch and copied to S.R. Pitts and

Jeffrey Bair. On March 3, 1988, Jeffrey Bair wrote another memo, indicating that he had "informed

Wayne to begin discarding [certain documents]." These acts of intentional destruction of records

by Westinghouse in order to avoid public knowledge that it had knowledge of health hazards

associated with its products constitute fraud under the laws of the state of Louisiana.

45.

During Kirk Reulet's exposure through his own work and through the work of his father, Pierre Reulet, defendant, defendant, General Electric ("GE"), was in the business of manufacturing, selling and/or distributing asbestos-containing materials to the employers of the Reulets and/or to the owners of the premises where they worked, throughout their entire employment history. Such products were installed, removed, and repaired by or in close proximity to the Reulets during these employments, thus exposing them to asbestos dust released by the installation, removal, and repair of said products. Throughout the time they were employed, the Reulets were exposed to asbestos fiber from these asbestos-containing materials manufactured, distributed, and/or sold by GE. At the time of his exposure to these products, they were being used in the manner and for the purpose for which they were intended; and these products were in the same condition as when they left the control and possession of GE. With regard to GE marine turbines at Avondale, plaintiffs alleges that the Reulets were exposed to asbestos from GE marine turbines on commercial vessels only.

46.

The asbestos-containing products manufactured, distributed and/or sold by GE were unreasonably dangerous *per se*, were defective in design, and constituted a breach of warranty from said manufacturers. Further, GE failed and refused to warn the Reulets of the danger of exposure to such products. They also failed to warn of the invisible nature of the asbestos and that it could cause deadly diseases such as lung cancer, asbestosis, and mesothelioma.

47.

Plaintiffs further allege that General Electric has through its actions sought to fraudulently conceal and suppress the truth about the dangerous nature of its asbestos containing products that it manufactured, sold and distributed.

48.

Furthermore, as scientists became more concerned with the connection between asbestos and occupational exposure, General Electric, along with others in the asbestos industry, sponsored both

animal and human research on the biological effects of asbestos at the Saranac Laboratory of the Trudeau Foundation. General Electric's association with the Saranac Laboratory extends at least to the 1940s, where Saranac Laboratory correspondence documents the contractual relationship between the Laboratory and General Electric. This research performed by the Saranac Laboratory revealed that exposure to asbestos produced harmful effects to those individuals who inhaled asbestos dust. More specifically, the Saranac Laboratory held the Seventh Saranac Symposium in 1952, whereupon General Electric representatives attended. The presentations by various doctors indicated that a link existed between asbestos and several lung diseases, including asbestosis and lung cancer.

In his presentation at the Seventh Saranac Laboratory in 1952, Dr. Kenneth M. Lynch indicated that he tested the effects of asbestos from a period of twenty five years (1926-1950). The testing resulted in the knowledge of a causal relationship between asbestos and cancer in 1934. This discovery was formally set in a published record. Additionally, in 1947, Dr. Lynch discovered that 13.2% of persons suffering from asbestosis also developed cancer. Furthermore, Dr. Lynch spoke of several reports, dated from 1918 to 1952, discussing the association of cancer with asbestos.

Also, Dr. Merewether began noting the deaths from asbestos exposure in the United Kingdom during the years of 1924 to 1947, including asbestos with tuberculosis and asbestos with lung cancer. Dr. Merewether discovered that 16.2% of persons suffering from asbestosis also developed cancer, as apposed to the 13.2% found earlier, thus further indicating a causal relationship between exposure to asbestos dust and lung cancer. In addition, Dr. Merewether discussed the original cases of asbestosis discovered around 1902. Another doctor, Dr. Arthur J. Vorwald, discussed the discovery of asbestosis in the early 1900s and the availability of information concerning the disease through several reports, ever since. Dr. Vorwald also admitted that individuals exposed to asbestos fibers develop asbestosis. Thus, General Electric's attendance at the Seventh Saranac Symposium in 1952 indicates that it knew, or at least should have known, of the hazardous nature of asbestos in causing asbestosis and lung cancer. Despite this knowledge, General

- 24 -

Electric failed to warn its workers and customers of the harmful effects that result from the inhalation of asbestos fibers.

49.

General Electric contracted Harvard University to conduct research regarding the various hazards existing in their plants. Dr. Alice Hamilton, along with other Harvard medical doctors, conducted the research for General Electric. She recommended that chest x-rays be taken of all employees working with asbestos. She additionally recommended an overhaul in the ventilation system on certain apparatus at their plants due to the hazardous nature of asbestos fibers and the fact that moving belts blew the asbestos dust about the room so that it accumulates in the room. Also, in the 1930s, asbestos victims began to sue Johns-Manville and Multibestos because of their asbestos-related illnesses. As a result, Dr. Hamilton wrote to Gerald Swope, President of General Electric, informing him that these suits were justified. She further recommended that General Electric take safety precautions, including an evaluation of the situation and dust counts, to avoid this litigation.

Furthermore, Carl Obermaier, a GE plant manager, wrote to Hamilton acknowledging/admitting that he knew that inhalation of asbestos dust caused health problems, mainly asbestosis. Furthermore, Obermaier spoke of reports and pamphlets discussing the connection between asbestos exposure and lung cancer. Several letters, dated years 1928 - 1934, between Hamilton and GE indicate that GE was well aware of the excessive asbestos dust contained inside their various plants. Thus, GE had knowledge that asbestos dust was harmful, but still refused to warn its employees and its customers to whom it sold its asbestos-containing products.

50.

Throughout the relevant time periods, GE conducted various asbestos tests in their different plants, further indicating that they knew that asbestos was hazardous since they tested for levels of asbestos dust. Also, when tested, several times GE ran well above the maximum allowable level. For example, a survey done in 1973 of several GE plant buildings found an asbestos dust

concentration count of 1540 fibers greater than five microns per milliliter of air, when the threshold limit value for asbestos at that time was five fibers greater than five microns per milliliter of air. GE was also aware that large quantities of asbestos fiber would blow into the exhaust system. Many times GE chose to use the cheaper asbestos fiber in the plants, even though the cheaper fiber produced more dust into the exhaust system. However, GE, knowing of the harmful effects of asbestos, still refused to warn those individuals/workers who would come into contact with their products. Instead, they used these cheaper asbestos fibers attempting to profit at the expense of those individuals who would inhale these fibers from their products. As a result of the tests conducted at General Electric's plants, various recommendations were given to GE during the 1950s to 1970s, including the improvement of ventilation (including exhaust systems), periodic chest X-rays, pulmonary function tests, medical surveillance programs, wearing of an approved respirator, gloves, and protective clothing, increasing air flow, better maintenance of dust filters, use of industrial vacuum to clean site, complete enclosure of saw and apparatus, checking filters at regular intervals to insure working properly, and the cutting of cloth where asbestos dust should be minimized. More specifically, in letters dated 1956 and 1959, Dr. Elkins informed the GE Lowell Plant that those employees working around asbestos should receive periodic chest x-rays due to the hazardous nature of asbestos. Also, he informed that the workers who sweep the area should wear respiratory equipment. Therefore, General Electric knew or should have known that asbestos could be harmful to those individuals exposed to this dust.

51.

Moreover, various published reports and articles available to GE, prove that GE was empowered with the knowledge that asbestos caused several diseases. Some of the reports and articles include:

(1) Safety Management: Accident Cost and Control, a published article written in 1956 by Dr. R. Simonds and Dr. J. Grimaldi, which discusses the fact that asbestos produces asbestosis, the symptoms of asbestos, and how asbestos dust can be found in all stages of asbestos handling;

(2)      Asbestos-Dust Exposures at Various Levels and Mortality, a published article written in 1967 by Dr. P. Enterline and Dr. A. Kendrick discussing the first reports of asbestosis in the early 1900s, the first reports of mesothelioma were published in 1955, and the acceptance of a causal relationship between asbestos dust and asbestosis and mesothelioma;

(3)      Asbestos Exposure Smoking, and Neoplasia, a published article written in 1968 by Dr. I. Selikoff, Dr. E. C. Hammond, and Dr. Jacob Churg, discussing that asbestos workers have a high risk of dying of bronchogenic carcinoma.

(4)      Industrial Pneumoconiosis Prevention and Control, an published article written in 1969 by Edmund M. Fenner, director of environmental control at J-M, talks about how scientists became concerned about the connection between the exposure to asbestos fibers and asbestosis in the 1920s.  Furthermore, the article speaks of the Saranac Laboratory's discovery, through animal and human research in the 1930s, that asbestos exposure did "produce a unique and identifiable pulmonary fibrosis."  Additionally, the article also talks about how Britain had become concerned about the link between asbestos dust exposure and lung cancer in the 1950s.

(5)      Asbestos And Health In 1969, a published article written in 1969 by George W. Wright, discusses the progression of knowledge about asbestos' relationship with different diseases.  Wright begins by talking about the discovery of diseases associated with asbestos exposure in the early 1900s.  Then, Wright mentions that in the 1930s, it was pointed out that asbestos poised a problem to the health of workers and that the health problem could be minimized by instituting protective measures to reduce the amount of asbestos airborne dust.  Wright also speaks about the various tests conducted to determine the exact relationship between asbestos and diseases.  Additionally, Wright indicates that an 80% incidence of asbestosis to workers exposed to asbestos 20 or more years was found, and also that the more asbestos dust concentration in the air the larger % of workers developing cancer.  Furthermore, Wright explains that there is a strong relationship between the development of mesothelioma and the exposure to asbestos fibers.

(6)      The Health of Chrysotile Asbestos Mine and Mill Workers of Quebec, a published article written in 1972 by Dr. C. McDonald, Dr. M. Becklake, G. Gibbs, Dr. A. McDonald, and C. Rossiter, talks about how asbestos has been known to cause three identifiable diseases, including asbestosis, lung cancer, and mesothelioma.  The article also discusses the fact the percent of people who develop lung cancer rises with the increase in asbestos dust exposure.

(7)      Recommended Safety Practices for Handling Asbestos Fiber, an article written by Johns-Manville indicating that asbestos should be handled in a way as to prevent asbestos dust and that approved asbestos respirators should be worn by when handling asbestos fibers.

(8)      Encyclopedia Of Occupational Health And Safety, written in 1971 by J.C. Gilson, talks about the health hazards, including several diseases, associated with the inhalation of asbestos fibers and asbestos dust.  The Encyclopedia also speaks of the first incidence of asbestosis discovered in 1899 in London and the fact that in the 1930s asbestos was seen as a major cause of health hazards in the asbestos textile industry in the U.S. and other countries.

52.

Eagle, Inc., The McCarty Corporation (successor to McCarty Branton, Inc. and predecessor and successor to McCarty Insulation Sales, Inc.), Taylor-Seidenbach, Inc., and Reilly-Benton Company, Inc., manufactured asbestos-containing pipe covering, blankets, special fittings, gaskets, blocks, valves, cements, mastics, and jackets.  They sold these products throughout the time that Kirk Reulet and Pierre Reulet were was exposed to asbestos to the various sites at which they worked and were exposed.  In addition, Eagle, Inc., The McCarty Corporation, Taylor-Seidenbach, Inc., and Reilly-Benton Company, Inc., distributed asbestos-containing products manufactured, distributed, and sold by  Bayer Cropscience, Inc. (Successor to Rhone Poulenc AG Company, formerly Amchem Products, Inc., formerly Benjamin Foster Company); coatings, sealants, and mastics),  Foster-Wheeler LLC--(block and boiler insulation), Riley Power, Inc. (block and boiler insulation), General Electric Company--(electric wire and cable, block and turbine insulation including, but not limited to sprayed asbestos insulation), CBS Corporation. (formerly Westinghouse Electric Corporation)–(block, boiler and turbine insulation as well as Micarta), and Uniroyal, Inc.  During various periods of time from the 1940s to the present, Eagle, Inc., The McCarty Corporation, Taylor-Seidenbach, Inc., and Reilly-Benton Company, Inc. would package the above-described products from other distributors and manufacturers' products in their own boxes and packaging, and hold out the products as their own, thus making them liable as the manufacturer under Louisiana law.  In addition, Eagle, Inc., The McCarty Corporation, Taylor-Seidenbach, Inc., and Reilly-Benton Company, Inc. also did contracting work at locations at which the Reulets were working thereby exposing them during their handling of these products.

53.

The asbestos-containing products manufactured, distributed and/or sold by Eagle, Inc., The McCarty Corporation, Taylor-Seidenbach, Inc., Hopeman Brothers, Inc., Bayer CropScience, Inc., International Paper Company, Uniroyal, Inc., CBS Corporation, General Electric Company, Foster Wheeler LLC, and Reilly-Benton Company, Inc. were unreasonably dangerous per se, were defective

in design, and constituted a breach of warranty from said manufacturers. Further, these defendants failed and refused to warn the Reulets of the danger of exposure to such products. They also failed to warn of the invisible nature of the asbestos and that it could cause diseases such as mesothelioma, cancer, asbestosis, pleural diseases, and other ill health effects.

54.

As a result of the defective and unreasonably dangerous condition and composition of the asbestos-containing products manufactured, distributed, and/or sold by Eagle, Inc., The McCarty Corporation, Taylor-Seidenbach, Inc., Hopeman Brothers, Inc., Bayer CropScience, Inc., Uniroyal, Inc., CBS Corporation, General Electric Company, Foster Wheeler LLC, International Paper Company, and Reilly-Benton Company, Inc., Mr. Reulet inhaled asbestos fibers and other harmful substances emitted by the normal use of said products, proximately causing the mesothelioma, cancer, and other related ill health effects from which he suffers. Plaintiffs further contends that these companies are liable as a result of manufacturing, distributing, or selling an unreasonably dangerous per se product, a product defective in design, for breach of warranty, and for failing to provide adequate warnings and instructions. Further, these companies are liable for failing to substitute available alternative products and for fraudulently concealing the dangers of their products and the health hazards associated with the use and exposure to said products.

55.

Prior to the time Mr. Reulet was exposed to asbestos, all defendants were aware or should have been aware of the health hazards associated with exposure to asbestos, including but not limited to pleural plaques, fibrosis, asbestosis, cancer, and mesothelioma. Further, all defendants were aware or should have been aware that invisible asbestos particles could remain airborne for many hours and that exposure could occur even after actual use of the products ceased; nevertheless, defendants remained silent as to the unreasonably dangerous nature of the products which suppression of the truth was made with the intention of obtaining an unjust advantage over unsuspecting victims. Such conduct constitutes fraud under Louisiana law.

- 29 -

56.

All defendants made the misrepresentations cited in the foregoing paragraph despite their knowledge of the falsity, and defendants fraudulently concealed and suppressed the truth about the dangerous nature of the products with the intent to induce purchasers to buy the products and innocent users and employees to continue to be exposed to same without concern for their health.

57.

As a result of the misrepresentations of the defendants that asbestos-containing products were safe, nontoxic, fully tested, desirable, and suitable for use, and as a result of the defendants suppression of the truth about the health hazards associated with exposure to said products, Mr. Reulet was exposed to products manufactured, distributed, and sold by "defendants," and he contracted mesothelioma, cancer, and other related ill health effects, which was first diagnosed on approximately December 26, 2018, and from which he died on January 2, 2019.

58.

The misrepresentations and suppression of the truth of occupational health hazards were made by all defendants with the intent of obtaining an unjust advantage over Mr. Reulet, and other employees who remained uninformed and ignorant of the risks of contracting occupational lung diseases from their work environment. These misrepresentations and suppressions were calculated to produce the effect of misleading the employees so that they would not associate any lung disease with occupational exposures on the job. As a result of these misrepresentations and suppressions, all defendants sought to prevent or limit occupational disease claims by injured employees and claims from family members who also contracted disease. These actions constitute fraud under Louisiana law.

59.

The health hazards of asbestos have been recognized by those in the business for two thousand years. The Greek geographer Strabo and the Roman historian Pliny the Elder both recognized asbestosis in slaves whose task was to weave asbestos into cloth. There is conclusive

evidence (more specifically outlined below) that by the end of 1930, it was widely known in the United States by those in the industry and their insurers that exposure to asbestos could cause asbestosis and cancer, that asbestosis was a fatal disease, and that the latency period of asbestosis and other asbestos-related disease was of many years duration subsequent to initial exposure, yet this knowledge was suppressed from workers like Mr. Reulet.

60.

By the time Mr. Reulet began working with and around asbestos products, virtually every state in the Unites States recognized asbestosis and silicosis as compensable claims under workers' compensation laws. In fact, the Louisiana legislature in 1952, when it enacted its first Workers' Compensation Occupational Disease Act, listed asbestosis and silicosis as a compensable occupational disease. Moreover, all suppliers (as well as independent contractors) to any company with government contracts were bound to comply with health and safety requirements of the Walsh Healey Public Contract Act first promulgated in 1936, as well as the regulations of the U.S. Navy and U.S. Maritime Commission in 1943. These mandatory regulations addressed asbestos hazards and asbestosis as a resultant disease of exposure to asbestos. They also required isolation of dusty work, ventilation, use of respirators, and medical examinations by doctors. Despite this, the Reulets never warned of any hazard associated with asbestos or silica, was never protected by use of adequate ventilation, and was required to work next to insulators using asbestos products. He never saw a warning on any asbestos or silica product nor was he warned by any contractor using asbestos or silica products. Despite the fact that all defendants were aware of the hazards of asbestos and silica and other toxic substances to which Mr. Reulet was exposed, they failed and refused to warn of these dangers and, furthermore, concealed these hazards. Moreover, defendants suppressed and prevented the dissemination of information relating to the hazards of asbestos and silica exposure, thus constituting fraud under Louisiana law. Even after OSHA became the law in 1971, Mr. Reulet was not warned of the health hazards associated with exposure to asbestos and silica.

61.

The acts of the defendants, as described above, constitute a fraudulent misrepresentation and/or concealment which proximately caused the injuries to the Petitioners in the following manner:

1) The material published or caused to be published was false and incomplete and that the defendants knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-related products.

2) The defendants intended the publication of false and misleading reports and/or the non-disclosure of documented reports of the health hazards of asbestos:
   a) To maintain a favorable atmosphere for the continued sale and distribution and use of asbestos and asbestos-related products;
   b) To assist in the continued pecuniary gain of the defendants through the sale of asbestos products to an ignorant public;
   c) To influence in the defendant's favor, legislation to regulate asbestos exposures and unlimited medical and disability claims for compensation;
   d) To provide a defense against lawsuits brought for injury resulting from asbestos disease;
   e) To prevent relevant medical inquiry about asbestos disease;
   f) To mislead the general public, and the Petitioner herein, about the hazards associated with asbestos products; and
   g) To induce the Petitioner to use and continue to use asbestos products.

3) The Petitioner reasonably relied upon the published medical and scientific data documenting the purported safety of asbestos and asbestos-related products, and the absence of published medical and scientific reports on the hazards of asbestos and asbestos-related products because Petitioner believed it to be safe.

4) Defendants, intended the Petitioner to rely upon the published reports regarding the safety of asbestos and asbestos-related products and upon the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products, and therefore to continue their exposure to those products.

5) Defendants are in a position of superior knowledge regarding the health hazards of asbestos and therefore the Petitioner and others deciding to use the said asbestos-containing products to which Petitioner was exposed, had a right to rely on the published reports commissioned by the defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos-related products.

62.

Insurance premiums were set based on the risks posed by the insured.  Insurance companies discussed the hazards of asbestos with insured who manufactured, used, or distributed asbestos products.  Insurance field inspectors would survey the premises or operations of the insured, advise the insured of the hazard, and set the premium accordingly.  This was true prior to the time that Mr. Reulet was first exposed to asbestos and continued throughout his employment.  The fact that workers' compensation insurance carriers were concerned about asbestos is evidenced by the 1932 occupational disease report in "The National Underwriter" where asbestos was listed as a serious hazard receiving special attention "for some time" in insurance underwriting.  When the Supreme Court of North Carolina (*McNeely v. Carolina Asbestos Co.*, May 23, 1934) determined that asbestosis was compensable under its workers' compensation law, insurance executive F. R. Jones wrote that the McNeely case and others like it injected elements of uncertainty that rendered the hazards of asbestosis "often uninsurable at practicable rates."; he wrote that even though rates for those in the asbestos business were high, "their adequacy ... is generally doubted."  To avoid losing money, insurance companies instituted a practice of servicing claims as well as providing the insurance--"sort of a right pocket to left pocket...in other words there wasn't any way (insurance companies) could lose money on it."  (See deposition of Harry J. Flynn in Bradley v. Todd Shipyards, Inc., C.A. No. 85 - 05657, Div. "D", Civil District Court for the Parish of Orleans.)

63.

That all defendants and the companies that insured them knew of the health hazards associated with exposure to asbestos since the 1930s (and suppressed this information) is shown by numerous documents and testimony.  In fact, the knowledge was so well recognized in the asbestos industry that the insurance industry considered confessing liability; instead, they decided to make it "economically impossible" for plaintiffs to pursue their claims.  The minutes of meetings in 1976 and 1977 of American Mutual Insurance Alliance (an insurance industry association) confirm that the hazards of asbestos exposure have been known for many years.  These minutes specifically state

that medical research in 1900 linked asbestos with asbestosis and by 1935 it was recognized that asbestos caused cancer. In a memorandum of a meeting of a discussion group dated April 21, 1977, it was stated: The meeting closed with a unanimous rejection of a suggestion that liability in asbestos cases be admitted and the carriers agreed between themselves as to their respective losses and expenses. That insurance companies and their insureds were working together to discourage plaintiffs from pursuing valid claims is also demonstrated in earlier memos. In minutes dated May 22, 1974, discussing *Borel v. Fibreboard Paper Products Corporation*, 493 F.2d 1076, (5th Cir. 1973), cert. denied, 419 U.S. 869 (1974), it is stated: "The appeals court decision in the Borel case of course sets a very bad precedent for our other pending asbestosis cases and (sic) this jurisdiction we will soon have to formulate a **'game plan'** for the continued defense of these asbestosis cases **with the other defendants."** In a memo dated October 22, 1974, it was decided that the asbestos defendants and their insurance companies would resist pending cases "and attempt to make this economocially (sic) impossible for the plaintiffs to pursue the other cases." These attempts to prevent and stifle valid claims by plaintiffs such as Mr. Reulet and plaintiffs herein show that the defendants, to this day, are committing fraud.

64.

Documents and testimony of defendants herein as well as associated asbestos companies is replete with the fact of knowledge and fraud. Although Johns-Manville (hereinafter sometimes referred to as "J-M" and Raybestos-Manhattan, Inc. (hereinafter sometimes referred to as "R-M") are not defendants herein, a discussion of their knowledge is necessary to show knowledge within asbestos industry associations, within the insurance industry, and among other defendants. In 1929, Johns-Manville Corporation and Raybestos-Manhattan, Inc. agreed to permit the Metropolitan Life Insurance Company to conduct a complete Industrial Hygiene survey of some of their facilities, including J-M's asbestos mines and mills in the Province of Quebec. The initial investigation began in October of 1929 and was completed in January of 1931. The study included the following: a survey of the dust conditions in the asbestos mines, mills and fabricating plants; physical

- 34 -

examinations of asbestos workers, including X-ray films; and a study of the dust exhaust systems designed to eliminate asbestos dust. This survey was supervised by Dr. Anthony J. Lanza, Assistant Medical Director of Metropolitan; Dr. William J. McConnell, Assistant Medical Director of Metropolitan; and J. William Fehnel, a chemist with Metropolitan. Subsequent to this initial study, meetings were held among Dr. Anthony J. Lanza, W. R. Seigle (Vice President of J-M), Vandiver Brown (General Counsel for J-M), S. A. Williams (President of Johns-Manville Products Corporation), and Sumner Simpson (President of Raybestos-Manhattan, Inc.). The minutes of these meetings which occurred in November, 1933, through January, 1934, reflect that Metropolitan Life was desirous of conducting a follow-up study of the J-M and R-M facilities, as well as expanding the scope of the study to include additional J-M facilities and facilities of other members of the asbestos industry. Dr. Lanza felt that the Metropolitan Life Insurance Company should advise the companies of the types of respirators which should be provided to the employees engaged in making a study of this problem. On December 7, 1934, Dr. Lanza forwarded to Vandiver Brown, counsel for J-M, the "galley proof" of the results of the 1929 through 1931 survey of the R-M and J-M plants, entitled "Effects of Inhalation of Asbestos Dust on the Lungs of Asbestos Workers." This "draft" was also circulated to representatives of Raybestos-Manhattan, who prepared editorial comments and recommendations for Dr. Lanza concerning the final publication of the report. Johns-Manville prepared similar comments. The Metropolitan report informed Raybestos-Manhattan and Johns-Manville of the following: that prolonged exposure to asbestos dust caused pulmonary fibrosis; that asbestosis could cause cardiac enlargement; that it was possible for uncomplicated asbestosis to have fatal results; and that the amount of dust in the air in the asbestos plants surveyed could be substantially reduced. After incorporating some of J-M's and R-M's editorial suggestions, Dr. Lanza published "Effects of the Inhalation of Asbestos Dust on the Lungs of Asbestos Workers" in the Public Health Reports, Volume 50, No. 1, January 4, 1935.

65.

In November 1936, Vandiver Brown of Johns-Manville, together with Sumner Simpson, President of Raybestos-Manhattan, solicited other members of the Asbestos Products Industry to participate in "asbestos dust experiments" by the Saranac Laboratory of the Trudeau Institute.  Dr. Leroy U. Gardner was the director of the Trudeau Foundation at the time.  A report of these works was prepared by Dr. Gardner on April 18, 1938.  The report was sent to Vandiver Brown, who in turn sent it to Dr. Lanza for his comments.

66.

In 1942, Charles Roemer, a New Jersey attorney, was advised by his cousin, Dr. Jacob Roemer, that in the course of reviewing chest x-rays of employees at the Union Asbestos and Rubber Company's Paterson, New Jersey plant, he had observed a significant number with lung changes which he believed were due to asbestos exposure.  Dr. Roemer advised that the men be informed of his findings and that they be instructed to secure outdoor employment which did not involve any exposure to asbestos dust.  Dr. Roemer said that unless this was done immediately, the men would suffer and die from asbestos-related lung disease.  Vandiver Brown acknowledged that J-M's physical examination program had produced similar findings of x-ray evidence of asbestos disease among workers, but told Mr. Roemer and the UNARCO representatives that it was foolish to be concerned.  Mr. Brown explained that it was J-M's policy to let its employees die of asbestos poisoning rather than inform them of health consequences which would undoubtedly lead to costly lawsuits against the company.  As testified to by Mr. Roemer, "I'll never forget, I turned to Mr. Brown... and I said, 'Mr. Brown, do you mean to tell me you would let them work until they dropped dead?' He said, "Yes.  We save a lot of money that way.'"  (Deposition Charles H. Roemer taken April 25, 1984, Johns-Manville Corp. et al. v. the United States of American, U.S. Claims Court Civ. No. 465-83C).

- 36 -

67.

As a result of the aforesaid Metropolitan Life study, additional health research on the effects of prolonged and excessive inhalation of asbestos fiber on human beings was undertaken at the Saranac Laboratory. A report on this research was delivered at the Seventh Saranac Lake Symposium in 1952 and was entitled "Pulmonary Function Studies in Men Exposed for Ten or More Years to Inhalation of Asbestos Fibers" by Fernand Gregorie and George W. Wright.

68.

In addition to the IHF, there were other trade associations which were formed to aid and service companies in the asbestos industry. Members of the Asbestos Textile Institute (ATI), founded on November 16, 1944, included companies which produced asbestos containing cloth and other products. Members included, among others, Uniroyal, Inc., which is a defendant in this action. At the June 13, 1946, meeting of the Asbestos Textile Institute, a question was posed as to whether or not a committee should be formed to deal with the question of dust control. Beginning on June 13, 1946, a subcommittee of the dust control committee of the Asbestos Textile Institute recommended that the committee contact the United States government, the state governments in which member plants were located, the Mellon Institute, and Metropolitan Life for the purpose of preparing a tentative program aimed at bringing to member companies the assistance of qualified technical and medical people. In 1946, the ATI was presented with a plan for a central medical committee which would call for individual medical programs at all facilities using asbestos as well as a central medical department which would be responsible to the association. Recommendations for initial medical examinations and periodic follow-up examinations were also made. The recommendation for periodic medical examinations was characterized by the presenting doctor as "fundamental in an industry where there was a 'known occupational health hazard'". While the ATI considered this proposal, it nonetheless elected to defer the plan. During the late 1940's and early 1950's, the ATI was presented with a number of other plans for wide ranging research on various

- 37 -

issues dealing with asbestos-related disease in the asbestos industry. However, in some instances, the research projects and proposals were discarded.

69.

Another trade organization was the National Insulation Manufacturers Association ("NIMA"), which formed in December of 1958 as a joint venture trade association to serve as a voice for the mineral insulation industry. After 1958, personnel of Ruberoid/GAF (defendant herein) attended most, if not all, NIMA meetings at which health hazards were frequently the topic of formal discussions. NIMA members had unequivocal knowledge of the potential health hazards posed by unprotected and prolonged exposure to excessive quantities of airborne asbestos fiber. The testimony of Harry Kaufman, who came to Ruberoid in 1958 as Assistant Director of Quality Control, admit knowledge of the potential health hazards to an unprotected worker from exposure to asbestos fiber as far back as 1943 when he attended a five month course at the University of Maryland on Industrial Safety. Charles Limerick, former manager of the Ruberoid Vermont Mines, has admitted that he was aware of dangers of asbestos as far back as the 1930's and 1940's. GAF/Ruberoid was put on notice of dangers in 1935 or 1936 through correspondence with "Asbestos" magazine. Ruberoid subscribed and advertised in "Asbestos". Moreover, Ruberoid was prodded by lawsuits brought by its employees alleging that they had developed asbestosis as early as 1934.

70.

Sumner Simpson, the first Raybestos-Manhattan Incorporated President, maintained a file or collection of documents, correspondence, and memoranda pertaining to the subjects of the health effects of asbestos, dust control, and dust levels. These documents clearly evidence knowledge, beginning in at least the 1930's, of dangers posed by exposure to asbestos and steps which could and should be taken to minimize the risk of asbestos-caused diseases. The "Sumner Simpson" documents, as a group, demonstrate the high level of awareness and early sophistication of the asbestos industry of knowledge that excessive exposure to asbestos over a prolonged period of time could and would produce asbestos-related diseases. Numerous letters in the "Sumner Simpson"

document collection refer to the fact that many states were adding asbestosis as a compensable disease and that Raybestos-Manhattan Incorporated was going to have to deal with that reality.

71.

Eagle, Inc. and Taylor-Seidenbach, Inc., did contracting work as early as the 1940s. Likewise, and The McCarty Corporation (formerly McCarty Branton, Inc.) and Reilly-Benton Company, Inc. have done contracting work since their initial existence. Accordingly, Eagle, Inc., The McCarty Corporation (formerly McCarty Branton, Inc.), Taylor-Seidenbach, and Reilly-Benton Company, Inc. were aware of the health and safety requirements of the Walsh Healey Public Contract Act, first promulgated in 1936, as well as the regulations of the U.S. Navy and U.S. Maritime Commission in 1943 (discussed *infra*) as well as the Louisiana Sanitary Code. These mandatory regulations addressed asbestos hazards and asbestosis as a resultant disease of exposure to asbestos. Moreover, these companies, being asbestos insulation contractors, had to pay higher insurance premiums as a consequence thereof. Mr. Reulet was exposed to asbestos both through their contracting work and through products manufactured, distributed, and sold by them. Yet at no time was Mr. Reulet protected from these hazards nor warned of these hazards. Even after OSHA became the law in 1971, Mr. Reulet was not advised of the hazards associated with exposure to asbestos. These defendants were aware of the hazards of asbestos but failed and refused to warn Mr. Reulet of the dangers and, furthermore, concealed and suppressed its knowledge of these hazards, thus constituting fraud under Louisiana law. See deposition of Fred J. Schuber, Jr., 05/31/90, pages 149-155, 176-179 and exhibits attached to the deposition of Schuber taken 5/09/90; and deposition of Thomas R. Dimm, 02/03/86, pages 65-66; and Eagle, Inc.'s response #4 to plaintiffs' interrogatories in the case of <u>Atzenhoffer, et al v. National Gypsum, Co., et al</u>, C. A. #89-894, which responses are dated March 27, 1990; and Act No. 532 (1952) amendments to the Louisiana Workers' Compensation Act.

- 39 -

72.

Since the early 1940s, defendant, Foster-Wheeler LLC (formerly Foster-Wheeler Corporation), was a major manufacturer of boilers. Since that time through and including the time when Mr. Reulet was last exposed, they supplied boilers to virtually every shipyard constructing and repairing vessels in the country. Accordingly, since the early 1940s, they were aware of the health and safety requirements of the Walsh Healey Public Contract Act, first promulgated in 1936, as well as the regulations of the U.S. Navy and U.S. Maritime Commission in 1943 (discussed infra) and the Louisiana Sanitary Code. These mandatory regulations addressed asbestos hazards and asbestosis as a resultant disease of exposure to asbestos. Despite this knowledge, at no time was Mr. Reulet advised of these hazards as defendants failed and refused to warn Mr. Reulet of the dangers and, furthermore, concealed and suppressed their knowledge of these hazards, thus constituting fraud under Louisiana law. In addition to manufacturing and selling boilers, (and providing the asbestos insulation products for insulation of their boilers and the piping connecting their boilers), they constructed their boilers on-site and provided an on-site representative during the construction of their boilers, thus exposing Mr. Reulet to asbestos during their operations.

73.

At various times from approximately 1972 through 2013, Kirk Reulet worked on the following premises where he was exposed to asbestos: CF Industries, Inc. ("CF Industries"). CF Industries was aware or should have been aware of the dangerous condition presented by exposure to asbestos, and that said asbestos and asbestos fiber would cause Kirk Reulet (and others similarly situated) to suffer from asbestos-related pulmonary disease, asbestosis, pleural plaques, pleural thickening, lung cancer, mesothelioma, and other ill health effects related thereto, but they failed and/or willfully withheld from Mr. Reulet knowledge of the dangers to his health from exposure to asbestos and asbestos fiber.

74.

CF Industries had the responsibility of providing Mr. Reulet with a safe place to work and safety equipment; however they negligently and/or intentionally failed to carry out these duties and failed to protect Kirk Reulet from the dangers of toxic fiber and asbestos dust exposure. CF Industries allowed and caused Mr. Reulet to be exposed to asbestos and failed to provide a safe place to work. As owners of the premises containing toxic asbestos, CF Industries failed to exercise reasonable care for the safety of persons on or around their property and failed to protect Kirk Reulet from the unreasonably dangerous conditions created by asbestos which existed on their premises and/or over which defendants had care, custody or control.

75.

There were various industry standards in place dating back to 1943 which applied to the places where Mr. Reulet worked, including CF Industries. These industry standards included the Louisiana Sanitary Code's Industrial Health Regulations, the Walsh Healey Public Contracts Act, and the OSHA regulations. Thus, these companies were aware or should have been aware of the hazards of asbestos at least by 1943. These standards required these companies to take protective measures to protect those individuals on its premises from exposure to asbestos. These standards required that as a premises owner take the following measures, among others, which defendants failed to do:

a)    Perform air monitoring for asbestos;

b)    Segregate asbestos work;

c)    Institute local exhaust ventilation and general ventilation;

d)    Provide respiratory protection;

e)    Warn those on the premises of the hazards of asbestos;

f)    Train those on the premises in the proper use of the protective equipment;

g)    Require those on the premises to change clothes before going home; and

h)    Preclude dry sweeping of asbestos dust.

- 41 -

76.

In addition to the above acts of negligence, strict liability, and fault identified throughout this petition, CF Industries is strictly liable for failing to properly handle and control the asbestos which was in its care, custody, and control. CF Industries was aware or should have been aware of the dangerous condition presented by exposure to asbestos, and that Kirk Reulet would suffer from asbestos-related diseases and other ill health effects associated therewith as a result of this exposure, but they failed and/or willfully withheld from Mr. Reulet knowledge of the dangers to their health from exposure to asbestos fiber.

77.

In addition to the foregoing acts of negligence and intentional concealment, CF Industries is liable for the following:

a) Failing to reveal and knowingly concealing critical medical information to Mr. Reulet;

b) Failing to reveal and knowingly concealing the inherent dangers in the use of asbestos, and other harmful substances in their manufacturing process;

c) Failing to provide necessary protection to Mr. Reulet;

d) Failing to provide clean, respirable air and proper ventilation;

e) Failing to provide showers and/or protective clothing to workers;

f) Failing to advise workers on their premises of the deadly nature of asbestos fiber, and that such fiber could result in the contraction of serious illness and disease;

g) Failing to reveal and knowingly concealing critical information from Mr. Reulet;

h) Wanton and reckless disregard in the storage, handling, and transportation of asbestos;

i) Failing to segregate work areas so that workers would not be exposed to deadly asbestos fiber;

j) Failing to provide necessary respiratory protection;

k) Failing to warn workers of the dangers associated with exposure to asbestos and failing to advise workers that they were being exposed to deadly asbestos fiber;

- 42 -

l)    Failing to use non-asbestos containing products including on jobs where non-asbestos containing products were specified;

m)    Failing to warn of the dangers of exposure to asbestos;

n)    Failing to warn workers that exposure to asbestos could cause deadly diseases including mesothelioma, lung cancer, asbestosis, pleural thickening, and pleural plaques; and

o)    Failing to warn workers of the invisible nature of harmful asbestos, that it could be carried home on clothing and other objects by a worker, and that it could cause diseases such as asbestosis, pleural plaques, pleural thickening, lung cancer, and mesothelioma.

These defendants intentionally or negligently committed these acts when they knew or should have known full well that Mr. Reulet's injuries would follow or were substantially certain to follow.

78.

In addition, Kirk Reulet was exposed to asbestos during the years of 1984 through 1996. His injuries were caused by defendants' wanton and reckless disregard for public safety in the storage, handling, and transportation of asbestos to which Kirk Reulet was exposed and which resulted in his injuries and death. These companies are liable to petitioner for punitive damages pursuant to Article 2315.3 of the Louisiana Civil Code.

79.

All defendants made the misrepresentations cited in the foregoing paragraphs despite their knowledge of the falsity, and defendants fraudulently concealed and suppressed the truth about the dangerous nature of the products with the intent to induce purchasers to buy the products and innocent users and employees to continue to be exposed to same without concern for their health.

80.

As a result of the misrepresentations of the defendants that asbestos-containing products were safe, nontoxic, fully tested, desirable, and suitable for use, and as a result of the defendants suppression of the truth about the health hazards associated with exposure to said products, Mr.

Reulet was exposed to products manufactured, distributed, sold, and/or used by the defendants in this case, and he contracted mesothelioma, cancer, and other related ill health effects.

81.

The misrepresentations and suppression of the truth of occupational health hazards were made by all defendants with the intent of obtaining an unjust advantage over Mr. Reulet and other employees who remained uninformed and ignorant of the risks of contracting occupational lung diseases from their work environment. These misrepresentations and suppressions were calculated to produce the effect of misleading the employees so that they would not associate any lung disease with occupational exposures on the job. As a result of these misrepresentations and suppressions, all defendants sought to prevent or limit occupational disease claims by injured employees and claims from family members who also contracted disease. These actions constitute fraud under Louisiana law.

82.

Petitioners' causes of action are based upon the acts and omissions of defendants or those for whom the defendants are responsible, and are specifically not based upon any act committed at the direction of the United States Government.

83.

As a result of the aforementioned acts of the hereinabove named defendants, Mr. Reulet contracted mesothelioma, cancer, and other related ill health effects, and from which he died on January 2, 2019.

84.

Petitioners are entitled to damages for the following: physical pain and suffering of Kirk Reulet; mental pain and anguish (including but not limited to fear of death) which Mr. Reulet suffered; fear of death, humiliation and emotional distress suffered by Mr. Reulet, loss of income of Mr. Reulet; medical expenses; care and personal assistance provided to Mr. Reulet; loss of personal services; loss of enjoyment of life and lifestyle; loss of support to children; loss

of consortium and society, love, and affection; loss of services, loss of companionship; grief suffered by Joanne Clement Reulet, the wife of Mr. Reulet, and Leslie Reulet Carrere and Evan John Reulet, the children of Mr. Reulet, as a result of the death of Mr. Reulet; funeral expenses; lost income and expenses related to the injuries and death of Kirk Reulet, funds expended by each of the plaintiffs herein for the care and treatment of their husband and father as well as loss of income and benefits associated therewith, and all other general damages arising out of this survival and wrongful death action which may be shown at the trial of this matter.

85.

A trial by jury is demanded on all issues.

86.

Kirk Reulet was employed by Barnard and Burk, Inc. in 1974. Aerojet Rocketdyne, Inc. (f/k/a Aerojet-General Corporation) is the successor to the liability of Barnard and Burk, Inc.

87.

All of the defendants named in this First Supplemental and Amending Petition as well as in the Original Petition for Damages are jointly, severally, and in solido liable to petitioner for the damages sustained as a result of Kirk Reulet's contraction of mesothelioma and death.

88.

From approximately 1967 through 1972, Kirk P. Reulet was a direct employee of Huntington Ingalls Incorporated (formerly, Northrop Grumman Shipbuilding, Inc., formerly Northrop Grumman Ship Systems, Inc., formerly Avondale Industries, Inc. and formerly Avondale Shipyards, Inc., formerly Avondale Marine Ways, Inc.) (hereinafter sometimes "Avondale" or "Avondale Industries, Inc."). From approximately 1964 through 1977, Pierre H. Reulet was a direct employee of Avondale. During these time periods, Henry "Zac" Carter, James O'Donnell, C. Edwin Hartzman, John McCue, Burnette "Frenchy" Bordelon, Ewing Moore, Hettie Dawes Eaves, John Chantrey, Steven Kennedy, Peter Territo, George Kelmell, Ollie Gatlin, Earl Spooner, Edward Blanchard, James T. Cole, J. Melton Garrett, William Whittle, William Alexander, and Albert Bossier, Jr. were

- 45 -

executive officers of Avondale with the specific responsibility for the health and safety of Kirk Reulet and Pierre Reulet and their fellow employees during the time the Kirk Reulet was exposed to substances which resulted in his mesothelioma and other ill effects related thereto. Henry "Zac" Carter, James O'Donnell, C. Edwin Hartzman, John McCue, Burnette "Frenchy" Bordelon, Ewing Moore, Hettie Dawes Eaves, John Chantrey, Steven Kennedy, Peter Territo, George Kelmell, Ollie Gatlin, Earl Spooner, Edward Blanchard, James T. Cole, J. Melton Garrett, William Whittle, and William Alexander have since died. Pursuant to Louisiana Revised Statute 22:1269, plaintiffs herein assert a direct action against Certain Underwriters of Lloyd's, London for the liability of Avondale and the following executive officers: Henry "Zac" Carter, James O'Donnell, C. Edwin Hartzman, John McCue, Burnette "Frenchy" Bordelon, Ewing Moore, Hettie Dawes Eaves, John Chantrey, Steven Kennedy, Peter Territo, George Kelmell, Ollie Gatlin, Earl Spooner, Edward Blanchard, James T. Cole, J. Melton Garrett, William Whittle, William Alexander, and Albert Bossier, Jr.

89.

Plaintiffs also makes claims against The Louisiana Insurance Guaranty Association ("LIGA"), a private non-profit unincorporated legal entity created by LSA-R.S. 22:1375, who has a statutory obligation to plaintiffs based upon policies of insurance issued by insolvent insurer, Lamorak Insurance Company (as successor in interest to the liability for policies of insurance issued by Commercial Union Insurance Company, Employers Commercial Union Insurance Company, and American Employers Insurance Company), including but not limited to, employers' liability, commercial general liability insurance policies and/or excess liability insurance policies sold by Lamorak Insurance Company to Eagle, Inc. and The McCarty Corporation providing coverage for the liability asserted herein.

90.

Plaintiffs also make claims against LIGA, who has a statutory obligation to plaintiffs based upon policies of insurance issued by insolvent insurer, Lamorak Insurance Company (as successor in interest to the liability for policies of insurance issued by Commercial Union

Insurance Company, Employers Commercial Union Insurance Company, and American

Employers Insurance Company), including but not limited to, employers' liability, commercial

general liability insurance policies and/or excess liability insurance policies covering the

following executive officers of Avondale for the liability asserted herein: Henry "Zac" Carter,

James O'Donnell, C. Edwin Hartzman, John McCue, Burnette "Frenchy" Bordelon, Ewing

Moore, Hettie Dawes Eaves, John Chantrey, Steven Kennedy, Peter Territo, George Kelmell,

Ollie Gatlin, Earl Spooner, Edward Blanchard, James T. Cole, J. Melton Garrett, William

Whittle, William Alexander, and Albert Bossier, Jr.

91.

Plaintiffs also make claims against LIGA, who has a statutory obligation to plaintiffs

based upon policies of insurance issued by insolvent insurer, Houston General Insurance

Company, based upon policies of insurance, including but not limited to, employers' liability,

commercial general liability insurance policies and/or excess liability insurance policies sold by

Houston General Insurance Company to Eagle, Inc. providing coverage for the liability asserted

herein.

92.

Berkshire Hathaway Specialty Insurance Company (f/k/a Stonewall Insurance Company),

United States Fidelity and Guaranty Company, and First State Insurance Company provided

coverage to Eagle, Inc. for the liability asserted herein, and plaintiffs assert a direct action

pursuant to Louisiana Revised Statute 22:1269 against these insurance companies for the liability

of this defendant.

93.

Liberty Mutual Insurance Company and Employers Mutual Liability Insurance Company

of Wisconsin provided coverage to Reilly-Benton Company, Inc. for the liability asserted herein,

and plaintiffs assert a direct action pursuant to Louisiana Revised Statute 22:1269 against these

insurance companies for the liability of Reilly-Benton Company, Inc.

94.

All defendants had care, custody, and control of the asbestos, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in the injury and death of Kirk Reulet and for which all defendants are strictly liable under Louisiana law.

95.

As a result of the exposures to asbestos from the acts of negligence, intentional tort, fraud, and strict liability of all of the defendants identified in the Original Petition for Damages, the First Supplemental and Amending Petition for Damages, and the Second Supplemental and Amending Complaint, Kirk Reulet contracted mesothelioma and died.

96.

All of the defendants named in this Second Supplemental and Amending Complaint as well as in the Original Petition for Damages and First Supplemental and Amending Petition for Damages are jointly, severally, and in solido liable to Complainant for the damages sustained as a result of Kirk Reulet's contraction of mesothelioma and death.

97.

Plaintiffs reiterate that trial by jury is requested on all issues.

**WHEREFORE,** Plaintiffs, Joanne Reulet, Leslie Reulet Carrere, and Evan J. Reulet, reiterating the prayers of the original Petition for Damages and First Supplemental and Amending Petition for Damages as though set forth at length herein, pray that the original Petition for Damages and First Supplemental and Amending Petition for Damages be supplemented and amended in the above particulars, that the defendants named herein be duly cited to appear and answer, and that after all due proceedings are had, there be judgment rendered herein in favor of Complainants and against defendants for all damages suffered by Complainants, together with legal interest from the date of judicial demand, and all costs

- 48 -

associated with the prosecution of this claim.  Complainants further pray for a jury trial on all

issues, and for all general and equitable relief to which he may be entitled.

Respectfully submitted,

**ROUSSEL & CLEMENT**

S/ Jonathan B. Clement
_____
GEROLYN P. ROUSSEL - 1134
PERRY J. ROUSSEL, JR. - 20351
JONATHAN B. CLEMENT - 30444
LAUREN R. CLEMENT - 31106
BENJAMIN P.  DINEHART - 33096
1550 West Causeway Approach
Mandeville, LA  70471
Telephone:  (985) 778-2733
Facsimile: (985) 778-2734
ATTORNEYS FOR PLAINTIFFS,
JOANNE CLEMENT REULET; LESLIE REULET
CARRERE; and EVAN JOHN REULET